# EXHIBIT 4

In the matter of:

MOTION TO QUASH SUBPOENAS TO
NONPARTY FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.

Miscellaneous Action No.

I, Troy Eads, declare as follows:

1.     I am a Senior Director Data Lead in the Market Data & Analytics unit in Market

Regulation and Transparency Services Department ("MRTS") at the Financial Industry

Regulatory Authority, Inc. ("FINRA"). I have worked at FINRA since 2014 in FINRA's

Technology Department and MRTS.

2.     I submit this Declaration in support of FINRA's Motion to Quash Subpoenas or, In the

Alternative, for a Protective Order ("Motion"). This declaration is based upon my personal

knowledge and based on records I reviewed that are maintained and kept in the ordinary course

of FINRA's business, and I am informed of and believe the facts and information set forth in this

Declaration to be true. I would testify to these facts if called upon to do so.

3.     In my role at FINRA, I am familiar with FINRA's data systems and research FINRA's

internal sources for purposes of ascertaining stored data accessibility and collectability, as well

as the related resources required to access and collect it. I performed this research with respect to

the subpoenas at issue in the Motion.

4.     To the best of my knowledge and belief, just the Trade Reporting Facility ("TRF") data

alone sought for the symbols MMAT and TRCH for the requested time period of September 21,

2020 through August 21, 2024 amounts to a volume of approximately 23.5 million records. In

addition, the MMTLP symbol OTC Reporting Facility ("ORF") data for the time period of June

28, 2021 through December 14, 2022 (the time period for which FINRA has such data) alone

amounts to an additional volume in excess of one million records. In the aggregate, just the TRF and ORF data requested in Exh. 2 categories 2 through 4, therefore totals close to 25 million records FINRA would be required to collect, process and produce. Given the substantial volume, MRTS would have to download the data onto secured hard drives, a function that would have to be performed manually.

     I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on August 6, 2025

_____

Troy Eads

# EXHIBIT 5

1  Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
2  HARTMAN & HARTMAN
3  510 W. Plumb Lane, Suite B
Reno, NV 89509
4  T: (775) 324-2800
F: (775) 324-1818
5  notices@bankruptcyreno.com
6  Attorney for Christina Lovato, Trustee

7              UNITED STATES BANKRUPTCY COURT

8                    DISTRICT OF NEVADA

9   In re                          | Case No.: 24-50792-hlb
                                    | (Chapter 7)
10  META MATERIALS INC.,           |
11         Debtor.                  | ***EX PARTE* APPLICATION BY CHAPTER
12                                  | 7 TRUSTEE TO EMPLOY THE LAW
                                    | FIRMS OF CHRISTIAN ATTAR AND
13                                  | KASOWITZ BENSON TORRES LLP AS
                                    | SPECIAL LITIGATION COUNSEL**
14                                  |
15                                  | Hearing Date:   N/A
                                    | Hearing Time:
16

17         Pursuant to 11 U.S.C. § 328(a) and F.R.Bankr.P. 2014, Christina Lovato, the duly

18  appointed and acting chapter 7 trustee ("Trustee"), requests an order authorizing the employment

19  of law firms of Christian Attar, and Kasowitz Benson Torres LLP (together the "Firms"), to act as

20  special counsel for the Chapter 7 estate of Meta Materials, Inc., ("Debtor" or "Estate").  The Firms

21  will investigate potential claims and, if meritorious, pursue litigation related to suspected stock

22  manipulation through illegal trading practices such as 'naked short selling' and 'spoofing.'

23         This Application is supported by the separately filed Declarations of James W. Christian

24  and Stephen W. Tountas.  In support of this Application, the Trustee represents as follows:

25         1.      Debtor Meta Materials Inc. filed a chapter 7 petition on August 9, 2024 ("Petition

26  Date"), and  Christina Lovato was duly appointed as the Chapter 7 trustee ("Trustee").

27         2.      In fulfilling her duties under § 704, and based upon her investigation of the events

28  leading up to the filing of the Chapter 7 case, the Trustee has learned that, prior to the filing of the

                                    1

case, the Christian Attar firm began a preliminary investigation into activities related to a merger in which Meta Materials ("MMAT"), acquired Torchlight Energy Resources ("TRCH"), both of which were listed on NASDAQ.[1]  A summary of the potential litigation is attached to this Application as Exhibit A.

3.      The Trustee believes retention of counsel specializing in this particular area of the law, involving the purchase and sale of securities, is necessary to represent the Estate's interest in recovery for the benefit of creditors and, potentially, for equity.

4.      The Firms will undertake the engagement on a contingency basis of Thirty Percent ("30%").  Importantly, the Firms have arranged for a litigation-funding source of approximately $11,000,000 which eliminates any risk to the Estate for payment out-of-pocket expenses such as travel, discovery, depositions, and expert witnesses.  The engagement agreement for both Christian Attar and the Kasowitz firms is attached as Exhibit B.

5.      To the best of the Trustee's knowledge, the Firms do not represent any interests adverse to the Estate in the matters upon which they are to be engaged and are disinterested as that term is defined in 11 U.S.C. § 101(14). There are no present connections which the Firms and/or their employees have with the Estate, any of its creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

---

[1] National Association of Securities Dealers Automatic Quotation System.

WHEREFORE, the Trustee requests that employment of the law firms of Christian Attar and Kasowitz Benson Torres LLP be approved by this Court, effective as of the date of the order approving employment, for the purpose and on the terms and conditions set forth above.

DATED: October 31, 2024.

HARTMAN & HARTMAN

*/s/ Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq., Attorney for
Christina Lovato, Trustee

APPROVED

*/s/ Christina Lovato*
Christina Lovato, Trustee

3

# EXHIBIT A

# EXHIBIT A

## SUMMARY OF POTENTIAL LITIGATION

The Trustee is seeking authority to employ special counsel to investigate and, if meritorious, pursue litigation related to suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing'. In general, naked short-selling refers to the practice of selling shares that an investor doesn't own and hasn't borrowed. Short-selling naked often begins with the intention of finding the shares to borrow, but the short seller is unable to do so. In general, spoofing is the practice of flooding a market with orders to buy or sell that are canceled before they go through. The goal is to manipulate the price of the security by artificially creating, or depressing demand, which the spoofer can then use to make a profit.

These types of manipulative orders create a false impression of market activity, misleading other traders into making poor trading decisions. The result is an artificial suppression (or inflation) of stock prices, allowing the manipulators to significantly profit at the expense of legitimate shareholders. These practices, illegal under U.S. securities laws, disrupt the natural balance of supply and demand in financial markets and leads to artificially altered stock prices.

In the case of Meta Materials, Inc. (the "Company"), (Nasdaq: MMAT) and its predecessor Torchlight Energy Resources, Inc. (Nasdaq: TRCH), the potential defendants or 'targets' engaged in persistent and extensive spoofing, placing millions of "Baiting Orders**."** It is believed this artificial sell-side pressure misled market participants into selling their shares at depressed prices, allowing the defendants to profit from purchasing stock at prices far below their actual value. The manipulation led to extreme financial losses for the Company, as it sold shares at artificially low prices which led to extreme financial losses for more than 65,000 retail shareholders. Prepetition, the Company engaged a group of specialist advisors, including Christian Attar (the "Firm"), whose analysis identified over 55 million shares of MMAT and 92 million shares of TRCH that were impacted by this fraudulent activity, highlighting the scale of the manipulation that occurred persistently and over several years. The Firm is teaming with Kasowitz Benson & Torres LLP ("Kasowitz"), to pursue this litigation and the combined experience of the two firms in investigating and prosecuting market manipulation cases, and their outstanding 24+ year track record of recovering substantial damages, demonstrate their qualifications to represent the Estate in pursuing claims against the target defendants.

**Potential For Financial Recovery**: The magnitude of the manipulation indicates the potential for a substantial financial recovery. The tens of millions of shares affected by this illegal activity resulted in significant financial harm to the Company and its shareholders. By engaging the Firm, the Trustee is positioning the Estate to possibly recover a portion of the lost value, which will directly benefit the creditors and equity holders. A successful litigation outcome could result in tens of millions of dollars in recovery, providing much-needed funds to the Estate, creditors and equity holders.

**Experienced Legal Representation**: Christian Attar and Kasowitz bring significant expertise to this case. With a long history of successfully litigating complex securities fraud cases,

particularly those involving illegal trading strategies like spoofing, they are uniquely positioned to handle the investigation and litigation of these matters. The Christian Attar and Kasowitz firms have previously secured numerous eight figure settlements and judgments, often against large financial institutions that engaged in similar market manipulation schemes. This experience will ensure that the Trustee has the best possible legal representation to maximize the potential recovery.

**Ongoing Regulatory And Legal Focus On Spoofing**: Spoofing has become a primary focus for financial regulators such as the U.S. Securities and Exchange Commission (SEC) and the Department of Justice (DOJ). Both agencies have been actively prosecuting spoofing cases and have developed a strong legal framework for addressing these manipulative practices. For example, TD Bank was recently assessed a $20M fine related to spoofing.[1] This increased, regulatory focus enhances the likelihood of success in this case. The Firms are well-versed in working within this regulatory environment, and their expertise in navigating the evolving legal landscape surrounding spoofing will be invaluable to the case.

**No Cost To The Estate Unless Recovery Is Successful**: An important consideration for the court is that Christian Attar and Kasowitz teams work on a contingency basis, meaning the Estate will not incur any upfront legal costs. This structure eliminates financial risk to the Estate while maximizing the potential for recovery. If the litigation is successful, the fees will be paid out of the recovered funds, ensuring that the creditors and Estate bear no unnecessary financial burden during the proceedings.

**Significant Impact On Shareholders**: The target defendants' manipulation of MMAT and TRCH shares not only harmed the Company but also caused significant financial losses for shareholders, with the majority of the 65,000+ shareholders being retail investors. The litigation will seek to recover damages on behalf of the Estate, but potentially, it will also provide recovery for the shareholders who were directly impacted by the fraudulent market activity.

**Strategic Timing And Leverage**: Given that Meta Materials is currently in Chapter 7 liquidation, now is the ideal time to pursue investigation and potential litigation. The timing of this action could create leverage in settlement negotiations, as the target defendants may seek to avoid the additional legal exposure that comes with prolonged litigation. Engaging the Firms now allows the Trustee to capitalize on the current momentum and maximize the potential recovery while the legal and regulatory environment remains favorable.

In conclusion, engaging the Firms represents a significant opportunity for the Trustee to pursue potential recovery for the Meta Materials Estate. With significant potential for financial recovery, minimal risk to the Estate, and the involvement of experienced legal professionals who have a proven track record of success, this litigation can directly benefit the creditors of the Estate and shareholders.

---

[1] https://www.wsj.com/finance/regulation/td-securities-to-pay-sec-more-than-6-5-million-in-spoofing-charges-probe-0e39f248

# EXHIBIT B

# EXHIBIT B

**THIS CONTRACT IS SUBJECT TO ARBITRATION
UNDER THE TEXAS GENERAL ARBITRATION STATUTE**

## POWER OF ATTORNEY
## AND CONTINGENT FEE CONTRACT

This agreement ("Agreement" or "Retention Agreement") is made by and between Christina W. Lovato in her capacity as chapter 7 trustee for the estate of META MATERIALS INC. pending in the United States Bankruptcy Court, District of Nevada as case no. 24-50792-hlb (referred to as "Client", and "Plaintiff") on the one hand, and James W. Christian of CHRISTIAN ATTAR and Stephen W. Tountas of KASOWITZ BENSON TORRES LLP, (referred to as "Attorneys") on the other hand.

In consideration of the mutual promises herein contained, the parties hereto agree as follows:

## I. PURPOSE OF REPRESENTATION

1.01    The Client hereby retains and employs Attorneys to investigate and, if appropriate, sue for and recover all damages and compensation due Client, under any and all claims and\or causes of action Client may have against all culpable defendants (the "Defendants" and each, individually, a "Defendant") as reasonably determined by Attorneys in connection with stock fraud and\or manipulation by Defendants involving the stock of META MATERIALS INC. (hereafter referred to as "the Litigation"). Client further retains and employs Attorneys to compromise and/or settle the Claims and causes of action that may be asserted on behalf of the Client, which compromise or settlement will be subject to Bankruptcy Court approval.

1.02    It is specifically agreed and understood that Attorneys' representation is limited to the Client, and that Attorneys are not representing nor expect to represent any other person or entity other than the Client, except future clients that may join in Plaintiff's shareholder action. It is expressly agreed and understood that Attorneys' obligations are limited to representing Client in the specific matters described in Paragraph 1.01, and Client does not expect Attorneys to perform any other duties or to take any other action except as specified in Paragraph 1.03.

1.03    It is specifically agreed and understood that Attorneys are not representing Client with regard to any claim that may be brought against it and Client is not aware of any counterclaims that could be brought against Client. Related Litigation includes a separate lawsuit brought by the Defendants in other forums or jurisdictions that would be a compulsory counterclaim if filed in the Litigation. If the Client wishes Attorneys to represent it with regard to any other lawsuit or with regard to any counterclaim, then Client agrees that she must execute a new or separate Power of Attorney and Fee Contract pertaining to such representation.

1.04    It is specifically agreed and understood that Attorneys' representation is limited to legal representation only. Attorneys are not responsible for providing business, insurance, tax, or accounting advice, even if related to the Claims or Litigation Proceeds.

## II. FEES, EXPENSES, AND LITIGATION PROCEEDS

2.01    The estimated budget for the expenses of the Litigation is $11,800,000 (the "Commitment"). Exhibit A is a general estimate of the expenses anticipated to be incurred in litigating these cases. Attorneys shall operate on a partial contingency and shall arrange for payment of third-party expenses related to the Litigation up to the amount of the Commitment. Client understands and agrees that Attorneys intend to seek financing for all or any portion of the Commitment from the Funder, and Attorneys anticipate Funder to be an affiliate of Parabellum Capital LLC. Client acknowledges that the Attorneys are operating on a partial contingency and arranging for payment of expenses related to the Litigation is not possible without financing from Funder, and Client shall execute any documents reasonably requested by Attorneys in connection with the financing of the Commitment, including, without limitation, a Litigation Proceeds Distribution Agreement. In consideration of the services rendered and to be rendered to Client by Attorneys, Client does hereby assign, grant and convey to Attorneys the following present undivided interests in all Litigation Proceeds and all of Client's Claims and Causes of Action for and as a reasonable fee for Attorneys' services, and said contingent attorneys' fee will be figured as follows on any recovery, settlement, or other receipt of Litigation Proceeds (collectively, the "Compensation"):

(i)     *First*, (A) 90% of Litigation Proceeds shall be distributed to Attorneys and (B) 10% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to the Commitment.

(ii)    *Second*, (A) 60% of Litigation Proceeds shall be distributed to Attorneys and (B) 40% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one times (1X) the amount of the Commitment.

(iii)   *Third*, (A) 50% of Litigation Proceeds shall be distributed to Attorneys and (B) 50% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one and one quarter times (1.25X) the amount of the Commitment.

(iv)    Fourth, (A) 30% of all remaining Litigation Proceeds shall be distributed to Attorneys and (B) 70% of all remaining Litigation Proceeds shall be distributed to Client.

In the event that the legal fees and expenses of the Litigation are anticipated to exceed $11,800,000, Client and Attorneys shall work together in good faith to agree on the financing of such additional amounts. The Client shall have no liability to the Funder in the event the Litigation is unsuccessful.

2.02    Intentionally Omitted.

2.03    Client acknowledges that $500,000 of the Commitment is allocated to this matter from the Harrington case and deemed spent as of the date hereof on account of methodologies

learned in the Harrington case with respect to illegal methods used by Defendants to manipulate the stock.

2.04   A settlement or recovery may involve (in addition to a cash payment) other matters received by or obtained for Client.  Just as one example, Client may recover or obtain shares of stock already issued or transferred to one or more Defendants.  As another example, Client may be compensated by means of stock issued by certain publicly traded defendants. All such amounts constitute Litigation Proceeds which are distributable in accordance with Section 2.01 above.

2.05   It is further agreed that the Compensation as set forth and calculated in Paragraph 2.01 and assignment of undivided interest set forth in Paragraph 3.01 shall not be offset, reduced nor affected by any judgment, if any, rendered against Client by any counterclaim or otherwise.

2.06.   The budget set forth above excludes appeals and judgment enforcement proceedings, budgets for which shall be negotiated by the Parties if necessary.

2.07.   The Compensation is not set by law but is negotiable between an attorney and client.  The Attorneys acknowledge that the potential Compensation constitutes fair and adequate consideration to compensate the Attorneys for its representation of Client in the Litigation and its obligation to bear the risk of the Commitment in accordance with this Retention Agreement.

2.08   Attorneys may enter into one or more separate agreements pursuant to which Attorneys allow Funder to obtain a portion of the Litigation Proceeds distributable to Attorneys under this Paragraph 2.01.

## III.  ASSIGNMENT OF INTEREST

3.01   In consideration of Attorneys' services, the Client hereby conveys and assigns to Attorneys and agrees to pay to Attorneys an undivided interest in and to all of Client's claims and causes of action to the extent of the percentages set out in Paragraph 2.01 resulting in a net contingency fee of not more than 30% to Attorneys after payment of all other amounts contemplated by Paragraph 2.01.

3.02   If there is any type of settlement whereby the Client is to receive or be paid future payments, then the settlement will be reduced to present value, and the settlement will be arranged whereby there will be sufficient cash at the time of the settlement to pay the attorneys' fees which will be figured on the present value of the settlement or recovery including the present value of future payments.  Such discounting will be computed at a market discount rate.

3.03   All sums due and to become due are payable at the office of ChristianAttar in Harris County, Texas.  Client hereby authorizes the Attorneys to endorse and negotiate any check, draft, or negotiable instrument on behalf of the Client, to deposit the same in Attorneys' trust account, and to distribute such funds pursuant to the terms of this Agreement.

## IV.  APPROVAL NECESSARY FOR SETTLEMENT

4.01   No settlement of any nature shall be made without Client's approval. Attorneys shall have full authority to sign papers or documents regarding a settlement after Client's and Bankruptcy Court approval.  Client will consult with Attorneys and Attorneys will keep Client fully advised of all settlement offers and counteroffers.

4.02    Attorneys are authorized and empowered to act as Client's sole negotiator in any and all settlement negotiations concerning this case, but it is expressly agreed and understood that no settlement of Client's Claim shall be made by Attorneys without Client's approval.  Client shall immediately notify in writing Attorneys of any settlement offer or proposal or "feeler" made to Client by anyone other than Attorneys.  Client agrees not to engage in any settlement discussion with any Defendant or its insurer or attorney or representative except by and through Attorneys. There will be no talk about settlement unless Attorneys are present and doing the talking for Client. Whenever a settlement offer is made by or on behalf of any Defendant, Client agrees to strongly consider in good faith the opinions and recommendations of Attorneys before accepting or rejecting the settlement offer, whether such settlement offer was made to Client through the Attorneys or in some other way.  Client agrees not to unreasonably withhold consent to a settlement offer, which in the judgment of Attorneys is a fair and reasonable basis for the disposition of Client's Claim or else Attorneys shall have the right to withdraw pursuant to Paragraph 9 from further representing Client.  In deciding whether to consent or not to a settlement offer, Client agrees never to ask, insist or seek that Attorneys cut or reduce their fees or expenses to which Attorneys are entitled to receive under this Agreement, and such conduct will constitute unreasonably withholding consent.

4.03    Attorneys are hereby granted a power of attorney so that they may have full authority to prepare, sign and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to conclude this representation including settlement and\or reducing to possession any and all monies or other things of value due to the Client under his claim as fully as the Client could so do in person.  Attorneys are also authorized and empowered to act as Client's negotiator in any and all settlement negotiations concerning the subject of this Agreement.

## V.  REPRESENTATIONS, WARRANTIES, AND COVENANTS

5.01    It is understood and agreed that Attorneys cannot warrant or guarantee the outcome of the case and Attorneys have not represented to the Clients that the Client will recover all or any of the funds so desired.  Further, Attorneys cannot warrant or guarantee they can procure a Funder to fund the Litigation Expenses.  In the event Attorneys are not successful in procuring a Funder, Client and Attorneys will sit down and determine how the matter can move forward. Client realizes that Attorneys will be investigating the law and facts applicable to Client's Claim and\or Causes of Action, on a continuing basis and should Attorneys learn something which in the opinion of Attorneys make it impractical for Attorneys to proceed with the handling of Client's Claim or the Litigation, if any, then Attorneys may withdraw from further representation of Client by sending written notice to Client's last known address.

5.02     In addition to any other representations and warranties in this Agreement, Client hereby represents and warrants that:

i.      Client legally and beneficially owns 100% of the Claims and has not assigned, transferred, or encumbered any right, title, or interest in or to the Claims other than as set forth in this Agreement.

ii.     Client has the unfettered right to pursue the Claims against Defendants, including, but not limited to, the exclusive right to (a) prosecute litigation, (b) enforce all rights, and (c) recover all damages in connection with the Claims, subject to possible setoff by Defendants.

iii.    Client is not aware of any other claims the Meta Materials Inc. estate may have against Defendants that arise from the transactions and occurrences underlying the Litigation, other than the Claims disclosed to Attorneys to be asserted in the Litigation.

iv.     Client did not intentionally omit any material information she possesses with respect to the Claims in connection with the Attorneys' analysis thereof.

v.      Subject to Bankruptcy Court approval, Client has full authority to enter into this Agreement and bind Client to all of its terms, none of which will (a) violate any other agreement of Client, (b) violate any applicable law, or (c) require any notice or approval of any third party.

vi.     Other than those claims disclosed to Attorneys to be asserted by Defendants against Client as of the Effective Date, Client is not aware of any compulsory or permissive claims that could be brought by one or more of the Defendants against Client, and Client has used reasonable best efforts to disclose in writing to the Attorneys all transactions or agreements she currently has or has had with any Defendant.

vii.    Client has consulted with independent legal counsel (separate from the Attorneys) regarding this Agreement and is fully advised with respect to Client's obligations and rights with respect hereto. Client acknowledges that Client has had sufficient time to review and consult with other attorneys considering this Agreement.

viii.   Client acknowledges that litigation is unpredictable and the Attorneys make no assurances as to any results or outcome of the Claims or Litigation.

ix. Client acknowledges that, although the Attorneys may offer opinions concerning the possible results of the Litigation, the Attorneys cannot guarantee any particular result. Client acknowledges that the Attorneys have made no promises on such a subject and that any opinion offered by the Attorneys in the future will not constitute a guarantee.

5.03 In addition to the covenants set forth elsewhere in this Agreement, Client hereby covenants that so long as this Agreement remains in effect:

i. Client shall not assign, transfer, or encumber any right, title, or interest in the Litigation Proceeds without the prior written consent of Attorneys.

ii. Client shall (a) fully comply with all reasonable requests of the Attorneys in the pursuit of recovery in the Litigation, and (b) reasonably seek to maximize the monetary value of the Claims; *provided that* Client may defer to the advice of Attorneys, including with respect to settlement. For example, and without limitation, Client agrees (a) to allow the Attorneys reasonable and timely access to Client and his records to facilitate the provision of legal services by the Attorneys, (b) to use reasonable best efforts to provide the Attorneys with all information and documents in the possession of Client or any entities or persons affiliated with Client, (c) to fully cooperate with the Attorneys in the prosecution of the Claims and Litigation, (d) to appear on reasonable notice, and at Client's expense, for any and all depositions and court appearances at which Client's attendance is reasonably required or ordered, and (e) to comply with all reasonable requests of the Attorneys in connection with the preparation and presentation of the Claims and Litigation.

iii. Client shall not knowingly, without the prior written consent of the Attorneys, which consent may be withheld in the Attorneys' sole and absolute discretion, take any action or inaction or permit any Person controlling, controlled by, or under common control with him ("Affiliates") or his agents, to take any action or inaction that will in any way create any circumstance which may or could: (a) interfere with the Attorneys' ability to pursue the Claims, (b) diminish the expected recovery of the Claims, or (c) provide, either directly or indirectly, a defense to the Claims.

iv. Client shall not accept any proposed compromise or settlement of the Claims with any individual, entity, group, or organization ("Person") without first consulting with and making full disclosure to the Attorneys. Client shall cooperate in good faith regarding any proposed compromise or settlement of the Claims. Client and the

Attorneys shall not offer or accept a settlement without one another's mutual discussion.

## VI.    INTENTIONALLY OMITTED

## VII.  COOPERATION OF CLIENT

7.01    Client agrees to cooperate with Attorneys at all times and to comply with all reasonable requests of Attorneys.  Client further agrees to keep Attorneys advised of his/her whereabouts at all times, and to provide Attorneys with any changes of address, phone number or business affiliation.

7.02    Attorneys or either of them may, at his/her option, withdraw from the case and cease to represent the Client should Client fail to comply with any portion of this Agreement or should Attorneys or either of them decide that he or she cannot continue to be involved in this case.  Such withdrawal will be effective by mailing written notice to Client's last known address.

## VIII. ASSOCIATION OF OTHER ATTORNEYS

8.01    Attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client.  Client understands that Attorneys are limited liability partnerships with a number of attorneys.  Several of those attorneys may work on Client's case.

## IX.  WITHDRAWAL OR REPLACEMENT OF ATTORNEYS

9.01    Attorneys accept employment on the condition that if, after investigation, research, and analysis, it ever appears to Attorneys that (a) Client's Claim is probably not recoverable, or (b) the pursuit of Client's Claim is no longer economically feasible or advisable, the Attorneys may with withdraw (such withdrawal, a "Reduced Success Withdrawal"),.  Attorneys may also withdraw if (1) Client fails to reasonably assist and cooperate with Attorneys or Client's conduct makes it unreasonably difficult for Attorneys to carry out their representation effectively; (2) Client fails or refuses to comply with this Agreement; (3) Client fails or refuses to comply with a matter regarding settlement set out in Paragraph 4, including, without limitation, its obligation to act in good faith in settlement discussions or when making settlement decisions; (4) sues Attorneys or threatens to do so or files a grievance or threatens to do so; (5) Client abandons prosecution of the Claims other than on account of the reasons set forth in (a) and (b) of the previous sentence, or (6) a legally prohibited conflict of interest has arisen; each of the foregoing (1) – (6) shall constitute "Good Reason".  Attorneys may withdraw from the representation of Client without further obligation or liability by first sending Client written notice by U.S. Mail, Certified Return Receipt, to Client's last known address that personally gives Client 30 days to hire new attorneys.  The act of firing, replacing, or terminating Attorneys Cause is the equivalent of withdrawal for Good Reason.

9.02    Since Attorneys will quite likely have done much work and\or paid or incurred liability for huge amounts of Litigation Expenses should Attorneys be fired or replaced by Client other than for Cause or should Attorneys withdraw for Good Reason, there must be fair provisions

for repayment to Attorneys its hard dollars and/or time spent developing the case. If Attorneys withdraw for Good Reason or are replaced other than for Cause, Client will hire another law firm ("new attorneys") to handle their claims by an agreement that the Client or new attorneys shall first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; and the Attorneys will be paid as attorneys' fees at the time of settlement or recovery a percentage of the contingent fees provided for in Paragraph 2.01 above (with credit applied to avoid double recovery) with the new attorneys to share in the portion of Litigation Proceeds allocated to Client pursuant to Paragraph 2.01. In the event Attorneys withdraw other than for Good Reason or should Client replace or fire Attorneys for Cause, Client will hire a new attorney to replace Attorneys and to handle Client's Claim by an agreement that requires new attorneys and\or Client to first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; or else Attorneys will have a first lien on any settlement or recovery requiring that all Litigation Expenses that Attorneys paid or incurred liability to pay are to be repaid and reimbursed first out of any settlement or recovery and that, as attorney fees, Attorneys will be paid at the time of settlement or recovery all of its Litigation Expenses included the reasonable value of the legal services it provided to Client; and any further recovery under 2.01(ii)-(iv) shall be proportionally reduced.. For the avoidance of doubt, if Attorneys are terminated (whether or not for Cause) or withdraw (whether or not for Good Reason) Attorneys shall have no further obligations toward the Commitment or the funding of any Litigation Expenses.

9.03    Notwithstanding Paragraph 9.02 or anything herein to the contrary, in the event of a Reduced Success Withdrawal, then the amounts and percentages distributable to the Attorneys under Paragraph 2.01 shall be proportionally reduced to reflect the percentage that the Litigation Expenses at the time of such Reduced Success Withdrawal bears against the Commitment.

## X.  TEXAS LAW TO APPLY

10.01   This Agreement shall be construed under and in accordance with the laws of the State of Texas, and the rights, duties and obligations of Client and of Attorneys regarding Attorneys' representation of Client and regarding anything covered by this Agreement shall be governed exclusively by the laws of the State of Texas law without regard to choice-of-law or conflict-of-law principles.

## XI.  ARBITRATION

11.01   Any and all disputes, controversies, claims or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by Attorneys to Client or (4) the relationship between Attorneys and Client, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association. Client shall not file a class action against Attorneys or seek to assert any claim or demands against Attorneys by or through a class action, either as the named plaintiff or as a member of the class, but rather shall submit his/her claims or demands to binding arbitration pursuant to the provisions of this ARTICLE XI. For the avoidance of doubt, any and all gateway issues of arbitrability are delegated to the arbitrators. Any such arbitration

proceeding shall be conducted in Harris County, Texas. This arbitration provision shall be enforceable in either federal or state court in Harris County, Texas pursuant to the substantive federal laws established by the Federal Arbitration Act. Any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered by any federal or state court in Harris County, Texas having jurisdiction.

## XII. BANKRUPTCY PROVISIONS

12.01   All parties acknowledge that Client is the chapter 7 trustee under Case No. 24-50792 in Reno, Nevada. As such, all obligations hereunder are conditioned on the Bankruptcy Court approving all terms and conditions.

## XIII.  PARTIES BOUND

13.01   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representative, successors and assigns.

## XIV.  LEGAL CONSTRUCTION

14.01   In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. Capitalized Terms used but not defined herein shall have the meanings set forth on Schedule I hereto.

## XV.  DISPOSITION OF FILES

15.01   The files of the Client will be retained for two (2) years after Attorneys' representation has been completed, and then will be discarded, except for information that Attorneys may need in the future. Client shall, however, promptly pick up all material furnished to Attorneys, and Attorneys shall have no responsibility for retaining Client's information and documents after the case has been closed for forty-five (45) days.

15.02   If the arrangement between Attorneys and Client is terminated for any reason, then Client shall be entitled to all or any part of Client's papers and property that Client desires. Attorneys shall be entitled to a copy of all or part of the file, at Attorneys' expense.

15.03   Independent Determination of Fairness and Reasonability. Client acknowledges that (a) Attorneys did not act as counsel to Client in preparing or negotiating this Agreement; (b) Client has made sufficient investigation to determine that this Agreement is fair and reasonable; (c) this Agreement was the subject of arm's length negotiation between Client and Attorneys; (d) Client has had ample opportunity to review the Agreement independently and with separate counsel; and (e) Client is entering into this Agreement freely and voluntarily.

## XVI.  PRIOR AGREEMENTS SUPERSEDED

16.01   This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreement between the parties respecting the within subject matter.

I certify and acknowledge that I have had the opportunity to read this Agreement.  I further state that I have voluntarily entered into this Agreement fully aware of its term and conditions.

Signed and accepted this 30th day of October, 2024.

CLIENT: META MATERIALS INC.

CHRISTIANATTAR

BY: _/s/ Christina W. Lovato_

Christina W. Lovato, Trustee

James. W. Christian

KASOWITZ BENSON TORRES LLP

Stephen W. Tountas

## SCHEDULE I TO RETENTION AGREEMENT

## <u>DEFINITIONS</u>

"<u>Business Deal</u>" shall mean any agreement involving the Claims entered into by Client and any Person, whereby such Person provides a direct or indirect benefit to Client including, without limitation, any transaction with any Defendant.

"<u>Cause</u>" shall mean either (a) the Attorneys are in material breach of any material term of the Retention Agreement, which is not cured within fourteen (14) calendar days after the Attorneys' receipt of written notice from Client (such written notice must set forth with specificity such breach), or (b) the Attorneys have has committed gross negligence or willful misconduct in pursuit of the Claims.

"<u>Claims</u>" shall mean all current and future claims, suits, causes of action, and other rights of Client which are or may be asserted or alleged in the Litigation, or arising from, relating to, or based on the Litigation or any transactions or occurrences underlying the Litigation.

"<u>Litigation Expenses</u>" means any out-of-pocket expenses (and not in-house costs) incurred by any of the Attorneys in connection with the Litigation, or otherwise reflected in the budget, as well as the hourly fees of the Attorneys (based on lodestar).

"<u>Litigation Proceeds</u>" shall mean the gross total economic value of any compensation (whether tangible, intangible, monetary, or otherwise) to which Client or Client's Affiliates, successors, and/or assigns (including any party on behalf of any of the foregoing) become entitled, receive, or are relieved from making related to the Claims (including, without limitation, any Business Deal, and/or Court-awarded fees/costs). For the sake of clarity, Litigation Proceeds shall not be offset, without limitation, due to taxes and tax withholding. All non-cash Litigation Proceeds shall be valued based on their fair market value as determined by a third-party appraiser.

EXHIBIT A
Budget

| Milestone (Hourly Fees) | Law Firm Payment (flat fees) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Payment at closing for all research, memo, due diligence: | $250,000.00 | | | | | | | $250,000.00 |
| Filing of complaint: | $150,000.00 | | | | | | | $150,000.00 |
| Draft reply, Sur-reply, research, attend hearing, etc. (motion to dismiss) | $200,000.00 | | | | | | | $200,000.00 |
| Commencement of discovery (provided that MTD is at least partially successful): | $150,000.00 | | | | | | | $150,000.00 |
| Various motions to compel, objections, hearings, etc...: | $75,000.00 | | | | | | | $75,000.00 |
| Taking all depositions, motions to compel, etc...Meet and Confer | $150,000.00 | | | | | | | $150,000.00 |
| Completion of general discovery: | $200,000.00 | | | | | | | $200,000.00 |
| Amount of expert discovery, including discovery preparation, draft reports, review evidence, etc. | $200,000.00 | | | | | | | $200,000.00 |
| Completion of all discovery, including experts: | $300,000.00 | | | | | | | $300,000.00 |
| Commencement of summary judgment briefing and motions: | $300,000.00 | | | | | | | $300,000.00 |
| After successful ruling on motion for summary judgment | $200,000.00 | | | | | | | $200,000.00 |
| Prepare witnesses: | $200,000.00 | | | | | | | $200,000.00 |
| Draft direct and cross examination questions: | $200,000.00 | | | | | | | $200,000.00 |
| Prepare exhibit list: | $100,000.00 | | | | | | | $100,000.00 |
| Draft all briefs: | $150,000.00 | | | | | | | $150,000.00 |
| Prepare for and attend pre-trial hearings: | $100,000.00 | | | | | | | $100,000.00 |
| Prepare jury charge and charge conference: | $50,000.00 | | | | | | | $50,000.00 |
| Attend trial (3 associate lawyers): | $510,000.00 | | | | | | | $510,000.00 |
| Additional fees for expanded discovery issues | $1,800,000.00 | | | | | | | $1,800,000.00 |
| **TOTAL HOURLY FEES:** | **$5,285,000.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$5,285,000.00** |

| Milestone (Costs) | Law Firm Payment (capped amount) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Court reported deposition experts: | $250,000.00 | | | | | | | $250,000.00 |
| Flights, hotels, meals, etc...: | $175,000.00 | | | | | | | $175,000.00 |
| Liability experts: Spoofing and NSS | $2,500,000.00 | | | | | | | $2,500,000.00 |
| Damage experts: | $2,000,000.00 | | | | | | | $2,000,000.00 |
| Two focus groups: | $150,000.00 | | | | | | | $150,000.00 |
| Special master for discovery/Mediator | $200,000.00 | | | | | | | $200,000.00 |
| Third party data: | $200,000.00 | | | | | | | $200,000.00 |
| SEC/DTC expert: | $150,000.00 | | | | | | | $150,000.00 |
| Consulting | $100,000.00 | | | | | | | $100,000.00 |
| Multi-media preparation | $40,000.00 | | | | | | | $40,000.00 |
| Contingency for expenses: | $750,000.00 | | | | | | | $750,000.00 |
| **TOTAL COSTS (CAP):** | **$6,515,000.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$6,515,000.00** |
| **TOTAL COSTS (CAP):** | **$11,800,000.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$11,800,000.00** |

# EXHIBIT 6

**U.S. Securities and
Exchange Commission**

Home  /  Newsroom  /  Press Releases  /  SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations

PRESS RELEASE

# SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations

**FOR IMMEDIATE RELEASE**  |  2024-77

Washington D.C., June 25, 2024 — The Securities and Exchange Commission today filed charges against Meta Materials Inc. and its former CEOs, John Brda and George Palikaras. The company has agreed to settle the SEC's charges in an administrative proceeding, while the SEC's litigation against Brda and Palikaras will proceed in federal district court.

The SEC's complaint against Brda and Palikaras alleges that, as a result of a concerted market manipulation scheme, Meta Materials, a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada, raised $137.5 million from investors in an at-the-market (ATM) offering in June 2021 immediately prior to the merger of Brda's Torchlight Energy Resources Inc. and Palikaras' Metamaterial Inc. that formed Meta Materials.

The SEC's complaint, filed in U.S. District Court for the Southern District of New York, alleges that Brda and Palikaras planned and conducted the manipulative scheme that included, among other things, issuing a preferred stock dividend immediately before the merger. The complaint alleges that Brda and Palikaras told certain investors and consultants — and hinted via social media — that the dividend would force short sellers to exit their positions and trigger a "short squeeze" that would artificially raise the price of the company's common stock. The SEC further alleges that Brda and Palikaras also misrepresented the company's efforts to sell its oil and gas assets and distribute proceeds to preferred stockholders, giving investors a false impression of the value of the dividend. While investors held or bought the company's common stock to receive the dividend, the complaint alleges, the company was cashing in by selling $137.5 million in an ATM offering at prices that the company, Brda, and Palikaras knew were temporarily inflated by their manipulative scheme. "We have two days," the complaint alleges Brda told Palikaras after the first day of the ATM offering, "to take advantage of the squeeze..."

"The conduct we allege was a sophisticated, yet brazen plan by a public company and its former CEOs to purposely mislead investors in the company's stock," said Eric Werner, Director of the SEC's Fort Worth

Regional Office. "This conduct is particularly alarming because it involves public company CEOs who were more concerned with 'burning the shorts' than creating long-term value for shareholders."

The SEC's complaint charges Brda and Palikaras with violating the antifraud and proxy disclosure provisions of the federal securities laws, and charges Brda with aiding and abetting Meta Materials's violations of the reporting, internal accounting controls, and books and records provisions. The complaint seeks permanent injunctions, officer-and-director bars, and civil penalties from both defendants. The complaint also seeks disgorgement with pre-judgment interest from Brda.

The SEC also instituted a separate administrative proceeding against Meta Materials, entering a settled order finding that Meta Materials violated the antifraud, reporting, internal accounting controls, and books and records provisions of the federal securities laws. Without admitting or denying the findings, Meta Materials was ordered to cease and desist from violations of the relevant provisions of the federal securities laws and to pay a $1,000,000 penalty.

The SEC's investigation was conducted by Christopher Rogers and Ty Martinez of the SEC's Fort Worth Regional Office under the supervision of Samantha Martin, B. David Fraser, and Mr. Werner. The SEC's litigation against Brda and Palikaras will be conducted by Patrick Disbennett and supervised by Keefe Bernstein.

A separate Commission investigation regarding subsequent events related to Meta Materials (MMTLP) remains ongoing. If you are an individual with information related to this investigation or any other related suspected fraud and you wish to contact the SEC staff, please submit a tip at SEC.gov (https://www.sec.gov/tcr).

###

Last Reviewed or Updated: July 2, 2024

## RESOURCES

- **SEC Complaint**
- **SEC Order**

# EXHIBIT 7

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 11292 / June 25, 2024**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 100415 / June 25, 2024**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21976**

| | |
|---|---|
| **In the Matter of**<br><br>　　**META MATERIALS, INC.**<br>　　**(f/k/a TORCHLIGHT**<br>　　**ENERGY RESOURCES,**<br>　　**INC.)**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

## I.

　　The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Meta Materials, Inc. ("Respondent").

## II.

　　In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      In June 2021, Respondent raised $137.5 million in an at-the-market offering (the "ATM Offering"). Leading up to the offering and in connection with a merger, Respondent engaged in a scheme to inflate the price of its stock and defraud investors through numerous material misstatements and omissions about the potential value of a stock dividend to be issued as part of the merger. As a result of its fraudulent conduct, Respondent sold 16.2 million shares during its ATM Offering for tens of millions of dollars more than it could have absent its efforts to inflate its stock price.

2.      Respondent artificially inflated the value of its common stock by structuring a merger between its predecessor entities (Torchlight Energy Resources and Metamaterial Inc.) to include an unregistered preferred stock dividend that would not be immediately publicly tradeable (the "Preferred Dividend"), specifically designed to cause a "short squeeze." Respondent privately and selectively disseminated—through paid consultants, private conversations with investors, and via social-media messages—the theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers in Respondent's stock to cover their positions before Torchlight issued the Preferred Dividend or risk violating their short contracts by having difficulty delivering the Preferred Dividend when the merger closed. But Respondent never disclosed in its public filings its intent to cause a short squeeze, and it waited until the last minute to announce the ATM Offering to capitalize on what Respondent believed would be a short-term price inflation of its stock.

3.      In support of its scheme, Respondent made false and misleading statements about the Preferred Dividend, which entitled its holders to receive the net proceeds of the sale of Respondent's oil and gas assets. In its public filings, Respondent misrepresented the status of its efforts to market and sell those assets while concealing a planned spin-off of the assets into a new entity. Further, in May 2021, Respondent's incoming Chief Executive Officer baselessly claimed that the value of the Preferred Dividend could be between $1 and $20 per share when, in fact, a valuation study by Respondent's investment bankers only supported a per-share value range of $0.03 to $0.83.

4.      Respondent's scheme occurred against the backdrop of a lax internal control environment. Respondent failed to devise and maintain internal accounting controls and make and keep adequate books and records by failing to account properly for the disposition of corporate assets or the recognition of legitimate expenses related to a series of payments made to stock promoters who rendered services to the company without any documentation. In addition, Respondent paid consulting fees designed to conceal the recruitment and compensation of a team

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity at the same time that Respondent touted in its public statements its intention to make efforts to sell the oil and gas assets and distribute the net proceeds to Preferred Dividend holders.

## Respondent

5.    Meta Materials, Inc. ("Meta II" or "Respondent") is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021 through a reverse merger between: (i) Torchlight Energy Resources, Inc. ("Torchlight"), a publicly traded Texas corporation headquartered in Plano, Texas that purported to be in the business of oil and gas exploration and production, then listed on the Nasdaq under the ticker symbol "TRCH"; and  (ii) Metamaterial, Inc. ("Meta I"), a Canadian headquartered company then listed on the Canadian Securities Exchange and focused on early-stage applied materials technology research and development. Today, Meta II's common stock, which trades under the Nasdaq ticker symbol "MMAT," is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Concurrent with the merger, Torchlight issued the Preferred Dividend to Torchlight shareholders of record as of June 24, 2021, and Torchlight shares became Class A Preferred Shares of Meta II after the merger closed.

## Other Relevant Individuals

6.    John A. Brda, age 59, resides in St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. Post-merger, Brda held a consulting role with Meta II through late 2022.

7.    Georgios "George" Palikaras, age 42, is a Greek citizen who resides in Halifax, Nova Scotia, Canada. From 2011 to 2021, Palikaras was Meta I's President & CEO. Upon Meta II's creation, Palikaras became President & CEO of Meta II and served on its board of directors ("Board"). In October 2023, Meta II terminated Palikaras and he subsequently resigned from the Board.

## Background

### Torchlight's Plan to Use a Preferred Dividend to Cause a Short Squeeze

8.    In early 2020, after selling off essentially all of its revenue-generating oil and gas properties, Torchlight faced an uncertain future: its stock traded below $1.00 per share, Nasdaq issued a delisting warning, and its auditors issued a going-concern warning. In response to Torchlight's predicament, Brda, Torchlight's CEO, implemented a plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but not its remaining oil and gas assets;

- Issue a Preferred Dividend in the form of preferred stock that would not be listed or traded on any exchange as part of the merger structure, ostensibly to allocate proceeds from the sale of Torchlight's remaining oil and gas assets to legacy Torchlight shareholders;

- Market and promote the Preferred Dividend to emphasize to the market that short sellers would have difficulty obtaining the Preferred Dividend without owning Torchlight stock, thus pressuring short sellers to close their positions or obtain Torchlight stock before the record date for the Preferred Dividend ("Record Date"), temporarily inflating the price of Torchlight's common stock;

- Leverage the resulting inflated common stock price to raise capital through an ATM Offering and remove debt through debt conversion; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's remaining oil and gas leases.

9.      Brda explained his plan—including the use of the Preferred Dividend to pressure short sellers—to members of Torchlight's Board of Directors, its investment banker, and several prospective merger partners, including Palikaras and the Meta I Board of Directors. From its earliest conception, in brainstorming the plan with Torchlight's Chairman and its lead banker in June 2020, Brda explained that, "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover." Also in June 2020, Brda explained to a potential merger partner that he expected Torchlight's stock price to increase "temporarily because of the short squeeze" while acknowledging that the resulting price increase would be "unsustainable." In initial merger discussions, Brda explained to Palikaras how the deal structure could create a short squeeze and the plan to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

**Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative**

*Brda Caused Torchlight to Make Public Statements to "Play Up" the Preferred Dividend*

10.      Torchlight never directly disclosed in any public filing the full scope of Brda's plan to use the Preferred Dividend to create a short squeeze. In Torchlight's 2020 Form 10-K filed March 18, 2021, Torchlight disclosed that "[t]he market price of our common stock may be influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." However, Torchlight did not publicly disclose that the Preferred Dividend could cause a short squeeze, much less that the Preferred Dividend was designed to create a short squeeze or that the ATM Offering was conducted to "take advantage of the squeeze." Instead, Torchlight's 2020 Form 10-K stated that "we have no reason to believe our shares would be the target of a short squeeze," which was directly contrary to the statements that Respondent and its executives made privately about the Preferred Dividend and the plan to create a short squeeze.

4

11.    Instead, in reports filed with the Commission and in public statements, Brda and Torchlight focused attention on the Preferred Dividend and the supposed net profits from the sale of Torchlight's oil and gas assets that Preferred Dividend holders could expect to receive, highlighting the Preferred Dividend in the announcement of the merger, the announcement of a final signed merger agreement, and the proxy filings concerning the merger. Torchlight also emphasized in its proxy filings that the Preferred Dividend would not be registered, would not be listed on any national exchange, and would not be "freely transferrable" unless an exemption applied. Brda believed that once short sellers understood it would be difficult acquire the Preferred Dividend in the market, they would be forced to cover their short positions in Torchlight because they would otherwise have difficulty obtaining the Preferred Dividend to comply with the terms of their short contracts, which would require them to deliver the proceeds or equivalent value of an in-kind dividend like Torchlight's Preferred Dividend. The company planned to leverage this short-covering activity by issuing shares via an ATM Offering and removing debt through equity conversions. But neither Torchlight nor Brda explained the full plan in public; rather, they selectively disseminated portions of the plan through consultants, via hints dropped on social media, and to select investors.

*Torchlight and Brda Used Consultants to Spread Their Short Squeeze Theory to Investors*

12.    Torchlight paid individual consultants to communicate with Torchlight's current or potential shareholders. Through these consultants—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated selective information about the merger to investors. For example, Brda emailed two of the consultants a slide presentation containing the plan to "[p]lay up the dividend to make sure the shorts understand their dilemma."

13.    On the day that Torchlight and Meta I announced their letter of intent to merge, Brda forwarded the consultants a draft press release announcing the merger, complaining that the stock price had not moved enough, "I think people don't understand the dividend properly." On September 21, 2020, Brda forwarded to two consultants the press release that Torchlight issued that day, announcing that it had entered into a letter of intent with Meta I to merge, and the following exchange occurred:

> **Brda:** We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.

> **Consultant:** Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?

> **Brda:** I think people don't understand the dividend properly.

> **Consultant:** I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

14.    In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote, "[w]e all knew [the shorts] would come

after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them."

15.     Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Torchlight kept no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative in Communications with Select Investors and Select Prospective Investors*

Virtual Investor Conference

16.     During Spring 2021, Brda and Palikaras conducted meetings with investors through conferences organized by Torchlight's financial advisors. From March 16-18, 2021, Brda and Palikaras met with a series of institutional investors at a virtual investor conference. During these meetings, Brda and Palikaras pitched the justification for the merger to one investor group at a time, and Brda explained to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze and Torchlight's plan to conduct a substantial ATM Offering concurrent with the merger close. In contrast, Torchlight never disclosed in its public filings the Preferred Dividend's potential impact on short sellers, and it waited to publicly disclose the ATM Offering until June 16, 2021.

Italian Investor Call

17.     In May 2021, Torchlight's investor relations firm set up several virtual meetings with a group of Italian shareholders that Torchlight believed held more than one million shares of its common stock. Brda attended one of the meetings, and Palikaras attended another. The stated purposes of the meetings were to solicit the Italian shareholders' proxy votes in favor of the merger and to encourage the investors to hold the common stock of the post-merger company. During his May 13, 2021 meeting with Italian shareholders (the "Italian Investor Call"), Palikaras described the plan to use the Preferred Dividend to create a short squeeze on several occasions, for example:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing…** As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … **the close**, **it's called a short squeeze**… (emphasis added).

18.     On June 7, 2021, a user posted on social media a screenshot purporting to show that the user recorded the Italian Investor Call. The user claimed they participated in the call and summarized their takeaways, including that the Preferred Dividend would "create a short squeeze as there are many short stocks to cover before the merger!!" Three days later, a Reddit user posted a partial audio recording of Palikaras's comments during the Italian Investor Call, including the plan to create a short squeeze.

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative, Including on Social Media*

19.    Palikaras and Brda also used Twitter to tout the Preferred Dividend and short squeeze theory. For instance, on June 7, 2021, one week before Torchlight announced the Record Date, Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze…yet. Just my two cents. ***Once it happens*** that's ok as it is fact, but [if you do it] before you are putting yourself at risk for potentially speculative content." (emphasis added).

20.    Six days later, the day before Torchlight announced the Record Date, Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets and public statements designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock:



21.    Palikaras's tweet received several public replies connecting the tweet to the short squeeze theory. For example, one user responded, "You should set the price of the shorts the price of TRCH at the end of the short squeeze." Another wrote, "We definitely get the reference 'Shorts Are Getting Burne[d].'"

22.    The next day, on June 14, 2021, Torchlight issued a press release announcing the Record Date (June 24, 2021), kicking off the sequence of events that culminated in the ATM Offering.

**Torchlight, Brda, and Palikaras Misrepresented the Value of the Preferred Dividend**

23.     To support their efforts to manipulate the market for Torchlight's common stock and encourage investors to buy or hold Torchlight's common stock, Torchlight and Brda misrepresented the likelihood of a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. They encouraged investors to buy or hold Torchlight's common stock by: (1) Torchlight and Brda giving the false impression in public filings and statements that Torchlight would undertake commercially reasonable efforts to sell the oil and gas assets; (2) Torchlight and Brda referencing the net proceeds that would be distributed to Preferred Dividend holders following the sale; and (3) Palikaras providing a wholly unsupported per-share value estimate (between $1 and $20) of net proceeds payable to Preferred Dividend shareholders that became a widely circulated talking point on social media.

*Torchlight and Brda Misrepresented Ongoing "Commercially Reasonable Efforts" to Sell Torchlight's Oil and Gas Assets and Distribute "Net Proceeds" in Proxy Filings and Forms 8-K*

24.     In public filings leading up to the merger, particularly in its preliminary and final proxy materials soliciting shareholder approval, Torchlight bolstered the potential value of the Preferred Dividend by misrepresenting that it would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to Class A Preferred Shareholders within six months of the merger closing. In total, Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets seven or eight times in each version of the proxy filings. And, references to the net proceeds to be distributed to preferred shareholders repeatedly appeared in press releases throughout the period that the merger was pending, including press releases dated April 15, 2021, May 3, 2021, and June 14, 2021 subsequently attached to current reports filed with the Commission.

25.     In reality, Torchlight had no prospects to sell the oil and gas assets. Torchlight made no effort to lay the groundwork for a sale when it made the aforementioned statements. The company's records contain no evidence of any communications with specific prospects from any time in 2020 or 2021. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of very large oil companies would be viable candidates to purchase Torchlight's assets. Even Brda acknowledged that only "very specialized buyers" would be interested in Torchlight's assets and that it would take from up to a year to a year and a half to complete the sale considering the due diligence a specialized buyer would need to undertake. Torchlight's long-time investment banker, who was not retained to sell the oil and gas assets, believed that it could take two to three years to complete such a sale.

26.     To the contrary, as early as December 2020, Brda had already begun planning a spin-off of the oil and gas assets into a new entity. Just days after Torchlight and Meta I signed the definitive agreement for the merger, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity, "Next Bridge Hydrocarbons, Inc." Then, in January 2021, Brda and Torchlight began paying $20,000 a month (through an

intermediary who received "consulting fees" for doing no actual work) to individuals who would form the initial management team of Next Bridge Hydrocarbons.

27.    By August 17, 2021, less than 60 days after the merger closed, Meta II's board voted to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible. Then, in December 2022, Meta II spun out the oil and gas assets into a new company—Next Bridge Hydrocarbons—the same entity name that Brda identified when he first began to plan for a spin-off transaction in December 2020.

*Palikaras's False Claim About the Value of the Preferred Share Dividend*

28.    On the May 13, 2021 Italian Investor Call, where Palikaras described the short squeeze to a select group of investors, he also made false and misleading statements about Torchlight's efforts to sell its oil and gas assets, and the potential values of a cash distribution of the net proceeds from that sale.

29.    During the call, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that those buyers were "top tier," when, in fact, Torchlight had not identified any potential buyers and Palikaras admitted that he had no knowledge of potential buyers or active negotiations.

30.    Palikaras also mentioned on the Italian Investor Call that, "according to the analysis," the value of the Preferred Dividend could be between $1-$20 per share. The $1-$20 range was wholly unsupported by a valuation study performed by Torchlight's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share. Palikaras's reference to an "analysis" gave investors the misleading impression that his value range was supportable when it was not.

31.    These statements by Palikaras quickly became a topic of discussion on social media, continuing to drive mentions throughout the ATM offering period. A common refrain on social media was that the company's CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share.

32.    After the merger, Meta II's VP of Business Development emailed Palikaras and other Meta II leadership about an investor complaint citing the $1-$20 dividend range. In the email, the VP stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares."

*Torchlight, Brda, and Palikaras Misled Investors about the Preferred Dividend.*

33.    The false and misleading statements by Torchlight, Brda, and Palikaras made investors believe that Meta II could quickly monetize the oil and gas assets and distribute the net proceeds to Preferred-Dividend holders post-merger. This belief incentivized Torchlight shareholders to acquire or hold the common stock through the Record Date so they would be

eligible to receive the Preferred Dividend. On July 21, 2021, just weeks after the merger closed, Meta II's CFO emailed Palikaras about the importance of demonstrating to the marketplace that Meta II took steps to diligently pursue a purchaser for the oil and gas assets before proceeding to a spin-off given the "preferred holders who are expecting to see cash for their shares."

34.    As it became clear that Meta II would not immediately pay Preferred Dividend holders any net proceeds and that no Torchlight asset sale (or net proceeds therefrom) were forthcoming, investors began to complain. One investor emailed Palikaras directly on August 15, 2021, suggesting that Meta II issue stock to Preferred Dividend holders "somewhere near the middle of the proposed $1 - $20 dividend range" to "help take the sting away."

**Torchlight's Market Manipulation Scheme Caught Fire**

35.    Brda and Palikaras privately celebrated as Torchlight's stock became a hot topic of conversation on social media in the days before the merger. Users on platforms from Twitter to Stocktwits to YouTube to Reddit discussed the merger, the Preferred Dividend, and the short squeeze. On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY," which succinctly summed up the plan: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain, "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras's "shorts-in-flames" tweet from the day before.

36.    Social media users posted the hashtag and versions of the graphic dozens of times in the days surrounding the Record Date announcement. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock by June 22, 2021 to benefit from the supposed short squeeze and the Preferred Dividend worth $1-$20 per share, using other hashtags, subreddits, and iterations on the short squeeze theory.

37.    Palikaras celebrated the "#TORCHDAY" campaign's impact on the price of Torchlight's stock and what it portended for the plan to use the ATM Offering to capitalize on the attention, texting Brda: "To the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." (emphasis in original). Brda agreed: "I think we can get there, just need to have diamond hands."

38.    The trading volume in Torchlight's common stock dramatically escalated as the merger approached. In May 2021, the average trading volume was five million shares per day. But, between the announcement of the Record Date on June 14 and the deadline to purchase Torchlight stock in order to obtain the Preferred Dividend on June 22, the average trading volume exceeded 80 million shares per day.

39.    On June 14, 2021, the day after Palikaras made his "shorts-in-flames" tweet, Torchlight issued a press release, announcing the Record Date of June 24, 2021. Palikaras issued a

tweet, linking the press release and promoting the June 24th record date: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Investors following Torchlight understood Palikaras's tweet to mean that the supposed key to ensuring the short squeeze and obtaining the Preferred Dividend that Palikaras touted would be worth $1—$20 per share was to buy or hold Torchlight stock by or through June 22, 2021. Torchlight's stock price immediately reacted, jumping from $3.58 to $5.07. It would reach $10.88 in the days leading up to the June 25 merger close.

### Torchlight Profited from Its Manipulation of Torchlight's Stock Price Using the ATM Offering

40.    Torchlight's Board, Meta I's Board, Brda, and Palikaras discussed their intention to raise funds at artificially inflated prices in a series of exchanges that occurred on the eve of the ATM Offering. As Torchlight's stock price rose after the announcement of the Record Date, Brda demanded a *quid pro quo* from Meta I: Torchlight (and Brda) would not go forward with the long-planned ATM Offering unless a portion of the funds raised by the ATM Offering would go toward drilling oil wells to maintain Torchlight's oil and gas leases.

41.    In a memo to the Meta I team, Brda explained that Torchlight's Board would not agree to conduct the ATM Offering without assurances that they would receive the *quid pro quo* that they requested:

> We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… *Otherwise, we have no inclination to raise capital now* as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

42.    Palikaras and Meta I's CFO recommended to Meta I's Board that they approve conducting the ATM Offering, stating "all [Meta's advisers] *strongly recommended we take as much of the money as we can ahead of the closing*." (emphasis added). And although the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

43.    Although Meta I did not formally agree to Brda's demands, Meta II ultimately did enter into an agreement with Brda post-merger regarding an amount to fund drilling for the oil and gas assets—consistent with Brda's original plan and part of his scheme.

44.    The day after Torchlight's stock price increased dramatically in response to the news of the Record Date announcement, Torchlight executed a sales agreement with an investment bank to conduct the ATM Offering. As a result of the ATM Offering, Torchlight sold 16.2 million shares of common stock between June 18 and June 24, at an average price of $8.50 per share,

raising $137.5 million. Over 95% of that volume was sold prior to the "T plus 2" date of June 22, 2021.

45.      Torchlight's stock reached its highest price around the "T plus 2 date" of June 22, 2021 just as Torchlight, Brda, and Palikaras predicted. But after closing at $9.92/share on June 21st, and $7.00/share on June 22nd, the stock price fell dramatically. On June 25, 2021, the Preferred Dividend payment date, the stock closed at $4.95/share. The following Monday (June 28th), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98/share (after accounting for the reverse split, less than half its prior day close).

46.      The communications by Brda and Palikaras during the ATM Offering reflected their intent to take advantage of the manipulated stock price. On Friday, June 18, after Torchlight sold two million shares on the first day of active selling on the ATM Offering, Brda texted Palikaras, "[*w*]e have two days to take advantage of the squeeze, today should have been a 5 million share day at 6 [dollars per share]…" (emphasis added). Palikaras responded, "[f]ill her up[.]" Another member of Torchlight's Board wrote to Brda, asking his input about transacting in the stock, "I won't move if I have information that isn't public, but *if this short squeeze goes high enough I don't want to miss it* if I can participate legally." (emphasis added).

## Violations

47.      As a result of the conduct described above, Respondent violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities; Section 17(a)(1) of the Securities Act, which prohibits the use of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of securities; and Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities . . . directly or indirectly . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

48.      As a result of the conduct described above in Paragraphs 24 through 26, Respondent violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities … directly or indirectly… to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading."

49.      As a result of the conduct described above, Respondent violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit the use of a proxy statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

50.     As a result of the conduct described above, Respondent violated Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-11 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and current reports as the Commission may require, and mandate that the reports contain such further material information as may be necessary to make the required statements not misleading.

51.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

52.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 10b-5(a), 10b-5(c), 12b-20, 13a-11, and 14a-9 thereunder.

B.     Respondent shall pay a civil penalty of $1,000,000 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.  Payment shall be made in the

13

following installments: $250,000 within 30 days after entry of this order; $250,000 within 120 days after entry of this order; $250,000 within 210 days after entry of this order; and the remaining balance within 300 days after entry of this order. Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Meta Materials, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to B. David Fraser, Associate Director, Division of Enforcement, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Unit 18, Fort Worth, TX 76102.

C.      Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change

14

the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

       D.     Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $1,000,000 based upon its agreement to cooperate in a Commission investigation and related enforcement action. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

       By the Commission.


                                     Vanessa A. Countryman
                                     Secretary

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JOHN BRDA,
GEORGIOS PALIKARAS,

Defendants.

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

## COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

## I.   SUMMARY

1.      Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.      Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3.        To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4.        As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5.        Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6.       As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7.       Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8.       When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger—Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9. By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10. For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.     JURISDICTION AND VENUE

11. The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12. This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13. Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

4

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

### III.     DEFENDANTS

15.     Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

### IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

### V.     FACTS

#### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.     As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B. Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26.     To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing—Torchlight's primary asset aside from its oil and gas leases.

27.     Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.    Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

**C.    Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

29.    The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.    Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.    The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

10

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32.     By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33.     In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

34.     Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35.     Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36.     Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

37.    Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.    Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.    Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.    Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred

Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the

potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with

negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the

Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate

Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41.     To illustrate, Torchlight's definitive proxy statement described the purported

"reasons" and "factors" that Torchlight's board (including Brda) considered in both approving

the merger and Preferred Dividend and recommending that shareholders approve the same. The

proxy statement repeatedly states that the supposed "reason" for approving and proposing the

Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to

retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false,

or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and

subsequent public filings that the reason—or at least a reason—that Torchlight and Brda

considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze

and/or to temporarily increase Torchlight's stock price.

42.     Similarly, Torchlight's definitive proxy statement also stated that "[t]he

*anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the

Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas

assets] after the consummation of the [merger]." (emphasis added). Again, this statement was

false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy

statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend

was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

14

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.     Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.     Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

15

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.    The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.    Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.    Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.    In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

17

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

### E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

51.     In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.     Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.     Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59.     Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60.     For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61.     As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … there will be **a potential jump towards the close**, **it's called a short squeeze**… (emphasis added).

62.    In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.    For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.    On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65.     Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.     Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67.     As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

### i. Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.

68.     In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69.     Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

25

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the
Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company
> will use commercially reasonable efforts to sell the O&G Assets [within six months
> of the merger closing]. Torchlight stockholders of record as of the Series A
> Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of
> Series A Preferred Stock.… Holders of shares of Series A Preferred Stock may
> receive Asset Sale Dividends from any Asset Sale Transactions consummated
> [within six months of the merger closing], and may also receive a Spin-Off
> Dividend of any Remaining Assets that have not been sold in an Asset Sale
> Transaction [within six months of the merger closing].

74.     These statements were made repeatedly in Torchlight's proxy materials. The
company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half
dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its
preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.     These statements and representations made by Brda in Torchlight's public filings,
proxy statements, and press releases were false and misleading at the time they were made. As
Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas
assets and had taken no actions to lay the groundwork for a sale when the statements were made.
Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for
years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number
of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records
do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise,
during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects
that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.     Without any identified buyers or ongoing negotiations, Brda knew, or was
severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.     In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.     Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity")**. He did not publicly disclose these plans.

79.     Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80.      By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81.      Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

***ii.   Palikaras made false statements about the value of the Preferred Dividend.***

82.      On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83. First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84. Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85. As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86. By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.     After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.     Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

### G. Defendants Succeeded In Manipulating The Price Of Torchlight Stock.

89.     As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.     On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend— which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93. Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94. The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95. Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96. Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97. Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

### H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.     Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99.     Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100.     Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101.     Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

102.     Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103.     More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104.     Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… ***We have two days to take advantage of the squeeze***, today should have been a 5 million share day at 6[.]" (emphasis added).

105. Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106. Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107. Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

## I.   Brda Profited From The Fraudulent Scheme.

108.   Brda profited off his fraudulent scheme and false and misleading statements to investors.

109.   On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.   Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111.   Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### *(Against All Defendants)*

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116. With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

*(Against All Defendants)*

118. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119. Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120. Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts
  necessary in order to make the statements made, in light of the circumstances
  under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would
  operate, as a fraud or deceit upon any person.

122.    With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted

with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.    By reason of the foregoing, Defendants have violated, and unless enjoined will

continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]**

*(Against All Defendants)*

124.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if

fully set forth hereunder.

125.    As further described and alleged in paragraphs 39-46 and 67-81 above,

Torchlight's proxy statements contained false or misleading statements and/or omissions of

material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval

via the proxy statements containing false or misleading statements or omissions of material fact.

126.    As further described and alleged in paragraphs 82-88 above, Palikaras  solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.    By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.    With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

129.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**
*(Against Brda)*

130.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.     At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.     As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.     As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135.    By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136.    By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

### FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

*(Against Brda)*

137.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.     As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.     Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.     By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

142. By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143. By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII. PRAYER FOR RELIEF

144. WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

- Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

- Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

- Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.   JURY DEMAND

145.   The SEC demands trial by jury in this action on all issues so triable.

Dated:  June 25, 2024                           Respectfully submitted,

                                                /s/ *Patrick Disbennett*
                                                Patrick Disbennett (*pro hac vice* application pending)
                                                Christopher Rogers (*pro hac vice* application pending)

                                                U.S. Securities and Exchange Commission
                                                801 Cherry Street, Suite 1900
                                                Fort Worth, Texas 76102
                                                Tel: 817-978-3821
                                                disbennettpa@sec.gov
                                                rogerschri@sec.gov