# EXHIBIT 9

**Table of Contents**

**Filed pursuant to Rule 424(b)(4)**
**File No. 333-266143**

Prospectus

# Next Bridge Hydrocarbons, Inc.

## Common Stock
**(par value $0.0001)**

---

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of 165,472,241 shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next Bridge Hydrocarbons, Inc. (the "Company," "Next Bridge," "we," "us" or "our") held by Meta immediately prior to the Spin-Off. As of the date hereof, Meta holds 165,523,363 shares of Common Stock, of which 165,472,241 shares will be distributed in the Spin-Off and will be 100% of the outstanding shares of capital stock of the Company following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution.

At the time of the Spin-Off, Meta will distribute 165,472,241 of the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock and contemporaneously cancel any remaining shares of Common Stock it holds. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of Common Stock. The Distribution will be made in book-entry form by a distribution agent. Fractional shares of Common Stock will not be distributed in the Spin-Off.

The Spin-Off will be effective as of close of business, New York City time, on December 14, 2022. Immediately after the Spin-Off, the Company will be an independent public reporting company, provided, the Common Stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

None of the Series A Preferred Stockholders are required to vote on or take any other action in connection with the Spin-Off. We are not asking you for a proxy, and we request that you do not send us a proxy. The Series A Preferred stockholders will not be required to pay any consideration for the Common Stock they receive in the Spin-Off; immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.

Meta currently owns all the outstanding shares of Common Stock of the Company, and we have not sought to have the shares of Common Stock traded on any exchange. Accordingly, there is currently no public market for the Common Stock, and there is no current expectation for a public market to develop for the Common Stock.

---

**In reviewing this Prospectus, you should carefully consider the matters described in the section titled "Risk Factors" beginning on page 7 of this Prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**This Prospectus is not an offer to sell, or a solicitation of an offer to buy, any securities.**

**The date of this Prospectus is November 18, 2022**

**Table of Contents**

Table of Contents

| | |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | i |
| DEFINITIONS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 7 |
| THE SPIN-OFF | 26 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 29 |
| USE OF PROCEEDS | 36 |
| DETERMINATION OF OFFERING PRICE | 36 |
| CAPITALIZATION | 36 |
| BUSINESS | 37 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 47 |
| MANAGEMENT | 58 |
| EXECUTIVE COMPENSATION | 65 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 69 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 70 |
| DESCRIPTION OF OUR CAPITAL STOCK | 74 |
| LEGAL MATTERS | 78 |
| EXPERTS | 78 |
| WHERE YOU CAN FIND MORE INFORMATION | 79 |
| INDEX TO FINANCIAL STATEMENTS | 80 |

**Table of Contents**

### CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This Prospectus contains certain forward-looking statements and information relating to our business that are based on the beliefs of our management as well as assumptions made by and information currently available to our management. When used in this communication, the words "may," "anticipate," "believe," "estimate," "expect," "intend," "plan," "forecasts," "projections," and similar expressions are intended to identify such forward-looking statements. Forward-looking statements include, without limitation, the statements regarding our strategy, future plans for development and production and other strategic options, future expenses and costs and future liquidity and capital resources. Forward looking statements involve a number of risks, assumptions and uncertainties which may cause actual results to differ materially from those contained in this Prospectus. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Such statements reflect our current views with respect to future events, the outcome of which is subject to certain risks, including, among others:

- general competitive conditions, including actions our competitors may take to grow their businesses;

- changes to payment terms, the discount or margin on products or other terms with our suppliers;

- risks associated with data privacy, information security and intellectual property;

- work stoppages or increases in labor costs;

- our ability to attract and retain employees;

- development costs of our current or future properties;

- timing and success of our drilling activities;

- amount and timing of future production of oil and natural gas;

- our ability to successfully implement our strategic initiatives, including amount, nature and timing of capital expenditures;

- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;

- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;

- operating costs including lease operating expenses, administrative costs and other expenses;

- the volatility of prices and supply of, and demand for, oil and natural gas;

- changes in regulatory requirements and legislation governing our business, including sustainability;

- the amount of our indebtedness and ability to comply with covenants applicable to any future debt financing;

- our ability to access the credit and capital markets to satisfy future capital and liquidity requirements on acceptable terms;

- if we are not able to successfully execute on our future operating plans, we may not be able to continue as a going concern;

- adverse results from litigation, governmental investigations or tax-related proceedings or audits;

- changes in accounting standards;

- impact and cost of energy conservation and other sustainability efforts;

- exploration and development risks, which could lead to environmental damage, injury and loss of life or the destruction of property;

i

**Table of Contents**

- proximity and capacity of oil, natural gas and other pipelines, transportation and support infrastructure to production facilities;

- availability of consumables and raw materials and drilling and processing equipment;

- adverse weather conditions, natural disasters or other events;

- the ability to successfully estimate the impact of litigation matters;

- our ability to initiate and maintain discussions with third parties regarding strategic options;

- the potential adverse impact on our business resulting from the Spin-Off; and

- the other risks and uncertainties detailed in the section titled "Risk Factors."

Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results or outcomes may vary materially from those described as anticipated, believed, estimated, expected, intended or planned. Subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements in this paragraph. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this Prospectus except to the extent required by law.

ii

**Table of Contents**

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this prospectus. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. All references to "us", "our", "we", or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

**Table of Contents**

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

"**SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

**Table of Contents**

<div style="border:1px solid black;padding:1em;">

**PROSPECTUS SUMMARY**

*This summary highlights certain information contained elsewhere in this Prospectus and may not contain all of the information that is important to you. To understand fully and for a more complete description of the terms and conditions of the Distribution, you should read this Prospectus in its entirety, including the information presented under the section titled "Risk Factors" and the consolidated financial statements and related notes, and the documents to which you are referred. See "Where You Can Find More Information." Except where the context otherwise requires, or where otherwise indicated, references to the "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Oil Corporation, a Texas corporation, Hudspeth Operating, LLC, a Texas limited liability company, and Torchlight Energy, Inc., a Nevada corporation. "Meta" refers to Meta Materials, Inc. and its consolidated subsidiaries.*

**The Company**

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. as a wholly owned subsidiary of Meta, and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022.

*Background*

On December 14, 2020, Meta (formerly known as Torchlight Energy Resources, Inc., "Torchlight") and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Ontario corporations, entered into an Arrangement Agreement (the "Arrangement Agreement") with Metamaterial Inc., an Ontario corporation headquartered in Nova Scotia, Canada, to acquire all of the outstanding common shares of Metamaterial, Inc. by way of a statutory plan of arrangement (the "Arrangement") under the Business Corporations Act (Ontario), on and subject to the terms and conditions of the Arrangement Agreement, as amended. On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed.

In furtherance of the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) declared a dividend, on a one-for-one basis, of shares of Series A Non-Voting Preferred Stock of Meta (the "Series A Preferred Stock") to holders of record of Torchlight's common stock as of June 24, 2021. The holders of the Series A Preferred Stock are entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business. Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets, to us prior to the Spin-Off.

*Business Overview*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in Oklahoma.

We plan to operate our business through our wholly owned subsidiaries transferred to us from Meta, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation, Torchlight Hazel, LLC, a

</div>

1

**Table of Contents**

Texas limited liability company, and Hudspeth Operating, LLC, a Texas limited liability company. In addition, we may consider strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties; however, we are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options. We currently have six full-time employees, and we employ consultants for various roles as needed.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and the Hunton wells in partnership with Kodiak in Central Oklahoma. (the "Oklahoma Properties"). See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

### *Emerging Growth Company Status*

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As an emerging growth company, we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public reporting companies that are not emerging growth companies. These provisions include:

- Exemption from the auditor attestation requirement in the assessment of our internal control over financial reporting; and

- Reduced disclosure of certain financial information requirements related to executive compensation, including the requirements to hold a non-binding advisory vote on executive compensation and to provide information relating to the ratio of total compensation of its Chief Executive Officer to the median of the annual total compensation of all of our employees.

We may take advantage of these exemptions for up to five years or such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.235 billion in annual revenues as of the end of a fiscal year, if we are deemed to be a large-accelerated filer under the rules of the SEC, or if we issue more than $1.235 billion of non-convertible debt over a three-year-period.

The JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public reporting companies. Following the consummation of the Spin-Off, we will elect to avail ourselves of the extended transition period. During the extended transition period, it may be difficult to compare our financial results with the financial results of a public reporting company that complies with accounting pronouncements when effective.

### *Smaller Reporting Company*

We are a "smaller reporting company" as defined by Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a "smaller reporting company," the disclosure we will be required to provide in our SEC filings are less than it would be if we were not considered a "smaller reporting company." Specifically, "smaller reporting companies" are able to provide simplified executive compensation disclosures in their filings; if annual revenue is less than $100 million, may be exempt from the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002 requiring that independent registered public accounting firms provide an attestation report on the effectiveness of internal control over financial reporting; and have certain other decreased disclosure obligations in their SEC filings, including, among other things, being permitted to provide two years of audited financial statements in annual reports rather than three years. Decreased disclosures in our SEC filings due to our status as a "smaller reporting company" may make it harder for investors to analyze our results of operations and financial prospects.

**Table of Contents**

---

*Market Opportunity*

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

*Regulatory Framework*

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of $CO_2$, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the federal Resource Conservation and Recovery Act, Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the federal Occupational Safety and Health Act and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Related to Our Business", including the following risk factors "—*Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "—*Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "—*Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*".

*Corporate Information*

Our executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116, and our telephone number is (817) 438-1937. We intend to have an internet website, nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be deemed a part of this prospectus and shall not be incorporated by reference herein.

**Table of Contents**

<div style="border:1px solid black; padding:10px;">

**Summary of the Spin-Off**

| | |
|---|---|
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,472,241 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution. |
| | Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled contemporaneously with the Spin-Off. |
| Record Date | The Record Date is the close of business on December 12, 2022. |
| Distribution Date | The Distribution Date is the close of business on December 14, 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates, other than upon request. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Distribution Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions: |
| | • the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to the holders of Meta's Series A Preferred Stock; |

</div>

4

**Table of Contents**

|  | • the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party thereto; |
|---|---|
|  | • the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC; |
|  | • no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Spin-Off shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Spin-Off; |
|  | • all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and |
|  | • any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived. |
|  | The fulfillment of the foregoing conditions will not create any obligation on the part of Meta to effect the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, state "blue sky" laws, or any material approvals that we must obtain, other than the SEC's declaration of the effectiveness of the Registration Statement and applicable filings or notices required in compliance with applicable state securities or "blue sky" laws, in connection with the Spin-Off. Meta has the right not to complete the Spin-Off if, at any time, the Meta board or directors determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable. |
| Trading Market | All of our outstanding shares of Common Stock are currently beneficially owned by Meta and our Common Stock is currently not listed for trading on any stock exchange or market and we have not sought to be traded on any exchange or market. The shares of Common Stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the Common Stock and there is no current expectation for a public market to develop. |
| U.S. Federal Income Tax Consequences to Series A Preferred Stockholders | U.S. federal income tax treatment of the issuance of our Common Stock to holders of the Series A Preferred Stock will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes, and U.S. and non-U.S. holders could be subject to tax as a result of the Spin-Off and the cancellation all shares of the Series A Preferred Stock. Accordingly, holders of Series A Preferred Stock are |

**Table of Contents**

|  |  |
|---|---|
|  | encouraged to consult their own tax advisors as to the specific U.S. federal, state and local, and non-U.S. tax consequences of the Distribution to such stockholders. |
| Transfer Agent | American Stock Transfer & Trust Company LLC. |
| Risk Factors | Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the Spin-Off. Following the Spin-Off, we will also face risks associated with being an independent company. Accordingly, you should read carefully the information set forth under the heading "Risk Factors." |

**Table of Contents**

## RISK FACTORS

*You should carefully consider all of the information in this Prospectus and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off and the ownership of our Common Stock. The risks and uncertainties described below are not the only ones faced by us. Additional risks and uncertainties not presently known or that are currently deemed immaterial also may impair our business operations. If any of the following risks occur, our business, financial condition, operating results and cash flows and the value of our Common Stock could be materially adversely affected.*

**Risks Relating to Our Business**

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this Prospectus, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;

- the success of our development and exploration;

- the demand for oil and natural gas;

- the level of our competition;

- our ability to attract and maintain key management and employees; and

- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited capital and will need to raise additional capital in the immediate future.***

Following the Spin-Off, we will require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of

7

**Table of Contents**

our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

***We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.***

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the three and nine months ended September 30, 2022, we incurred a net loss of $2,164,187 and $4,764,293, respectively, and used cash of $6,067,015 for operating activities for the nine months ended September 30, 2022. At September 30, 2022, we had an accumulated deficit of $72,951,809 and had a working capital deficit of $19,385,284 compared with a working capital deficit of $13,307,453 as of December 31, 2021. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a "going concern" audit qualification. A "going concern" qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

***There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our Common Stock.***

After the Spin-Off, we may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our Common Stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern. We are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options.

8

**Table of Contents**

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

***Litigation may adversely affect our business, financial condition, and results of operations.***

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Legal Proceedings."

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Following the Spin-Off, our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual

**Table of Contents**

arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of September 30, 2022, we had leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas expiring in 2022 if we fail to drill five wells as obligated, for which there can be no assurance will be met. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of September 30, 2022, we have leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Following the Spin-Off, our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;

- the domestic and foreign supply of oil and natural gas;

- the ability of the members of the Organization of Petroleum Exporting Countries ("OPEC") to agree to and maintain oil price and production controls;

- the price of foreign oil and natural gas;

- domestic governmental regulations and taxes;

- the price and availability of alternative fuel sources;

- weather conditions;

- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and

- worldwide economic conditions.

**Table of Contents**

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year. These trends materially, adversely affected our results of operations, cash flows and financial condition during the last two years.

If oil or natural gas prices reverse again and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

The Company recognized an impairment charge of $2,108,301 in 2020 due to an adjustment required by this ceiling test.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. This technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. Nonetheless, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. We currently have no insurance to cover such losses and liabilities, and even if insurance is obtained, it may not be adequate to cover any losses or liabilities. We cannot predict the

11

**Table of Contents**

availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

### *The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.*

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

### *Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.*

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

### *We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.*

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

### *Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of Common Stock.*

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the recent

**Table of Contents**

development costs related to our Hazel Project were paid by Masterson Hazel Partners LP ("MHP"). We granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing (the "Option Agreement"). The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, and the present value of such reserves was adjusted based on our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;

- pressure or irregularities in geological formations;

- restricted access to land for drilling or to existing pipeline infrastructure;

- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines;

- equipment failures or accidents;

- failure of secondary recovery operations to perform as expected;

- unexpected operational events and drilling conditions;

- declines in oil or natural gas prices;

- limitations in the market for oil or natural gas;

- pipe or cement failures;

- casing collapses;

- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;

- lost or damaged drilling and service tools;

- loss of drilling fluid circulation;

Table of Contents

- uncontrollable flows of oil and natural gas, water or drilling fluids;

- blowouts, explosions fires and natural disasters;

- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;

- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and

- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the Environmental Protection Agency and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the Clean Air Act and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the Resource Conservation and Recovery Act which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations in reliance on our contractual relationship with Maverick Operating LLC, who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating

14

**Table of Contents**

standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce***.

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

15

**Table of Contents**

In addition, in November 2016, the U.S. Department of the Interior Bureau of Land Management ("BLM") issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our Common Stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated

16

**Table of Contents**

reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.***

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

17

**Table of Contents**

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

### Our business will suffer if we cannot obtain or maintain necessary licenses.

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension of, any of these licenses or permits could hamper our ability to produce revenues from our operations.

### Challenges to our properties may impact our financial condition.

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

### We rely on technology to conduct our business, and our technology could become ineffective or obsolete.

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

### The loss of key personnel would directly affect our efficiency and profitability.

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We have entered into employment agreements with certain of our executive officers effective immediately following the Spin-Off. Three of our executives were party to prior employment agreements with one of our subsidiaries, which have been terminated and superseded by the agreements as described in more detail under the heading "Executive Compensation" elsewhere in this Prospectus.

18

**Table of Contents**

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

After the Spin-Off we plan to have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and

- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor. For additional discussion of our management's business affiliations and the potential conflicts of interest of which our stockholders should be aware, see "Certain Relationships and Related Party Transactions."

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

**Table of Contents**

*Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.*

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

**Risks Relating to the Spin-Off**

*The Spin-Off could result in significant tax liability to Meta and its stockholders.*

The Spin-Off and cancellation of all shares of Meta's Series A Preferred Stock together will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes. Series A Preferred stockholders could be subject to tax as a result of the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock together for U.S. federal income tax purposes for a U.S. holder (as defined further below) will depend on whether the Spin-Off and such cancellation qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Spin-Off and cancellation of all shares of the Series A Preferred Stock together qualify as a sale or exchange of the Series A Preferred Stock, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the Spin-Off and such cancellation together, and such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock for U.S. federal income tax purposes for a non-U.S. holder (as defined further below) likewise will depend on whether the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock, gain recognized from the Spin-Off by a non-U.S. holder generally will not be subject to U.S. federal income taxation. If the Spin-Off and such cancellation together do not qualify as a sale or exchange of Series A Preferred Stock, a non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be subject to any applicable withholding. If a Series A Preferred stockholder is subject to withholding tax in connection with the Spin-Off (including nonresident withholding tax or backup withholding tax, each as described further under the heading "Material U.S. Federal Income Tax Considerations" below), Meta has the right to reduce the amount of Common Stock deliverable to such stockholder in the Spin-Off in order to pay such withholding tax.

Meta will generally recognize gain equal to the fair market value of our Common Stock in excess of Meta's adjusted tax basis in such Common Stock at the time of the Spin-Off. To the extent such gain gives rise to unreimbursed federal, state or other tax liabilities, such liabilities could adversely affect Meta's liquidity or capital reserves.

**Table of Contents**

See below under the headings "Notes to Unaudited Pro-Forma Condensed Combined Financial Statements" and "Material U.S. Federal Income Tax Considerations" for more information.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

We believe that, as an independent company, we will be able to, among other things, better focus our financial and operational resources on our specific business, implement and maintain a capital structure designed to meet our specific needs, design and implement corporate strategies and policies that are targeted to our business, more effectively respond to industry dynamics and create effective incentives for our management and employees that are more closely tied to our business performance. However, by separating from Meta, we may be more susceptible to market fluctuations and have less leverage with suppliers, and we may experience other adverse events. In addition, we may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all. The completion of the Spin-Off will also require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and we may experience increased costs after the Spin-Off.***

Meta has provided us with various corporate services. Following the Spin-Off, Meta will have no obligation to provide us with assistance other than as described under "Certain Relationships and Related Party Transactions—Agreements with Meta." These arrangements do not account for every service that we have received from Meta in the past. Accordingly, following the Spin-Off, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Meta. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Meta. We may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently or may incur additional costs. If we fail to obtain the services necessary to operate effectively or if we incur greater costs in obtaining these services, our business, financial condition and results of operations may be adversely affected.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this Prospectus from Meta's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.

- We will enter into certain transactions with Meta that did not exist prior to the Spin-Off, such as the Tax Matters Agreement, which may cause us to incur new costs.

- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we will lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

21

**Table of Contents**

Following the Spin-Off, we will also be responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

***Our contracts may contain provisions requiring the consent of third parties in connection with the Spin-Off. If these consents are not obtained, we may be unable to enjoy the benefit of these contracts in the future.***

Our contracts may contain provisions that require the consent of third parties to the Spin-Off. Failure to obtain such consents on commercially reasonable and satisfactory terms may impair our entitlement to the benefit of these contracts in the future.

***The 2021 Note with Meta contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). If we are not in compliance with the covenants of the 2021 Note, or if we are in default under the 2021 Note, it is unlikely that Meta will offer to extend any additional loans or debt financing under the 2021 Note or otherwise, which may affect our business as a going concern. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Prospect as defined in the Security Agreement (defined below), each held by the Pledgor (defined below) or the Pledgor's affiliate. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***Our Loan Agreement with Meta contains restrictive covenants that limit our operations.***

As of August 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;

22

[Table of Contents](#)

- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;

- our ability to incur additional debt beyond certain limits or encumber our assets; and

- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements with Meta.***

We have negotiated agreements with Meta including the 2021 Note, Loan Agreement, Distribution Agreement and Tax Matters Agreement, while we are still part of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements being negotiated relate to, among other things, loans for working capital, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See "Certain Relationships and Related Party Transactions" for more information.

### Risks Relating to our Common Stock

***Our Common Stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to hold or trade the stock.***

A significant number of the holders of the Series A Preferred Stock hold such shares in "street name" brokerage accounts. Our shares of Common Stock will not become eligible with DTC to permit our shares of Common Stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our Common Stock, restricting all trades by holders of our Common Stock following the Spin-Off, and the brokerage firms may return all such shares from the brokerage accounts to the beneficial holders.

***The price per share of Meta's Series A Preferred Stock traded on the over-the-counter ("OTC") market under the symbol MMTLP may not accurately reflect the value of a share of our Common Stock that you will receive in the Distribution.***

Before the Distribution, Meta's Series A Preferred Stock was traded on the OTC market under the trading symbol "MMTLP", although such shares of MMTLP were not eligible for broker-dealer quotations. The OTC

23

**Table of Contents**

market does not constitute an established stock exchange, and as a result, the historical trading prices for the shares of MMTLP may not be a reliable benchmark on which to determine the value of the shares of our Common Stock you will receive in the Distribution.

Additionally, securities of certain companies have recently experienced significant and extreme volatility in stock price due to short sellers of shares of securities, known as a "short squeeze." These short squeezes have caused extreme volatility in both the stock prices of those companies and in the market and have led those companies' securities to trade at a significantly inflated price per share that is disconnected from the underlying value of the company. In particular, if any investors have sold shares of MMTLP short, then in connection with the Distribution such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution. If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share as shown on the OTC market may rise significantly but not be representative of the value of the underlying shares of our Common Stock that you will receive in the Distribution.

### *No trading market for our Common Stock is expected to develop.*

There is presently no public market for our shares of Common Stock and our shares are not expected to become DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, you may have to hold the shares of Common Stock indefinitely.

### *We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.*

We do not intend to pay cash dividends on our Common Stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our board of directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

### *Your percentage ownership in the Company may be diluted in the future, including in our plan to issue our Common Stock for the working interests in our Orogrande Project.*

Your percentage ownership in the Company may be diluted in the future because of equity awards that we expect to grant to our directors, officers and other employees and current holders of working interests in our Orogrande Project. Prior to the Spin-Off, we approved an incentive plan that will provide for the grant of Common Stock-based equity awards to our directors, officers and other employees. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

### *We may issue preferred stock with terms that could adversely affect the voting power or value of our Common Stock.*

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our Common Stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our Common Stock.

**Table of Contents**

**Risks Relating to Our Status as a Public Reporting Company**

***We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our Common Stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our Common Stock less attractive if we choose to rely on these exemptions.

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million as of the end of the prior June 30th, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates is less than $700 million as of the prior June 30th. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.


***We may be required to file reports with the SEC only for the fiscal year in which the registration statement for the Spin-Off becomes effective and may no longer be subject to the reporting obligations under the Exchange Act thereafter.***

By registering the shares of Common Stock in connection with the Spin-Off, we become subject to the reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. We would be obligated to continue these reporting obligations for subsequent reporting periods if on the last day of our fiscal year in which the Registration Statement of which this prospectus forms a part becomes effective we have more than $10 million in assets and either 2,000 or more record holders or 500 or more record holders who are not "accredited investors." It is unclear whether the number of our record holders following the Spin-Off will meet one or both of these thresholds, in which case, we may become exempt from such reporting requirements after the year ending December 31, 2022. If we were to decide not to continue reporting, you will not have access to updated information regarding our business, financial condition and results of operation. Although we may and intend to continue to file such reports with the SEC, such filings will be voluntary.

**Table of Contents**

## THE SPIN-OFF

### Background

In June 2020 the board of directors of Torchlight began to pursue strategic alternatives for Torchlight due to the permeating financial climate of the oil and gas industry in 2020. In July 2020 Torchlight engaged Roth Capital Partners, LLC as its financial advisor in connection with a strategic transaction. After discussions with various companies, Torchlight began discussions with Metamaterial, Inc. in September 2020 concerning a potential strategic transaction.

After several months of negotiations, in December 2020 Torchlight and Metamaterial, Inc. entered into the Arrangement Agreement. Within the Arrangement Agreement, the oil and gas properties of Torchlight (the "O&G Assets") were effectively allocated to the legacy Torchlight stockholders, which became the Series A Preferred stockholders of Torchlight (which was subsequently renamed "Meta Materials, Inc."). Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock. Pursuant to the Certificate of Designation, upon a sale of the O&G Assets, the proceeds from any such transaction are to be distributed to the Series A Preferred stockholders, or Meta was to pursue a spin-off. In lieu of a sale of the O&G Assets, the Meta board has now determined to pursue the Spin-Off.

### Reasons for the Spin-Off

The Meta board of directors considered the Spin-Off to be strategic so that Meta can concentrate on its core business.

### When and How You Will Receive Shares of Common Stock

Meta will distribute to the holders of its Series A Preferred Stock, as a pro rata dividend, one share of our Common Stock for every share of Series A Preferred Stock outstanding as of December 12, 2022 (the "Record Date").

Prior to the Spin-Off, Meta will deliver all of the issued and outstanding shares of our Common Stock to the distribution agent. American Stock Transfer & Trust Company LLC (the "Transfer Agent") will serve as distribution agent in connection with the Distribution and as transfer agent and registrar for our Common Stock.

If you own Series A Preferred Stock of Meta as of the close of business on December 12, 2022, the shares of our Common Stock that you are entitled to receive in the Distribution will be issued to your account as follows:

- *Registered stockholders*. If you own your shares of Series A Preferred Stock directly through Meta's transfer agent, American Stock Transfer & Trust Company LLC, you are a registered stockholder. In this case, the distribution agent will credit the whole number of shares of our Common Stock you receive in the Distribution by way of direct registration in book-entry form to a new account with the Transfer Agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Distribution. You will be able to access information regarding your book-entry account holding our shares at the Transfer Agent.

Commencing on or shortly after the Distribution Date, the Transfer Agent will mail to you an account statement that indicates the number of whole shares of our Common Stock that have been registered in book-entry form in your name. We expect it will take the Transfer Agent up to two weeks after the Distribution Date to complete the distribution of the shares of our Common Stock and mail statements of holdings to all registered stockholders. You or your bank, broker or other nominee may request that the Transfer Agent issue to you a physical stock certificate representing your shares of Common Stock.

- "*Street name*" *or beneficial stockholders*. Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

**Table of Contents**

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent on or prior to the Record Date such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our Transfer Agent.

If you sell shares of Series A Preferred Stock on or before the Record Date, you will not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of Series A Preferred Stock sold. We expect all trading of the shares of Series A Preferred Stock to be suspended as of the Distribution Date.

We are not asking holders of Meta Series A Preferred Stock to take any action in connection with the Spin-Off. No approval of any holders of Meta's capital stock is required for the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Meta Series A Preferred Stock for shares of our Common Stock. As of the Distribution Date, all of the shares of Series A Preferred Stock will be automatically cancelled and the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares.

**Number of Shares You Will Receive**

On the Distribution Date, you will receive one share of our Common Stock for every share of Meta Series A Preferred Stock you hold on the Record Date. No fractional shares of Common Stock will be issued.

**Results of the Spin-Off**

After the Spin-Off, we will be an independent company. Immediately following the Spin-Off, we expect to have approximately 64,000 holders of shares of our Common Stock. In computing the number of holders of record, all broker-dealers and clearing corporation holding shares on behalf of its customers, the holders of the Series A Preferred Stock, is counted as a single shareholder. A significant number of shares of our Common Stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our Common Stock.

We have entered into a Distribution Agreement and certain other agreements with Meta related to the Spin-Off. These agreements will govern the relationship between us and Meta up to and after completion of the Spin-Off and allocate between us and Meta various assets, liabilities, rights and obligations, including employee benefits, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships and Related Party Transactions—Agreements with Meta."

**Conditions to the Spin-Off**

We expect that the separation will be effective on the Distribution Date, provided that the following conditions shall have been satisfied or waived by Meta:

- the Meta board of directors shall have authorized and approved the Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders;

- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party to those agreements;

**Table of Contents**

- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;

- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Distribution;

- all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and

- any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.

**Reasons for Furnishing this Prospectus**

We are furnishing this Prospectus solely to provide information to Meta Series A Preferred Stockholders who will receive shares of our Common Stock in the Distribution. You should not construe this Prospectus as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Meta. We believe that the information contained in this Prospectus is accurate as of the date set forth on the cover. Changes to the information contained in this Prospectus may occur after that date, and neither we nor Meta undertake any obligation to update the information except in the normal course of our and Meta's public disclosure obligations and practices and except as required by applicable law.

Remaining Pages of Prospectus Excerpted

# EXHIBIT 10

EX-99.1 2 ex_99-1.htm PRESS RELEASE DATED DECEMBER 20, 2022

**Exhibit 99.1**



# *NEWS RELEASE*

### NEXT BRIDGE HYDROCARBONS, INC. ANNOUNCES
### COMPLETION OF SPIN-OFF FROM META MINERALS, INC.

**FT. WORTH – December 20, 2022 – Next Bridge Hydrocarbons, Inc.** ("Next Bridge", "our", or the "Company") announced today that the spin-off of all of the issued and outstanding shares of common stock of Next Bridge by Meta Materials, Inc. ("Meta"), was successfully completed on December 14, 2022. The Company has posted a Frequently Asked Questions document regarding the spin-off on its website at https://www.nextbridgehydrocarbons.com/investors, which includes all publicly available information.

The Company also announced that its transfer agent, American Stock Transfer & Trust Company, LLC ("AST"), is in the process of mailing statements of holdings to all registered stockholders.

- If you are a **registered holder of record** (on the books of Next Bridge maintained by AST) of the MMTLP Series A Preferred Stock as of December 12, 2022 (the "Record Date"), you are considered the holder of record with respect to those shares, and AST will mail statements of holdings to all registered stockholders after the distribution is complete. No action is required for registered holders to register their shares. Registered holders may contact AST directly at:

    | By Mail: | AST Shareholder Services Call Center: |
    |---|---|
    | American Stock Transfer & Trust Company, LLC | Toll Free: 800.937.5449 |
    | ATTN: Operations Center, Reorganization Dept. | Local & International: 718-921-8124 |
    | 6201 15th Avenue | Hours: 8 a.m. – 8 p.m. ET Monday-Friday |
    | Brooklyn, New York 11219 | Help@astfinancial.com |

- If your MMTLP Series A Preferred Stock are held in an account at a broker, bank, broker-dealer, custodian, or other similar organizations, then you are the **beneficial owner of shares** held in "street name." You should contact your custodial institution directly if you wish to have your shares registered.

The Company anticipates meeting its reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. The Company has also established an "Investor Form" on the Company's website, which is to be used for internal purposes only.

**About Next Bridge Hydrocarbons, Inc.**

The Company is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project consisting of 134,000 contiguous gross acres we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas. In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas, and two minor well interests in Oklahoma. Please visit www.nextbridgehydrocarbons.com for more information.

This press release may contain "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described herein. Although the Company believes the expectations in such statements to be reasonable, there can be no assurance that such expectations will prove to be correct. Information concerning the assumptions, uncertainties and risks that may affect the actual results can be found in the Company's filings with the Securities and Exchange Commission ("SEC") available on the Company's website or the SEC's website at sec.gov.

Contact:
Dennard Lascar Investor Relations
NextBridge@dennardlascar.com

EXHIBIT 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | Case No. 23-90085 (CML) |
| Debtors. | (Jointly Administered) |

## THE U.S. SECURITIES AND EXCHANGE COMMISSION'S STATEMENT IN SUPPORT OF CONSOLIDATED AUDIT TRAIL, LLC'S OBJECTION TO SCILEX HOLDING COMPANY'S MOTION FOR ENTRY OF AN ORDER COMPELLING THE PRODUCTION OF BOOKS AND RECORDS FROM CONSOLIDATED AUDIT TRAIL, LLC PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

(Related to Dkt. No. 1878)

The U.S. Securities and Exchange Commission (the "Commission"), a statutory party to these proceedings[2] and the federal agency responsible for regulating and enforcing compliance with the federal securities laws, submits this Statement in Support of Consolidated Audit Trail, LLC's Objection to Scilex Holding Company's Motion for Entry of an Order Compelling the

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

[2] As a statutory party in corporate reorganization proceedings, the Commission "may raise and may appear and be heard on any issue." 11 U.S.C. §1109(a).

Production of Books and Records from Consolidated Audit Trail, LLC Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Motion").[3]

## I.    INTRODUCTION

The consolidated audit trail ("CAT") is of critical importance to the Commission and to self-regulatory organizations ("SROs")[4] in their regulation and oversight of the nation's securities markets.  Because of the vast amount of confidential data captured in CAT for these purposes, maintaining the confidentiality of CAT data is of utmost importance.  Toward this end, the Commission has required that CAT data be used only for regulatory and oversight responsibilities pursuant to the federal securities laws, rules, and regulations.  It should not be used in private litigation.  Therefore, the Commission respectfully requests that the Court deny Scilex's Motion.

## II.   CAT DATA SHOULD BE USED ONLY FOR REGULATORY AND OVERSIGHT PURPOSES

### A.  CAT Data Should Be Kept Confidential

1.      CAT allows regulators to track activity throughout the U.S. markets in National Market System ("NMS") securities.  CAT captures customer and order event information for orders in NMS securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution.  CAT data "substantially enhance[s] the ability of SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws."  Joint Industry Plan; Order Approving the National Market System

---

[3] The Motion filed by Scilex Holding Company ("Scilex") is docket number 1878.  Consolidated Audit Trail, LLC's Objection to the Motion is docket number 2075.

[4] SROs include registered stock exchanges (e.g., the New York Stock Exchange (NYSE)) and registered securities associations (e.g., the Financial Industry Regulatory Authority (FINRA)).

Plan Governing the Consolidated Audit Trail, Release No. 34-79318, 81 Fed. Reg. 84696, 84698

(November 16, 2016) ("CAT NMS Plan Approval Order") (quotations omitted).

2.      Rule 613, which was adopted by the Commission in 2012, required the creation of

CAT and mandated that SROs develop a "national market system plan to govern the creation,

implementation, and maintenance of a consolidated audit trail and central repository" ("CAT

NMS Plan").  17 CFR § 242.613(a)(1).  The SROs subsequently filed the CAT NMS Plan, and

the Commission approved it in the November 16, 2016, CAT NMS Plan Approval Order.[5]

3.      Since its inception, the Commission has sought to balance the value of CAT data

for regulatory and oversight purposes with the risk of consolidating vast amounts of confidential

information by requiring strong privacy and confidentiality protections.  *See, e.g., Consol. Audit

Trail*, Release No. 34-67457, at 45782 (July 18, 2012) ("Rule 613 Adoption Release") (stating

the Commission "believes that maintaining the confidentiality of customer and other information

reported to the central repository is essential. Without adequate protections, market participants

would risk the exposure of highly-confidential information about their trading strategies and

positions."); CAT NMS Plan Approval Order, 81 Fed. Reg. at 84758 ("[T]he CAT is designed to

---

[5] The CAT NMS Plan takes the form of a limited liability agreement establishing a company jointly owned by the participating SROs (the "participants," also referred to as the "plan sponsors" in Rule 613) through which they conduct the activities related to CAT.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84699.  Pursuant to an amendment to the CAT NMS Plan, the limited liability company is named Consolidated Audit Trail, LLC ("CAT LLC").  Joint Industry Plan; Notice of Filing and Immediate Effectiveness of Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-87149 (September 27, 2019), 84 Fed. Reg. 52905 (Oct. 3, 2019).  The CAT NMS Plan obliges a "plan processor" to develop and implement policies, procedures, and control structures related to the CAT system that are consistent with Rule 613(e)(4) (ensuring the security and confidentiality of CAT data), among other provisions.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84704.  Pursuant to the CAT NMS Plan, the participants must report specified CAT data that is received, consolidated, and retained in a "central repository" overseen by the plan processor. *Id.*, 81 Fed. Reg. at 84706-07.

be a regulatory tool. . . . [T]he Commission also believes that limiting the use of CAT Data for regulatory and surveillance purposes is reasonable at this time, given the vast scope of the CAT Data and need to ensure the security and confidentiality of the CAT Data.").

4.      In accord with protecting the confidentiality of CAT data, Commission regulations provide that CAT LLC is subject to strict limits on how and by whom CAT data is used.  Rule 613(e)(4) expressly requires that the plan processor "[e]nsure the security and confidentiality of all information reported to the central repository by requiring that: (A) All plan sponsors and their employees, as well as all employees of the central repository, agree to use appropriate safeguards to ensure the confidentiality of such data and agree not to use such data for any purpose other than surveillance and regulatory purposes."  17 CFR § 242.613(e)(4)(i)(A).[6]  Rule 613(e)(4) further requires that rules be adopted and enforced that "[r]equire information barriers between regulatory staff and non-regulatory staff with regard to access and use of data in the central repository" and that "[p]ermit only persons designated by plan sponsors to have access to the data in the central repository."  17 CFR § 242.613(e)(4)(i)(B).

5.      Similarly, the Commission's rule provides that access to and use of CAT data should be for the purpose of performing regulatory and oversight responsibilities.  Rule 613(e)(2) states that, "Each [Participant] and the Commission shall have . . . access to and use of the data reported to and consolidated by the central repository . . . *for the purpose of performing its*

---

[6] Rule 613(e)(4) clarifies that this language should not be "construed to prevent a plan sponsor from using the data that it reports to the central repository for regulatory, surveillance, commercial, or other purposes as otherwise permitted by applicable law, rule, or regulation."  17 CFR § 242.613(e)(4).  However, this exception only applies to plan sponsors (SROs) and with respect to the data plan sponsors have retained independently of their CAT reporting obligations; the exception does not apply to CAT LLC's employees or data.

*respective regulatory and oversight responsibilities* pursuant to the federal securities laws, rules, and regulations."  17 CFR § 242.613(e)(2) (emphasis added).

6.      Consistent with the requirements of Rule 613, the Commission-approved CAT NMS Plan provides that "access to and use of the CAT Data" is "solely for the purpose of performing [the plan participants'] respective regulatory and oversight responsibilities pursuant to the federal securities laws, rules and regulations or any contractual obligations."[7]  CAT NMS Plan, § 6.5(c)(i) (available at https://www.catnmsplan.com/sites/default/files/2023-09/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-9.06.23.pdf); *see also* CAT NMS Plan, §§ 6.5(f)(i)(A) (requiring individuals who have access to CAT data to agree "to use appropriate safeguards" and to use CAT data only for approved purposes), 6.5(g) (requiring plan participants to have policies and procedures to "ensure the confidentiality of CAT Data" and limit the use of CAT data "solely for surveillance and regulatory purposes").  The CAT NMS Plan Approval Order similarly states that "access to and use of the CAT Data stored in the Central Repository [will be provided to the Participants and the SEC] *solely for the purpose of performing their respective regulatory and oversight responsibilities* pursuant to the federal securities laws, rules and regulations or any contractual obligations."  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84706 (emphasis added).[8]

---

[7] Regarding the reference to "contractual obligations," some plan participants contract with other plan participants to provide regulatory services via regulatory services agreements.

[8] *See also id.*, 81 Fed. Reg. at 84764 ("The Commission takes very seriously concerns about maintaining the security and confidentiality of CAT Data and believes that it is imperative that all CAT users, including the Commission, implement and maintain a robust security framework with appropriate safeguards to ensure that CAT Data is kept confidential and used only for surveillance and regulatory purposes.").

7.     A violation of the CAT NMS Plan is a violation of Rule 613,[9] so CAT LLC and the plan participants have a legal duty to keep CAT data confidential and to use it only for regulatory and oversight purposes.

**B. Disclosure of CAT Data to Private Entities Would Significantly Compromise CAT Data**

8.     Allowing disclosure of CAT data to private entities creates a significant risk of improper disclosure of this highly confidential information.  Since private parties were not intended recipients of CAT data, they are not subject to the numerous security and confidentiality requirements with which SROs must comply.  *See, e.g.*, CAT NMS Plan Approval Order, 81 Fed. Reg. at 84724 (requiring SRO participants to "establish, maintain and enforce written policies and procedures reasonably designed to ensure the confidentiality of the CAT Data," "adopt and enforce policies and procedures that implement effective information barriers between each Participant's regulatory and nonregulatory Staff with regard to CAT Data, permit only persons designated by Participants to have access to the CAT Data stored in the Central Repository; and impose penalties for Staff noncompliance with any of its or the Plan Processor's policies and procedures with respect to information security.").  Private parties also may not have the infrastructure or ability to protect CAT data with the same level of security protections that the Commission and SROs have put in place.

9.     Requests like Scilex's, if granted, would result in the release of a vast amount of data.  Scilex is seeking over two years' worth of data, and that data will include, for each trade in Scilex stock, information relating to the price, size, time, and venue of trades, firm-designated

---

[9] *See* 17 CFR § 242.613(h)(2) ("[a]ny failure by a national securities exchange or national securities association to comply with the provisions of the national market system plan approved by the Commission shall be considered a violation of this section.").

identifiers and confidential customer identifiers, as well as numerous other aspects of orders, executions, and allocations, such as order type information.  And to the extent that Scilex's open-ended request for "all other data not listed" includes customer and account information, sensitive identifying information of any entity or individual that ordered, traded, or was allocated Scilex securities would be disclosed, including, but not limited to, legal names, addresses, years of birth, Employer Identification Numbers, and unique customer identifiers currently available only to regulators.

10.     As delineated in the CAT NMS Plan Approval Order, if the security of CAT data were compromised, the resulting costs could be significant, including (a) damage to market participants' trading profits and client relationships as a result of the disclosure of confidential trading strategies or positions, and (b) damage to business profits as a result of the disclosure of proprietary information about non-public business relationships.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84874.

11.     Protective orders would not be sufficient to assure that CAT data was kept in computer systems with all the protections that the Commission and the SROs have implemented for CAT data.

12.     Because CAT data is confidential data that, by law, is gathered and maintained solely for regulatory and oversight use, it should not be available to litigants who are seeking to use it for other purposes and who are unlikely to be able to protect the data pursuant to the confidentiality and security requirements imposed on CAT participants and the Commission.

**C.   CAT Data Constitutes "Protected Matter" under Rule 45 of the Federal Rules of Civil Procedure**

13.     Rule 2004 exams are enforced through subpoenas issued in accordance with Rule 45.  *See* Fed. R. Bankr. Proc. 2004(c) (production "may be compelled as provided in Rule

9016"); Fed. R. Bankr. Proc. 9016 (stating that Rule 45 of the Federal Rules of Civil Procedure applies in bankruptcy cases). Rule 45 provides, in relevant part, that a court must quash or modify a subpoena that "requires disclosure of privileged *or other protected matter*, if no exception or waiver applies." Fed. R. Civ. Proc. 45(d)(3)(A))(iii) (emphasis added); *see also id.* at (d)(3)(B)(i) (providing that a court may quash or modify a subpoena if it requires disclosing confidential commercial information).

14. "[P]rivacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336 (11th Cir. 2020); *see also Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 526–27 (N.D. Ga. 2012) (quashing a plaintiff's request for nonparty educational records based in part on the privacy rights protected by the Family Educational Rights and Privacy Act of 1974, which "does not provide a privilege preventing disclosure of student records, [but nevertheless] seeks to protect the confidentiality of educational records").

15. Given that the Commission's regulations, the CAT NMS Plan, and other Commission statements evidence a critical government policy of protecting the confidentiality of CAT data, CAT data is a "protected matter," and Scilex's Motion should be denied on this basis. *See, e.g., In re Subpoena Dated June 18, 2020*, No. 20-MC-82327-BER, 2021 WL 7540812, at *5 (S.D. Fla. Apr. 14, 2021) (holding that where, "for important Governmental policy reasons, the FDA uses contractual provisions and agency regulations to limit disclosure of clinical testing data until after a final report is issued," "these restrictions bring the subpoenaed materials within the definition of 'protected' material within the meaning of Fed. R. Civ. P. 45(d)(3)(A)(iii) until the final study report is issued"); *Shetayh v. State Farm Fire & Cas. Co.*, No. 5:20-CV-00693,

2020 WL 6817325, at *4 (E.D. Pa. Nov. 20, 2020) (quashing a subpoena to a district attorney's office, in part, because the court found that documents relating to a criminal investigation were confidential and therefore a "protected matter" under Rule 45; in doing so, the court considered the state's statute evidencing confidentiality concerns and imposing confidentiality duties relating to investigative materials, despite the inapplicability of state privileges in federal court).

### D.  Private Litigants Like Scilex Cannot Show Good Cause for CAT Data and Should Turn to Alternate Sources for Discovery

16.     The Commission believes that no request by a private litigant for CAT data would be appropriate.  However, if a disclosure that was not for a regulatory or oversight purpose were to be considered, any party seeking CAT data should be required to show that the party's need outweighs the need to protect CAT data.  Such a party would need to make a clear showing that CAT data is relevant and necessary to the party's litigation position, that it cannot obtain it from another source, and that it has administrative, technical, and physical safeguards sufficient to protect CAT data from any unauthorized disclosure.  *See Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C. Cir. 1968) (in ruling on Rule 2004 motions "a determination on good cause requires that all reasonable alternatives be explored."); *Jordan*, 947 F.3d at 1336 ("confidentiality concerns can factor into a decision whether to quash a subpoena").

17.     In this case, Scilex has not made and cannot make such showing.  It seeks eight categories of data for a two-year period, including a broad category of "other data" and does not provide any reason to believe that naked short selling occurred or that other, less intrusive, sources of information were not available to determine if naked short selling occurred.

18.     Moreover, Scilex does not have the capacity to analyze the vast amounts of CAT data it is seeking.  CAT collects hundreds of billions of records per day.  Unlike other data private parties may obtain, the raw CAT data that would be produced would be so voluminous

and contain so much proprietary information that it would be essentially meaningless in the absence of specific technical expertise to process, query, and analyze the records. And, because the expertise necessary to query the data and properly interpret query output is both evolving and non-public, it does not exist outside of the Commission and the SROs.

## III.    **CONCLUSION**

For the foregoing reasons, the Commission requests that the Court deny the Motion.


Dated: March 22, 2024


UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By: /s/ Melinda Hardy
Melinda Hardy
Assistant General Counsel
(202) 551-5149
hardym@sec.gov
Esther Cheng
Senior Counsel
(202) 551-5092
chenges@sec.gov
100 F Street, NE
Washington, D.C. 20549

# EXHIBIT 12

Jeffrey L. Hartman, Esq. – NSB #1607
HARTMAN & HARTMAN
510 W. Plumb Lane
Suite B
Reno, NV 89509
Tel: 775-324-2800
Fax: 775-324-1818
Email: notices@bankruptcyreno.com

Kent R. Robison, Esq. – NSB #1167
Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@rssblaw.com
        cbrust@rssblaw.com
        hwinston@rssblaw.com

*Attorneys for Christina Lovato, Trustee*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.: 24-50792-hlb |
| | (Chapter 7) |
| META MATERIALS INC., | |
| | **EX PARTE MOTION FOR ORDER** |
| Debtor. | **REQUIRING CUSTODIAN OF** |
| | **RECORDS FOR FINANCIAL INDUSTRY** |
| | **REGULATORY AUTHORITY TO** |
| | **APPEAR FOR EXAMINATION** |
| | **PURSUANT TO F.R.BANKR.P. 2004 AND** |
| | **TO PRODUCE RECORDS** |
| | |
| | Hearing Date:  N/A |
| | Hearing Time:  N/A |

Pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Rule 2004, Christina Lovato,  Chapter 7 Trustee for the Estate of Meta Materials Inc. ("Trustee"), by and through her undersigned counsel, respectfully applies to this Court for an *Ex Parte* Order requiring the Custodian of Records of Financial Industry Regulatory Authority ("FINRA"), to appear as set forth in a subpoena to be issued pursuant to Federal Rule of Bankruptcy Procedure 9016, at a time, place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon no less than fourteen (14) calendar days written notice by the Trustee for examination, regarding the Debtor's assets, liabilities, and financial condition.

This Motion is supported by the following Memorandum of Points and Authorities.

1

DATED this __6th__ day of March, 2025.

ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503

_____/s/ Clayton P. Brust_____
KENT R. ROBISON, ESQ.
CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509

## MEMORANDUM OF POINTS AND AUTHORITIES

F.R.Bankr.P. 2004 provides, in relevant part, that upon motion of any party in interest, the court may order the examination of the debtor or any other entity regarding the acts, conduct, property, liabilities and financial conditions of the debtor, or any other matter which affects the administration of the debtor's estate or the debtor's right to a discharge. Rule 2004 further provides that production of documents may be compelled at this examination.

The Trustee seeks to conduct oral examination relating to the Debtors' assets, liabilities, and financial affairs to ascertain the facts and circumstances surrounding potential manipulation of Debtor's share prices from September 21, 2020 through August 7, 2024, and how the manipulation affected Debtor's financial condition for possible recovery on behalf of Debtor's estate. The Trustee also seeks to compel production of the following documents from FINRA (all documents of which are for the time frame of September 21, 2020 through August 7, 2024, and in respect to Meta, MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP):

1.     FINRA OATS or comparable Data ("OATS"): data records reflecting the lifespan transactions of orders from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

2.     Short Interest Data (Broker Level): Records reflecting the total short interest

shares reported to FINRA, twice a month, with broker level detail.

3.      All communications (emails, text, message, IM messages, letters or any other

forms of communication by and between FINRA (including its employees,

directors, officers or other agents) and any prime broker, broker, dealer, market-

maker or hedge fund) concerning any aspect of the shares of Meta and/or

MMTLP.

The requested discovery from the Custodian of Records of FINRA is well within the scope

of examination permitted under F.R.Bankr.P. 2004, which includes:

> [t]the acts, conduct, or property or … the liabilities and financial
> condition of the debtors, or … any matter which may affect the
> administration of the debtor's estate, or to the debtor's right to a
> discharge.  In a …reorganization case under chapter 11 of the Code,
> … the examination may also relate to the operation of any business
> and the desirability of its continuance, the source of any money or
> property acquired or to be acquired by the debtor for purposes of
> consummating a plan and the consideration given or offered
> therefore, and any other matter relevant to the case or to the
> formulation of a plan.

WHEREFORE, the Trustee respectfully requests that this Court enter its Order authorizing

the examination of the Custodian of Records of FINRA, as described herein.  A proposed Order is

attached as **Exhibit 1**.

DATED this  6th  day of March, 2025.

ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503

_____/s/ Clayton P. Brust_____
KENT R. ROBISON, ESQ.
CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509

*Attorneys for Christina Lovato, Trustee*

3

# EXHIBIT 1

# EXHIBIT 1

1

2

3

4

5

6

7 **UNITED STATES BANKRUPTCY COURT**

8 **DISTRICT OF NEVADA**

9 In re

10 META MATERIALS INC.,

11 Debtor.

Case No.: 24-50792-hlb
(Chapter 7)

**[PROPOSED] ORDER GRANTING EX PARTE MOTION FOR ORDER REQUIRING CUSTODIAN OF RECORDS FOR FINANCIAL INDUSTRY REGULATORY AUTHORITY TO APPEAR FOR EXAMINATION PURSUANT TO F.R.BANKR.P. 2004**

Hearing Date: N/A
Hearing Time: N/A

12

13

14

15

16

17

18    This Court having reviewed the *Ex Parte Motion For Order Requiring Custodian Of*

19 *Records For Financial Industry Regulatory Authority to Appear for Examination Pursuant to*

20 *F.R.Bankr.P. 2004* (the "Motion") submitted by Christina Lovato, the Chapter 7 Trustee, and for

21 good cause appearing;

22    **IT IS HEREBY ORDERED** that the Motion is GRANTED; and

23    **IT IS FURTHER ORDERED** that the Custodian of Records of Financial Industry

24 Regulatory Authority, through an appropriate designee(s) shall appear for examination regarding

25 the Debtor's assets, liabilities, and financial condition, before a certified court reporter at a time,

26 place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon

27 no less than fourteen (14) calendar days written notice by the Trustee for examination; and

28    **IT IS FURTHER ORDERED** that oral examination shall continue from day to day, as

1

1    necessary.

2         **IT IS FURTHER ORDERED** that Financial Industry Regulatory Authority shall produce

3    the following documents (time range from September 21, 2020 through August 7, 2024, and in

4    respect to Meta, MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP):

5          1.      FINRA OATS or comparable Data ("OATS"): data records reflecting the lifespan

6                  transactions of orders from origination to completion capturing all relevant

7                  information (i.e. broker info, customer info, long or short indicators, unique ID

8                  etc.), with precision timestamps. These records will also reflect but are not limited

9                  to cancel/replaces, order forwarding, executions, and expired orders etc.

10         2.      Short Interest Data (Broker Level): Records reflecting the total short interest shares

11                 reported to FINRA, twice a month, with broker level detail.

12         3.      All communications (emails, text, message, IM messages, letters or any other forms

13                 of communication by and between FINRA (including its employees, directors,

14                 officers or other agents) and any prime broker, broker, dealer, market-maker or

15                 hedge fund) concerning any aspect of the shares of Meta and/or MMTLP.

18   Respectfully Submitted By:

20      */s/ Clayton P. Brust*

Kent R. Robison, Esq. – NSB #1167
21   Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
22   ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
23   Reno, NV 89503
Tel: 775-329-3151
24   Email: krobison@rssblaw.com
25          cbrust@rssblaw.com
       hwinston@rssblaw.com

27   *Attorneys for Christina Lovato, Trustee*

EXHIBIT 13



_____
Honorable Hilary L. Barnes
United States Bankruptcy Judge

Entered on Docket
March 10, 2025

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>META MATERIALS INC.,<br><br>Debtor. | Case No.: 24-50792-hlb<br>(Chapter 7)<br><br>**ORDER GRANTING EX PARTE MOTION FOR ORDER REQUIRING CUSTODIAN OF RECORDS FOR FINANCIAL INDUSTRY REGULATORY AUTHORITY TO APPEAR FOR EXAMINATION PURSUANT TO F.R.BANKR.P. 2004**<br><br>Hearing Date: N/A<br>Hearing Time: N/A |

This Court having reviewed the _Ex Parte Motion For Order Requiring Custodian Of Records For Financial Industry Regulatory Authority to Appear for Examination Pursuant to F.R.Bankr.P. 2004_ (the "Motion") submitted by Christina Lovato, the Chapter 7 Trustee, and for good cause appearing;

**IT IS HEREBY ORDERED** that the Motion is GRANTED; and

**IT IS FURTHER ORDERED** that the Custodian of Records of Financial Industry Regulatory Authority, through an appropriate designee(s) shall appear for examination regarding the Debtor's assets, liabilities, and financial condition, before a certified court reporter at a time, place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon no less than fourteen (14) calendar days written notice by the Trustee for examination; and

/ / /

1    **IT IS FURTHER ORDERED** that oral examination shall continue from day to day, as

2    necessary.

3

4    Respectfully Submitted By:

5

6    _/s/ Clayton P. Brust_
     Kent R. Robison, Esq. – NSB #1167

7    Clayton P. Brust, Esq. – NSB #5234
     Hannah E. Winston, Esq. – NSB #14520

8    ROBISON, SHARP, SULLIVAN & BRUST
     71 Washington Street

9    Reno, NV 89503
     Tel: 775-329-3151

10   Email: krobison@rssblaw.com

11          cbrust@rssblaw.com
            hwinston@rssblaw.com

12

13   *Attorneys for Christina Lovato, Trustee*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28