UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the matter of:

MOTION TO QUASH SUBPOENAS TO NONPARTY FINANCIAL INDUSTRY

REGULATORY AUTHORITY, INC.

**Case No. 1:25-mc-00129-LLA-GMH**

**Hon. G. Michael Harvey**

# EXHIBIT 1

**Corrected/Amended Brief of Amicus Curiae Jeffrey Stephen Pittman**

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| |
|---|
| **In the matter of:**<br><br>**MOTION TO QUASH SUBPOENAS TO NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.** |

Case No. 1:25-mc-00129-LLA-GMH

Hon. G. Michael Harvey

**CORRECTED/AMENDED BRIEF OF AMICUS CURIAE JEFFREY STEPHEN PITTMAN IN SUPPORT OF DENYING NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.'S MOTION TO QUASH SUBPOENAS OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**

**<u>TABLE OF CONTENTS</u>**

Cases ........................................................................................................................... 2

I.   INTEREST OF AMICUS CURIAE ................................................................... 2

II.  ARGUMENT SUMMARY ................................................................................ 3

III. ARGUMENT ..................................................................................................... 4

   A.  The Subpoenas Are Narrowly Tailored and Do Not Impose an Undue Burden on FINRA. ....................................................................................... 4

   B.  FINRA's Claim of Absolute Immunity Is Inapplicable Because the Challenged Conduct Falls Outside Its Protective Scope. ................................................. 6

   C.  The Overwhelming Public Interest in Market Integrity and Investor Protection Demands Disclosure. ........................................................................ 8

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Alpine Sec. Corp. v. FINRA* No. 23-5129, 2024 WL 5177085 (D.C. Cir. Nov. 22, 2024) ...... 8

**I.      INTEREST OF AMICUS CURIAE**

Pursuant to Local Civil Rule 7(o) of the United States District Court for the District of

Columbia, Jeffrey Stephen Pittman respectfully submits this brief as *amicus curiae* in support of

denying Nonparty Financial Industry Regulatory Authority, Inc.'s ("FINRA") Motion to Quash

Subpoenas or, in the Alternative, for a Protective Order. No party's counsel authored this brief in

whole or in part, and no person other than *amicus* contributed money to fund its preparation or

submission.

*Amicus* is a retail investor who held shares of Meta Materials Inc. Series A Preferred

Stock ("MMTLP") and had his shares rendered illiquid, frozen funds in excess of $50,000, as a

result of the trading halt imposed by FINRA in December 2022. The circumstances surrounding

this halt are the central focus of the subpoenas issued by the Chapter 7 Trustee in the underlying

bankruptcy proceeding. As one of approximately 65,000 similarly harmed retail investors,

*amicus* has a profound and representative interest in ensuring the Trustee can obtain the evidence

necessary to investigate the market events that led to significant collective losses and the

subsequent bankruptcy of the issuer.

This brief is uniquely desirable and relevant because it introduces new, material evidence

that is not otherwise before the Court. On information and belief, a successful Freedom of

Information Act (FOIA) request to the Securities and Exchange Commission ("SEC") (FOIA

Request 23-00564) revealed internal communications between senior FINRA officials and the

SEC in the days immediately preceding the MMTLP trading halt. This correspondence, attached as Exhibit E, provides a starkly different context for FINRA's actions than the one presented in its motion to quash. It demonstrates that FINRA was not merely engaged in a routine administrative processing of a corporate action but was simultaneously conducting an active fraud investigation into MMTLP for alleged market manipulation. This evidence directly bears on the Court's analysis of FINRA's claims of undue burden and regulatory immunity.

## II.    ARGUMENT SUMMARY

FINRA's motion to quash rests on two pillars: the assertion that the subpoenas impose an undue burden and the invocation of absolute regulatory immunity. Both pillars crumble under the weight of newly discovered evidence. The motion should be denied because the subpoenas seek routine regulatory data that is essential to investigating allegations of widespread market manipulation, and because substantial evidence now suggests FINRA's conduct may fall well outside the protective scope of regulatory immunity.

First, FINRA's claim of undue burden is factually baseless. The internal FINRA-SEC communications obtained by *amicus* (Exhibit E) reveal that FINRA's own Market Fraud Investigations team was already in the process of collecting the very data the Trustee now seeks. In an email dated four days before the halt, on December 5, 2022, a senior FINRA official informed the SEC that FINRA was "looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak". FINRA cannot now credibly claim that producing data it was already compiling for its own fraud investigation constitutes an "undue burden." The argument is a pretext for concealment.

Second, and more critically, FINRA's assertion of absolute immunity is vitiated by strong evidence of bad faith. Absolute immunity shields SROs when they perform their quasi-

governmental functions in good faith. It was never intended to shield a regulator from scrutiny when it takes actions with full awareness of ongoing fraud, particularly when those actions have the effect of harming investors and potentially protecting wrongdoers. The evidence in Exhibit E establishes that FINRA imposed the U3 trading halt not in a vacuum, but with the explicit, contemporaneous knowledge that it was investigating MMTLP for fraud and manipulation based on "several tips" it had received. This context supports a powerful inference that the halt was not a good-faith regulatory act, but rather an *ultra vires* attempt to contain a market crisis of which it was fully aware. This action falls outside the bounds of immunity.

Quashing these subpoenas would do more than merely frustrate the Trustee's investigation; it would sanction an unprecedented level of regulatory opacity. It would allow a Self-Regulatory Organization (SRO) to investigate market manipulation, take a drastic action that freezes the assets of 65,000 investors, and then invoke immunity to hide the very data that would explain its actions and expose the nature of the manipulation. The public interest in market integrity, investor protection, and regulatory accountability overwhelmingly demands disclosure. This Court should deny the motion to quash in its entirety.

## III.    ARGUMENT

### A.    The Subpoenas Are Narrowly Tailored and Do Not Impose an Undue Burden on FINRA.

FINRA's contention that the Trustee's subpoenas subject it to an "undue burden" is directly contradicted by its own actions and the fundamental nature of its role as a market regulator. The subpoenas seek blue sheet data and related communications concerning MMTLP, information that is central to the Trustee's investigation into market manipulation. This is data that FINRA, in a normal course of business, collects, analyzes, and interprets.

4

1.      **The Legal Standard for "Undue Burden" Under Rule 45 Requires a Balancing Test, Not Deference to a Regulator's Mere Assertion.**

Under Federal Rule of Civil Procedure 45, a party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena". The court is required to enforce this duty and must quash or modify a subpoena that, upon timely motion, is found to subject a person to "undue burden". The analysis is not a simple acceptance of a non-party's objection; rather, it is a balancing test that weighs the relevance and need for the information against the hardship of production.

A key consideration is whether compliance would impose a "significant expense" on the non-party, in which case the court must protect the non-party by shifting the costs of compliance to the requesting party. The status of the non-party is particularly relevant here. FINRA is not a disinterested third party incidentally possessing records. It is the sole SRO responsible for overseeing the market where the alleged manipulation occurred and is the exclusive repository for the comprehensive trading data required to prove or disprove the Trustee's claims. The litigation, which seeks to uncover fraud that harmed tens of thousands of investors and led to a public company's bankruptcy, is of immense public importance. In this context, a mere assertion of burden is insufficient; FINRA must demonstrate a specific, significant, and unreasonable hardship that outweighs the profound need for the requested information.

2.      **Producing Blue Sheet Data and Related Communications Is a Core, Routine Function for FINRA.**

FINRA's claim of undue burden is rendered untenable by the direct evidence contained in Exhibit E. The email from Sam Draddy of FINRA's Fraud Team to the SEC on December 5, 2022, is dispositive on this point. In it, he states that FINRA was "in fact, bluesheeting both MMAT and MMTLP as we speak". "Bluesheeting" is the industry term for the process of

5

collecting and compiling detailed trading data (i.e., blue sheets) from member firms to trace

trading activity in a specific security. This admission proves that FINRA had already undertaken

the precise data-gathering and compilation process that the Trustee's subpoena now requests. The

"burden" of collecting and organizing this data was shouldered by FINRA days before it imposed

the trading halt, as part of its own self-initiated fraud investigation.

The Trustee's subpoena does not ask FINRA to embark on a new, costly, and time-

consuming data collection effort. It merely asks for the output of work FINRA has already

completed. The data has been identified, the queries have been run, and the information has been

compiled. The logistical burden of production is therefore minimal, consisting of little more than

transmitting existing electronic records. FINRA's own rules and discovery guides, which govern

its arbitration proceedings, routinely contemplate the production of vast amounts of trading data

and electronic communications, underscoring that such production is a normal and expected part

of its operations. The claim that producing this pre-compiled data set is "unduly burdensome" is

not credible. The argument is not a good-faith objection based on logistical hardship but a

transparent pretext for concealing information that would illuminate its knowledge and conduct

surrounding the MMTLP halt.

**B.      FINRA's Claim of Absolute Immunity Is Inapplicable Because the
         Challenged Conduct Falls Outside Its Protective Scope.**

FINRA's primary shield is its assertion of absolute immunity, a doctrine that protects

SROs from private lawsuits for actions taken within their quasi-governmental regulatory

capacity. However, this immunity is a functional one, not a blanket protection for all conduct. It

applies only when an SRO is acting as a regulator in good faith. It does not protect actions taken

in bad faith, acts that are *ultra vires* (beyond the scope of delegated authority), or conduct that is

commercial rather than regulatory in nature. The evidence in Exhibit E provides a powerful basis

to infer that FINRA's actions regarding the MMTLP halt were not a good-faith exercise of its

regulatory function, thereby stripping it of the protection of immunity.

The scope of SRO immunity is limited to actions "incident to the exercise of regulatory

power". Using a regulatory tool designed to ensure market integrity to instead bring down a

curtain on a market crisis is the antithesis of a good-faith regulatory act. The timeline of FINRA's

awareness, laid bare by its own internal communications, makes this inference unavoidable.

**Table 1: Timeline of FINRA's Pre-Halt Awareness of MMTLP Fraud Allegations**

| Date | Source / Participants | Key Communication/Action |
|---|---|---|
| December 2, 2022 | Richard Boyle (FINRA Market Fraud Investigations) to SEC | Acknowledges receipt of "several tips" regarding MMTLP that "appear to have also been sent to the SEC" and requests a meeting to discuss the matter. |
| December 5, 2022 | Sam Draddy (FINRA Fraud Team) to SEC | Confirms the MMTLP matter has "hit my Fraud team's radar screen." States definitively: "We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak". |
| December 9, 2022 | FINRA Action | FINRA imposes a U3 "halt" on MMTLP trading, effective at the open of trading, citing "Extraordinary Event." This halt prevents the final two days of trading before the security's deletion. |
| December 11, 2022 | Robert Cook (FINRA CEO) to SEC | Reports receiving a "large number of complaints (on |

| | | social media and directly to FINRA)" and "threats related to FINRA in general, as well as to certain of our employees" as a direct result of the halt, forcing staff to work from home out of an "abundance of caution". |
|---|---|---|

This timeline establishes that FINRA was fully aware it was dealing with a potential market-wide fraud event. Its decision to halt trading must be scrutinized as a crisis-response measure taken with full knowledge of the underlying allegations. Furthermore, the judicial landscape is shifting. In *Alpine Sec. Corp. v. FINRA*, the D.C. Circuit recently granted a preliminary injunction against FINRA, finding a likelihood of success on the argument that FINRA's power to expel a member without prior SEC review violates the private non-delegation doctrine. The Supreme Court's subsequent denial of certiorari leaves this critical precedent intact. This demonstrates an increased judicial willingness to scrutinize FINRA's power and counsels against an expansive view of its immunity.

C.    **The Overwhelming Public Interest in Market Integrity and Investor Protection Demands Disclosure.**

Beyond the specific legal defects in FINRA's motion, denying the Trustee's request for information would contravene the powerful public interest in maintaining fair, transparent, and accountable capital markets. The MMTLP affair is not a private dispute; it is a public crisis of confidence that has impacted tens of thousands of American citizens and raises fundamental questions about the integrity of the market's plumbing and the regulators who oversee it.

1.    **Quashing the Subpoenas Would Sanction Regulatory Opacity and Permanently Harm Tens of Thousands of American Investors.**

The purpose of SRO immunity is to empower regulators to act decisively to protect the public from fraud and manipulation. It was never intended to be used as a sword to prevent the public from discovering the facts when a regulatory action results in widespread, catastrophic harm. Approximately 65,000 investors saw their liquid assets turned illiquid, untradeable shares overnight by FINRA's halt. The Trustee, acting on behalf of these investors as creditors of the bankruptcy estate, has a fiduciary duty to investigate the causes of the company's collapse, including the role of market manipulation. The information held by FINRA is indispensable to that duty, and to the discovery of truth in this matter.

To allow FINRA to quash these subpoenas would be to create a perverse moral hazard. It would establish a precedent that a regulator can become aware of massive fraud, take an ambiguous action that locks in investor losses, and then hide behind an impenetrable wall of immunity, refusing to produce the very data that would explain its conduct and expose the full scope of the wrongdoing. This would not only deny justice to the 65,000 MMTLP investors but would also signal to all market participants that in a crisis, the regulatory priority may be containment and concealment rather than transparency and investor protection.

## 2.    Transparency Is Essential to Restoring Public Trust in U.S. Capital Markets.

The events surrounding MMTLP have caused a seismic shock to investor confidence. As FINRA's own CEO acknowledged in his email to the SEC, the halt generated a "large number of complaints" and even "threats" against its employees. This extraordinary public outcry reflects a deep-seated belief among a significant segment of the investing public that the system is rigged, that rules are applied unequally, and that retail investors are sacrificed to protect powerful, entrenched interests.

A judicial ruling that pierces FINRA's veil of secrecy would be a powerful antidote to this corrosive cynicism. Compelling FINRA to produce the subpoenaed data would not be a judgment on the merits of the case, but it would be a resounding affirmation of the principle of accountability. It would signal that regulatory bodies, even those cloaked with quasi-governmental authority, are not above the law and cannot operate in the dark, especially when their actions have devastating consequences for the public they are charged to protect. Restoring faith in the fairness and integrity of our markets is the highest public interest this Court can serve in this matter, and that interest begins with disclosure.

Restoring faith in the fairness and integrity of our markets is the highest public interest this Court can serve in this matter, and that interest begins with disclosure.

## IV.    CONCLUSION

For the foregoing reasons, FINRA's motion to quash is a legally and factually unsupported attempt to evade necessary scrutiny. The claim of undue burden is belied by FINRA's own admission that it was already compiling the requested data for its own fraud investigation. The claim of absolute immunity is overcome by substantial evidence suggesting FINRA acted with full foreknowledge of the very manipulation it was tasked with preventing, supporting a strong inference of bad faith. The subpoenas are vital to achieving justice for tens of thousands of harmed investors and restoring public trust in our markets. The Court should deny FINRA's motion in its entirety and compel the production of the subpoenaed documents and information.


DATED:    August 21, 2025
          Newport, Washington

Respectfully Submitted,


Jeffrey S. Pittman, *Pro Se*
PO Box 461
Newport, WA 99156
(202) 596-7488
jeff.pittman@gmail.com