IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the matter of:

MOTION TO QUASH SUBPOENAS TO NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

Miscellaneous Action No. 1:25-mc-00129-LLA-GMH

**DECLARATION OF DAVID S. NORRIS IN SUPPORT OF
NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.'S
REPLY IN SUPPORT OF MOTION TO QUASH SUBPOENAS
OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**

I, David S. Norris, declare as follows:

1. I am a Partner in the law firm Squire Patton Boggs (US) LLP, attorneys for nonparty Financial Industry Regulatory Authority, Inc. ("FINRA") in this matter. I make this declaration based upon my personal knowledge and, if called as a witness, could and would testify competently to the matters stated herein.

2. I submit this declaration on behalf of nonparty FINRA's reply in support of the Motion to Quash Subpoenas or, in the alternative for a Protective Order (the "Motion") to address the argument that FINRA did not adequately meet and confer prior to filing the Motion.

3. I met and conferred with the Trustee's counsel for months before filing the Motion.

4. The meet and confers began shortly after FINRA received the first two subpoenas from the Trustee on March 27, 2025. The initial subpoenas sought three categories of documents—FINRA OATs data, short interest data, and communications with broker dealers about Meta Materials. On April 1, 2025, I sent a letter on behalf of FINRA responding to those subpoenas. A true and correct copy of that April 1 letter is attached as Exhibit K to the Declaration of David D. Burnett (Doc. 14-1 at p.63).

5. The April 1 letter asserted detailed, written objections to the initial subpoenas, with supporting case law, including that:

      a.      The Subpoenas were "unduly burdensome" because "the subpoenas seek four years of trade data and communications on 'any aspect of the of the shares of Meta and/or MMTLP,'" which appear to "encompass millions of records which FINRA will need to review prior to any production …. *See, e.g.*, *Alsaadi v. Saulsbury Industries, Inc.*, 2024 WL 2132467, at *3 (D.N.M. May 13, 2024) (quashing 'subpoena seek[ing] all GPS data for the entire two-month period of time' sought 'vast amount of data')."

      b.      The subpoenas "seek data from numerous different types of storage systems," and it "would be unduly burdensome for FINRA to … collect, search, and then review that data for responsiveness, privilege, redactions, etc. *Convolve, Inc. v. Dell, Inc.*, 2011 U.S. Dist. LEXIS 53641, at *5 (N.D. Cal. May 9, 2011)."

      c.      The Subpoenas were unduly burdensome "given the lack of relevance these documents have to the administration of Meta's bankruptcy estate. *See In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007)."

      d.      The subpoenas sought "documents and information that can and must be obtained from a source other than FINRA," because "Meta is the debtor and undoubtedly has substantial data about the trading of its own securities," particularly given that "Meta already settled charges with the [SEC] relating to the manipulation of its shares."

      e.      The Subpoenas sought documents protected by the "investigative file privilege" because as a self-regulatory organization, FINRA has "substantial staff work product and internal investigative materials" that "are protected by the investigative file privilege, which is intended to 'prevent disclosure of law enforcement techniques and procedures … and otherwise prevent interference with an investigation.' *In re Dep't of Investig.*, 856 F.2d 481, 484 (2d Cir. 1988)."

6.      After several months of emailing back and forth, on May 27, 2025, the Trustee's counsel James Wes Christian sent an email attaching what he represented was "a revised list of documents **that narrows your client's search**." The revised list of documents, however, did not narrow FINRA's search. It expanded the three document requests from the initial subpoenas into

12 separate requests (18 including subparts). A true and correct copy of this email and the revised requests that were attached thereto are enclosed herewith as Exhibit A.

  7. Although the Trustee had not served these revised requests to FINRA in a subpoena, in a good faith effort to meet and confer with the Trustee on the discovery she sought from FINRA, I participated in a videoconference with the Trustee's counsel on June 12, 2025. Mr. Christian, David D. Burnett, and Jeffrey L. Hartman appeared for the Trustee. To the best of my recollection, the meet and confer lasted approximately one hour, if not longer. During the meet and confer, we discussed numerous topics, including:

  a. All 12 of the Trustee's revised document requests;

  b. Whether and how the Trustee could assert stock manipulation claims on behalf of Meta Materials or its estate that would ordinarily belong to shareholders who bought and sold Meta Materials' stock (Mr. Christian represented that Meta Materials had standing because the manipulation damaged the value of Meta Materials' treasury shares (MMAT), which Meta Materials bought and sold);

  c. Why the Trustee needed overbroad and burdensome requests for trading data from FINRA when FINRA published substantial trading data online;

  d. Whether there was a narrow set of requests that FINRA could produce records on to limit the burden (Mr. Christian indicated that the Trustee was most interested in communications, including communications relating to FINRA's internal investigations); and

  e. The substantial burden and expense the requests would impose on FINRA in collecting potentially documents, data, communications, hosting that electronically stored information, running search terms, and reviewing the results for privilege and responsiveness.

  8. Following that call, I informed the Trustee's counsel that their request for FINRA's confidential, non-public data, documents, and communications must be made pursuant to a valid subpoena and that if the Trustee issued a subpoena, "FINRA will respond subject to any applicable

objections or privileges." A true and correct copy of that email is attached as Exhibit L to the Burnett Declaration (Doc. 14-1 at p.69).

9.  In response, the Trustee revised her document requests (again) and issued two new subpoenas to FINRA (the "Subpoenas"). The Subpoenas demanded FINRA to produce documents and custodian of records testimony regarding nine separate categories (15 including subparts). A true and correct copy of the Subpoenas is attached as Exhibits 1 and 2 to the Motion. All nine of the Subpoenas' document requests were included in the Trustee's prior 12 requests and thus discussed during the June 12, 2025 meet an confer videoconference.

10. FINRA accepted service of the Subpoenas on July 25, 2025. On August 4, 2025, I met and conferred via videoconference with Mr. Christian (again). Mr. Christian and I discussed several of FINRA's objections to the Subpoenas, including the investigative file privilege and protection for CAT data. Mr. Christian asked if FINRA was going to produce records in response to the Subpoenas. When I said no, Mr. Christian said the Trustee would move to compel. I told Mr. Christian that FINRA had a deadline in two days to move to quash, so FINRA would be moving to quash in the U.S. District Court for the District of Columbia. Mr. Christian said something to the effect of, that was fine, the parties could litigate the matter in court.

11. At no point during the August 4, 2025 meet and confer did Mr. Christian suggest that further meet and confers would be productive, helpful, or necessary. At no point during the August 4, 2025 meet and confer did Mr. Christian suggest that it was premature for FINRA to move to quash because the parties had not sufficiently met and conferred. Again, Mr. Christian first suggested that the Trustee would be moving to compel before I indicated that FINRA would be filing a motion to quash.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed October 27, 2025

/s/ David S. Norris  
David S. Norris

# EXHIBIT A

## Norris, David S.

| | |
|---|---|
| **From:** | Holly Pappas <hpappas@christianattarlaw.com> |
| **Sent:** | Tuesday, May 27, 2025 8:06 AM |
| **To:** | Norris, David S. |
| **Subject:** | [EXT] FW: META |
| **Attachments:** | Stipulated Protective Order - Nasdaq DE 1955 ENTERED 052125.pdf; FINRA.docx |

### Holly Pappas
*Legal Assistant to James W. Christian*

### CHRISTIANATTAR
1177 West Loop South, Ste 1700 | Houston, Texas 77027
p. 713-659-7617 | f. 713-659-7641

**PLEASE NOTE: Our address has changed. Please use the address above. Thank you.**

CONFIDENTIALITY NOTICE: This email transmission and any attachments may be privileged, confidential or otherwise protected from disclosure and is intended only for the named recipient. The use, distribution, transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing. If you are not the intended recipient, please delete it from your system without copying it and notify our firm. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

---

**From:** Holly Pappas
**Sent:** Tuesday, May 27, 2025 9:59 AM
**To:** davidnorris@squirepb.com
**Cc:** David Burnett <dburnett@schneiderwallace.com>; Ryan R. C. Hicks <rhicks@schneiderwallace.com>; Stephen W. Tountas <stountas@kasowitz.com>; 'Jeffrey L. Hartman' <jlh@bankruptcyreno.com>; Clay Brust <cbrust@rssblaw.com>
**Subject:** META

Dear David,

Enclosed please find the Protective Order entered by the court; and a revised list of documents that narrows your client's search. I would appreciate you advising me when we can confer this week as you sent your response letter April 1st and it is now approaching June 1st.

For the record, since FINRA received the subpoena on March 27th, 1) we gave you a two week extension on April 3rd and ask for a call; 2) David Burnett emailed you to ask for a call on 5/5/25; 3) David emailed you again on 5/9/25 asking for a call; 4) you then said you cold not deal with the Schneider firm until they have been retained (which has now occurred); and 5) I then took over and emailed you for a time to meet and confer on 5/23/25. I would appreciate a response as soon as possible as it has been over two months since your client received the subpoena.

I look forward to hearing from you.

Sincerely,
JWC

## Holly Pappas
*Legal Assistant to James W. Christian*

## CHRISTIANATTAR

1177 West Loop South, Ste 1700 | Houston, Texas 77027
p. 713-659-7617 | f. 713-659-7641

**PLEASE NOTE: Our address has changed.  Please use the address above. Thank you.**

CONFIDENTIALITY NOTICE: This email transmission and any attachments may be privileged, confidential or otherwise protected from disclosure and is intended only for the named recipient. The use, distribution, transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing. If you are not the intended recipient, please delete it from your system without copying it and notify our firm. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

These requested records are in respect to Meta (including trading activity for tickers TRCH and MMAT), MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP.

Please note that all records requested below are for the timeframes of (i) Meta over the period from September 21, 2020 to August 21, 2024, and (ii) MMTLP over the period from June 28, 2021 to December 14, 2022.

1. **Short Interest Reporting Data**
(i)  Records provided to FINRA by firms required to report short interest positions in all customer and proprietary accounts in all equity securities twice a month. Records should be provided in the original format received by FINRA, including broker and account details.
(ii) Any additional records FINRA utilized in the production of its short interest report data.

2. **FINRA Trade Reporting Facility (TRF) Data**
(i)  Records provided to FINRA through a FINRA trade reporting facility (TRF) or FINRA's Alternative Display Facility (ADF). Records should be provided in the original format received by FINRA including broker and account detail.
(ii) Any additional records FINRA utilized in the production of Monthly Short Sale Transaction data which provides detailed trade activity of all short sale trades executed and reported to a FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

3. **Reg SHO Daily Short Sale Volume Report Data**
(i)  Records utilized in the production of report data involving daily short sale aggregated volume by security for all short sale trades executed and reported to a FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

4. **Monthly OTC Summary Report Data**
(i)  Records utilized in the production of report data involving monthly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

5. **Weekly OTC Summary Report Data**
(i)  Records utilized in the production of report data involving weekly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

**6. Blocks Summary Report Data**
(i)     Records utilized in the production of report data involving aggregated ATS trade data in NMS stocks that meet share based and dollar-based thresholds defined by FINRA.

**7. OTC Block Summary Report Data**
(i)     Records utilized in the production of report data involving aggregated OTC (Non-ATS) trade data in NMS stocks that meet share-based and dollar-based thresholds as defined by FINRA.

**8. Threshold List Report Data**
(i)     Records provided to FINRA by member firms utilized in the production of report data involving OTC Threshold data published daily by FINRA to identify OTC equity securities with "fails to deliver" (FTD) that are required to be closed out pursuant to Rule 203(b)(3) of Regulation SHO or FINRA Rule 4320. Records should be provided in the original format received by FINRA, including broker and account details.

**9. FINRA Investigative Files**
(i)     All data records, communications, notes, and investigative records associated with any FINRA investigation concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**10. FINRA Investigative Files**
(i)     All data records, communications, notes considered in the preparation of all public communications by FINRA (e.g. Notices, FAQs) concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**11. FINRA Electronically Stored Communications**
(ii)     All electronically accessible communications (emails, text, message, IM messages, letters or any other forms of electronically accessible communication by and between FINRA (including its employees, directors, officers or other agents) and any prime broker, broker, dealer, market-maker or hedge fund concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**12. Order, Quotations, and Execution Records**
(i)     All data records provided to FINRA by member firms reflecting the lifespan transactions of orders in Meta and/or MMTLP from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short

(ii)     indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

(ii)     Each reportable CAT event with respect to each quote and order in Meta, such as origination, modification, cancellation, routing, and execution as required by SEC Rule 613 (FINRA Rule 6800 series).

(iii)     All data records retained by FINRA related to the dissemination of quotations in MMTLP published on an Inter-Dealer quotation System (IDQS) in OTC equity securities. The data records should include the quotations in MMTLP received by FINRA, in the original format received, as well as the published quotation data based on such records.

(iv)     All data records retained by FINRA related to the dissemination of executions in MMTLP published on Trade Data Dissemination Service (TDSS). The data records should include the executions received by FINRA, in the original format received, as well as the published trade report data based on such records.

(v)     All data records retained by FINRA related to the administration of Meta and/or MMTLP through the CAIS subsystem and/or managed by FINRA's CAT HelpDesk.