# EXHIBIT D

```
                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                     .
IN RE:                               .  Case No. 24-50792-gs
                                     .  Chapter 7
META MATERIALS INC.,                 .
                                     .  300 Las Vegas Blvd. S.
                                     .  Las Vegas, NV 89101
               Debtor.               .
                                     .  Thursday, October 30, 2025
. . . . . . . . . . . . . . . . .    .  10:36 a.m.
```

TRANSCRIPT OF DOC# 2088 MOTION TO QUASH NON-PARTY CITADEL
SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL,
LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR
FOR A PROTECTIVE ORDER FILED BY RYAN J. WORKS ON BEHALF OF
                    CITADEL SECURITIES LLC
              BEFORE THE HONORABLE GARY SPRAKER
              UNITED STATES BANKRUPTCY COURT JUDGE


ZOOM APPEARANCES:


For Virtu Financial,      Davis Wright Tremaine LLP
LLC:                      By:  SHANAYE CARVAJAL, ESQ.
                               MICHAEL V. RELLA, ESQ.
                          1251 Avenue of the Americas
                          21st Floor
                          New York, NY 10020
                          (212) 489-8230

ZOOM APPEARANCES CONTINUED.

Audio Operator:           Maria Garrett, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1

```
ZOOM APPEARANCES (Continued):


For Anson Funds          Greenberg Traurig, LLP
Management LP:           By:  MICHAEL R. HOGUE, ESQ.
                              ALAN J. BRODY, ESQ.
                              SYLVIA E. SIMSON, ESQ.
                         10845 Griffith Peak Drive
                         Suite 600
                         Las Vegas, NV 89135
                         (702) 792-3773

For Citadel Securities   McDonald Carano
LLC:                     By:  JIMMY F. DAHU, ESQ.
                         2300 West Sahara Avenue
                         Las Vegas, NV 89102
                         (702) 873-4100


                         Quinn Emanuel Urquhart & Sullivan
                         LLP
                         By:  PETER H. FOUNTAIN, ESQ.
                         295 Fifth Avenue
                         New York, NY 10016
                         (212) 849-7000

For the Trustee:         Hartman & Hartman
                         By:  JEFFREY L. HARTMAN, ESQ.
                         510 West Plumb Lane
                         Suite B
                         Reno, NV 89509
                         (775) 324-2800

                         Christian Attar
                         By:  JAMES W. CHRISTIAN, ESQ.
                         1177 West Loop South
                         Suite 1700
                         Houston, TX 77027
                         (713) 659-7617

                         Robinson, Sharp, Sullivan & Brust
                         By:  CLAYTON P. BRUST, ESQ.
                              HANNAH WINSTON, ESQ.
                         71 Washington Street
                         Reno, NV 89503
                         (775) 329-3151

                         Schneider Wallace Cottrell Kim LLP
                         By:  DAVID D. BURNETT, ESQ.
                         1050 30th Street Northwest
                         Washington, DC 20007
                         (415) 421-7100
```

1         (Proceedings commence at 10:36 a.m.)

2              THE COURT:  Please be seated.

3              Ms. Mendoza, would you go ahead and call the court to

4    order and get us on record, please?

5              THE CLERK:  Good morning.  This is Maria speaking

6    from the courtroom.  We are now on record for the Court's 10:30

7    calendar with the Honorable Gary Spraker presiding.

8              THE COURT:  Thank you, Madam Clerk.

9              For the record, this is Judge Spraker, as I just

10   mentioned.  We are on record for the 10:30 miscellaneous

11   hearing this morning arising in Meta Materials, Case Number

12   24-50792, to hear motion to quash non-party subpoenas.  We'll

13   note for the record that this matter is being conducted

14   remotely via Zoom video conference.  More on that in just a

15   moment, but there are no parties or counsel in the courtroom.

16             So we'll go ahead and begin appearances.  Again, my

17   apologize [sic] as this is my introduction to the case.  I

18   still don't have names and faces with everyone, and we'll get

19   through that.  But let's just start with counsel for the movant

20   party seeking to quash, and when we get through them after

21   appearances, if you would just kindly let me know who is

22   presenting.

23             You know, just looking at it since Mr. Fountain is

24   standing at a podium, I'm thinking that that may be a clue.

25   But whoever would like to lead us off on appearances for the

```
 1   movants, please.
 2            MR. DAHU:  Good morning, Your Honor.  Jimmy Dahu on
 3   behalf of Citadel Securities, LLC, local counsel.  Peter
 4   Fountain will -- is main counsel.  He'll be presenting for
 5   Citadel.  And in the conference room with Mr. Fountain is
 6   Michelle Chen from Citadel Securities, LLC.
 7            THE COURT:  Thank you, Mr. Dahu.  Good morning.
 8            MR. DAHU:  Good morning.
 9            THE COURT:  Anyone else --
10            MR. HOGUE:  Morning, Your Honor.
11            THE COURT:  Go ahead for the movants.
12            MR. HOGUE:  Good morning, Your Honor.  Michael Hogue,
13   Greenberg Traurig, on behalf of Anson.  With me today is Sylvia
14   Simpson and Alan Brody, pro hac in.  We also have a client
15   representative in the listen-only room as well.  Mr. Brody will
16   be presenting for Anson.  We also have a client representative
17   in the listen-only room as well.  Mr. Brody will be presenting
18   for Anson.
19            THE COURT:  Thank you.
20            All right.  Anyone else on the movants?
21            MS. SIMPSON:  Judge Spraker, this Sylvia Simson,
22   counsel for Anson.  I just wanted to let you know I understand
23   that counsel for Virtu is having trouble accessing into the
24   Zoom.  They are in a waiting room for the email
25   (indiscernible).
```

1          THE COURT:  And can you tell me who that counsel is

2    just so I can, you know, look out?

3          MS. SIMPSON:  Michael Rella, R-E-L-L-A.

4          THE COURT:  All right.  Thank you.

5          All right, Madam Clerk, if you can just let us know.

6    I assume that we'll see Mr. Rella when he appears.  Hopefully,

7    he gets that resolved.

8          Yeah.  Thanks, Ms. Simpson.

9          And now for the Trustee, Mr. Hartman, do you want to

10   follow Mr. Dahu and, as local counsel, lead us off?

11         MR. HARTMAN:  Yes.  Good morning, Your Honor.  Jeff

12   Hartman for Trustee Lovato, who is somewhere out there in the

13   ether, I believe.

14         THE COURT:  I see her.

15         MR. HARTMAN:  And co-counsel is James Wes Christian.

16   He's located in Texas.  And Clayton Brust and Hannah Winston

17   are here locally in Reno.  I have asked Mr. Brust to take the

18   lead on the procedural issues and Mr. Christian to take the

19   lead on the substantive issues.

20         MR. CHRISTIAN:  And if I might, Your Honor, Wes

21   Christian.  Also David Burnett, who is another -- from a

22   different law firm, is part of the special counsel hired by

23   Ms. Lovato.  He is also on.  He will not be speaking today,

24   will be observing.

25         THE COURT:  All right.  Thank you.

1              This raises an interesting procedural point.  You

2    know, taking up your statement, Mr. Hartman, as to the

3    procedural and substantive.  Is that an agreed divide between

4    the parties?  It seems like it could be a useful one, but I

5    don't want to -- I want to see how we are going to proceed.

6              Mr. Fountain, did you have any thoughts?

7              MR. FOUNTAIN:  Good morning, Your Honor.  Peter

8    Fountain at Quinn Emanuel for Citadel Securities.

9              THE COURT:  We're having trouble hearing you.  I

10   don't know if other people on the video are having it, but if

11   you could -- yeah.

12             MR. FOUNTAIN:  Is this any better, Your Honor?  I

13   apologize.

14             THE COURT:  What say the panel?  Are you hearing him

15   okay, or --

16             UNIDENTIFIED:  Not great.

17             UNIDENTIFIED:  I can barely hear him, Your Honor,

18   so --

19             THE COURT:  Okay.  Thank you.  Yeah, it's -- it

20   sounds a little fishbowl, unfortunately.  Is there a direct mic

21   or --

22             MR. FOUNTAIN:  Forgive me, Your Honor.  I am trying

23   to troubleshoot that.  Let me take a look.

24             MR. HOGUE:  Peter, if your conference room is using a

25   table mic, you can pull it down.  If there's one, look halfway

1  up there.  Yep, there you go.

2           THE COURT:  Yeah.  Thank you, Mr. Hogue.

3           MR. FOUNTAIN:  I don't see a microphone in there.

4           THE COURT:  You know, in this virtual world, there's

5  nothing gained by a podium, so if you want -- if you have

6  earbuds or something else that will be more direct, it would

7  certainly help with the recording.

8           MR. FOUNTAIN:  Understood, Your Honor.  I will just

9  take a moment to sort this out if -- with the Court's

10 permission.  It will be quick.

11          THE COURT:  Sure.  We're still waiting for Mr. Rella,

12 apparently, so I don't see that -- and while you do that, I'll

13 offer my apologies and thank you for your patience as we try to

14 get this new platform for this video hearing.  Any time here's

15 something new, there's obviously, you know, adjustments and a

16 learning period.  Hopefully, if we continue to use this, it

17 will get smoother so everybody will be more aware of and more

18 adapt at -- adept at using this platform instead of just

19 regular Zoom, given the number of people that we have listening

20 and, quite honestly, the issues we had with interruptions to

21 the recording at the last hearing in Meta.

22          So with that, we'll wait just another moment until

23 Mr. Fountain reengages.

24          If people do have trouble hearing, especially the

25 participants, again, I try to gauge that, but you never know if

1  it's just me or if it's everybody.  So if you just give me a

2  signal, hands up or something, I will try to address that

3  because, you know, of key importance is the quality of the

4  recording and everybody's ability to hear it as we proceed.

5        MR. DAHU:  And, Judge, on behalf of the movants, we

6  greatly appreciate your -- the (indiscernible) that you're

7  giving us.  Thank you.

8        UNIDENTIFIED:  And, Judge, may I be excused for about

9  two minutes to get a document down the hall from someone?

10       THE COURT:  Oh, certainly.

11       UNIDENTIFIED:  I'll be right back.  Thank you.

12       THE COURT:  Madam Clerk, I think the fastest way to

13  ensure we get to this quickly is to go off record.  I'm sure

14  that as soon as we do, Mr. Fountain will reappear.  But why

15  don't we go off record until Mr. Fountain reconnects with

16  audio?

17       THE CLERK:  Thank you.  Off record.

18     (Recess taken at 10:44 a.m.)

19     (Proceedings resumed at 10:45 a.m.)

20       MR. HARTMAN:  I'm still waiting for Trustee Lovato,

21  but we can proceed.

22       THE COURT:  Oh, she's here.

23       MR. HARTMAN:  Oh, she is?

24       MS. LOVATO:  I am here.

25       MR. HARTMAN:  We can't see her.

1        THE COURT:  Yeah.  She had originally signed in under

2  your name, Mr. Hartman, so yeah.

3        THE CLERK:  We're on record, Your Honor.

4        THE COURT:  Thank you, Madam Clerk.

5        This is Judge Spraker, and we're back on record in

6  Meta Materials as to the motion of quash when we left to adjust

7  some of the audio issues.

8        Mr. Fountain, do we want to break this up into a

9  procedural and substantive discussion, or do you just want to

10  present on the movants?  And if so, what is the, you know,

11  designation as between you and Mr. Brody?

12        MR. FOUNTAIN:  Thank you, Your Honor.  I -- with the

13  Court's permission, my plan had been to speak to, first, the

14  Rule 45 subpoenas -- excuse me, first, the Rule 2004 subpoenas

15  and then the Rule 45 subpoenas and to take it -- you know,

16  separate out the two subpoenas.  And that's how we propose to

17  proceed with the Court's permission.  Mr. Brody and Mr. Rella,

18  I think, will handle any specific issues as to their clients

19  that may arise.  But the plan is that I'll give a presentation

20  on behalf of the non-parties.

21        THE COURT:  Okay.

22        UNIDENTIFIED:  That is correct, Your Honor.

23        THE COURT:  We might as well just jump into it.

24  We're at least 15 minutes into it and haven't gotten to

25  anything, the discussion yet, so we might as well just jump

1   into it.  I do have other matters in two hours.  I am hopeful

2   that this will not take the full, you know, hour and 45 minutes

3   now, but let's see where it takes us and what transpires.

4           So, Mr. Fountain, why don't you start us off, please?

5           MR. FOUNTAIN:  Thank you, Your Honor, and thanks for

6   the Court's patience as we dealt with our technical issues.

7           As the Court noted, we're here today on the

8   non-parties' motion to quash, which concerns subpoenas that are

9   both substantively and procedurally defective.  The subpoenas

10  should be quashed because they attempt to do exactly what

11  courts have repeatedly warned against and rejected, which is to

12  use Rule 2004 to circumvent the safeguards and protections

13  otherwise provided under the Federal Rules of Civil Procedure.

14          And I want to start, Your Honor, with the plain

15  language of Rule 2004.  Rule 2004, by its plain terms, permits

16  examinations relating, quote, "only to the debtor's acts,

17  conduct, or property, the debtor's liabilities and financial

18  condition, matters affecting the administration of the debtor's

19  estate, and the debtor's right to a discharge."

20          And the keywords of "only" and that limitation, as

21  well as the focus on the debtor, preclude Rule 2004 subpoenas

22  that do not have the requisite connection between the debtor's

23  estate.  Those subpoenas --

24          THE COURT:  So why isn't a subpoena that is asking

25  for information regarding what appears to be a, if not the,

1  potential primary asset of the estate, fall within acts,

2  conduct, or property?

3          MR. FOUNTAIN:  There are a few reasons for that, Your

4  Honor.  First, these securities, what the subpoenas seek, are

5  four years of trading records involving Meta Material's stock.

6  But that's --

7          THE COURT:  Let's get into that too because I'm a

8  little concerned and unfocused as to the specifics of what is

9  being sought versus -- well, in relationship to the objection.

10          MR. FOUNTAIN:  Absolutely, Your Honor.

11          THE COURT:  To help you put this into some construct

12  from how I am perceiving it, I am roughly analogizing this, at

13  least initially, as I try to wrap my hands around it, as a

14  subpoena to third parties in a Ponzi scheme case.  At minimum,

15  you send it out to the banks to try to get the actions and the

16  financial transactions, which may implicate the bank, which may

17  implicate the other financial institutions and such.  It's a --

18  it's not a great analogy, but it seems to at least get me in

19  the door here.

20          Whereas in the Ponzi, you're asking for the financial

21  transactions, here, you're asking for the trading documents,

22  right?  Is that basically what's being sought?

23          MR. FOUNTAIN:  Your Honor, let me address both of

24  your questions or attempt to.  What is being sought by the

25  debtor here goes beyond just trading records.  What they've

1   sought is all communications relating to trades of Meta stock

2   over a four-year period.  And so they acknowledge in their

3   briefing that they're seeking emails and other correspondence.

4   So it isn't so limited, and but even if it were --

5            THE COURT:  But it's inclusive?

6            MR. FOUNTAIN:  I'm sorry, Your Honor?

7            THE COURT:  But it is inclusive in that there is

8   trading materials being sought?

9            MR. FOUNTAIN:  There are trading materials being

10   sought, that's correct.  And what --

11            THE COURT:  And you object to that as well?

12            MR. FOUNTAIN:  We do object to that, and for several

13   reasons.  And one of the key reasons is that the trades in the

14   stock of the debtor is not the debtor's estate.  It is not

15   within the confines of Rule 2004.  These are not trades --

16            THE COURT:  (Audio interference) -- the first

17   interaction that we've had -- I tend to interrupt.  I

18   apologize.  And look, for everybody here, please don't feel the

19   need to apologize to me, you know, for speaking over.  This is

20   video.  It happens, so just kind of set that up.  So I

21   apologize for interruptions, but I need to get this information

22   out.  You are taking a very, very narrow view of debtor's acts

23   and conduct, and it seems fairly well accepted in the Ninth

24   Circuit and beyond that potential litigation assets fall

25   within, at least, Rule 2004(b)(1)(A) or (B).

1          MR. FOUNTAIN:  Your Honor, respectfully, I would

2  disagree with that.  We are --

3          THE COURT:  The best case seems to be Transmar for

4  that.

5          MR. FOUNTAIN:  Transmar is one of the many cases that

6  support that.  I like the In Re GHR case, and would direct you

7  there.  The In Re Lee case, which Your Honor, in fact, decided,

8  also supports our position, and I'll explain why that is.  It

9  is that these are third-party trades on the public market that

10 are not trades involving the debtor.  These are not stock owned

11 by the debtor.  There is no connection that the debtor attempts

12 to articulate between --

13         THE COURT:  It's not in the debtor?  These trades are

14 not involving in the debtor or MMTPL [sic] or the --

15         MR. FOUNTAIN:  This is securities that are owned by

16 third parties.  They're not owned by the debtor.  And there is

17 no authority supporting the idea that this third-party trading

18 of equity in a debtor that is no longer owned by the debtor,

19 that the debtor was not on either side of the trade, could be

20 within the confines of Rule 2004.  No case has ever expanded

21 Rule 2004 in that way.

22         THE COURT:  And what cases rejected that?

23         MR. FOUNTAIN:  So, Your Honor, cases have rejected --

24 I wouldn't say that a case has expressly rejected this, but

25 what I would say is every single case that has addressed this

14

1    issue of the debtor's estate, the debtor's assets, the

2    liabilities, what is Rule 2004 has found a relationship with

3    the debtor to be a necessary condition.  And that's your case,

4    Your Honor, in In Re Lee where, you know, you put it well.  The

5    third parties subject to examination under Rule 2004 are only

6    those persons possessing knowledge of the debtor's acts,

7    conduct, financial affairs, so far as this relates to a

8    debtor's proceeding in bankruptcy.

9         There is no allegation or articulation of any

10   relationship between our clients and the debtor.  We didn't

11   have contact --

12              THE COURT:  Isn't this involving the debtor's equity?

13              MR. FOUNTAIN:  Your Honor, that is -- it is

14   third-party trading in the public market.

15              THE COURT:  Of the debtor's equity.

16              MR. FOUNTAIN:  So, Your Honor, that's correct that

17   it's the debtor's equity.  But I think that to expand the

18   concept of Rule 2004 to capture any third-party trading in a

19   debtor's equity would allow Rule 2004 subpoenas to be issued

20   properly to every single market participant who had traded in

21   that stock.  And that cannot be what Congress intended in Rule

22   2004.  That is precisely why the words "only to" and the

23   limitations of Rule 2004 exist.

24        Rule 2004 could be broad, but it is broad within the

25   confines of the debtor's estate, and there is no connection

1    that is even attempted to be drawn here between the equity --

2            THE COURT:  That seems to be self-defeating though,

3    Mr. Fountain, because the debtor's interest in his equity

4    inherently seemed to be part of the debtor's estate.

5            MR. FOUNTAIN:  I don't think that's what is being

6    articulated by the debtor here, and nor do I think there's any

7    connection between any change in price of these securities.  I

8    mean, there's simply nothing articulated as to why it is the

9    case that a change in the price of security or the --

10            THE COURT:  Because it gets to litigation, as you

11    said.  Clearly, ambiguously, yes.

12            MR. FOUNTAIN:  So I think that does bridge the gap a

13    little bit, and we have attempted in the meet-and-confer

14    process to understand what connection the debtor is attempting

15    to find, the Trustee is attempting to find, between third-party

16    trading in a public market that does not involve the debtor and

17    what it's seeking.

18            We've said, you know, why do you need this

19    information from our clients?  And the response that we've

20    received is that is a work product.  We're not going to

21    articulate the relevance of the Rule 2004 requests because it

22    is a litigation work product that is protected from disclosure.

23            And I think that's critical, Your Honor, because even

24    if the Court were to find that this is properly within the

25    scope of Rule 2004, and it's not, but even if the Court were to

```
 1   find that, the Trustee would still need to articulate good
 2   cause for the Rule 2004 investigation.  The burden is on them
 3   to articulate the good cause, and, you know, they haven't done
 4   that here.  Good cause in the Rule 2004 context means either
 5   necessity or that the denial of their subpoenas would cause
 6   some undue hardship and injustice, and we know that isn't the
 7   case here.  They have that --
 8           THE COURT:  Is that really the standard for
 9   overarching 2004?
10           MR. FOUNTAIN:  Your Honor, under the In Re Lee case,
11   which the bankruptcy appellate panel decided, the burden is on
12   the Trustee.  So here, there were extraordinary --
13           THE COURT:  What is the quantum of that burden in a
14   2004 exam?
15           MR. FOUNTAIN:  Okay.
16           THE COURT:  It has to be good cause, but you want to
17   -- you are wanting to drill down.  The good cause is this leads
18   us to a potential asset of the estate, which may be
19   significant, may not, but we need to figure it out before we
20   bring lawsuits.  Why isn't that sufficient good cause?
21           MR. FOUNTAIN:  Yeah.  I would disagree with that
22   respectfully, Your Honor, for a couple of reasons.  First,
23   there has to be an articulated connection between the
24   information that is sought and the estate.  And here, there
25   hasn't been any.  We've attempted to understand what it is, but
```

1    we've been told in response that it's work product and we don't

2    need to disclose that information.  We won't disclose that

3    information.

4           But the other reason that that cannot be the case

5    here is because the Trustee is obtaining this information from

6    other parties, and therefore, the information is duplicative

7    and there's nothing that is uniquely necessary from our

8    clients.  The Trustee has obtained information from Nasdaq,

9    from the DTCC, and is seeking information from FINRA.  And so,

10   Your Honor, these are market-wide sources.  Nasdaq is one of

11   the primary exchanges where stocks are traded in the entire

12   country.  The DTCC is a centralized clearinghouse that provides

13   settlement services, and FINRA is a self-regulatory

14   organization for all the broker dealers.

15          And so this is a way in which the Trustee would be

16   able to obtain market-wide data.  It raises the question of why

17   they would need this information from our clients if they've

18   already obtained market-wide information from these centralized

19   sources.  That's another question that we've asked them, and

20   the answer that the non-parties have received is, we're not

21   going to provide that information to you.

22          And so they cannot show that they need this

23   information from the non-parties, nor can they show that

24   there'd be some undue, you know, harm to them or prejudice

25   where they did not obtain it from us.  And so, Your Honor, not

1   only is this not within the confines of Rule 2004, they can't

2   show good cause.  And then the case law that we've cited -- and

3   I don't think this point is disputed by the Trustee in her

4   briefing, which is that once you've crossed into the litigation

5   target, Rule 2004 is no longer available.  And --

6           THE COURT:  And again, I read Transmar as your cite

7   for that proposition most specifically.  Was there another case

8   that had that cross into you are effectively, you know, pending

9   proceeding, in the zone of pending proceeding?

10          MR. FOUNTAIN:  I would direct Your Honor, to the In

11  Re J&R Trucking case, which also involves those issues.  I

12  believe there's at least one other case in our briefing that

13  raised this specific issue and found that, you know, once you

14  cross -- for example, I think this is the Defoor case, Your

15  Honor, cited in our briefing, which explains that once you've

16  crossed into litigation targets, you can no longer pursue the

17  Rule 2004 subpoenas against those parties.

18          And I can get into in detail the various ways in

19  which the Trustee has gone far past that question.  And I think

20  there's even some language in her opposition brief that says

21  almost exactly that, which is this wordplay that she hasn't

22  said that the non-parties are litigation targets, but

23  everything that she's done and represented has indicated that

24  she believes that they are litigation targets.

25          One of the things we point out is that in the FINRA

1   context, where FINRA has also filed a motion to quash, they're

2   seeking the market-wide data from FINRA, they have said to

3   FINRA, you are not a litigation target.  That is not something

4   they would say to us.  They've obtained $11 million in

5   litigation funding to pursue claims against this -- apparently,

6   against the non-parties that are paying these firms to pursue

7   claims against us.  And there's also the extensive

8   investigation that they've already done where they've analyzed

9   shares and claimed to have identified market manipulation.  All

10  of these establish that they've crossed into litigation target

11  and that they cannot proceed with the Rule 2004 under that

12  circumstance.

13          Your Honor, I'm happy to proceed or to pause for any

14  questions the Court may have.

15          THE COURT:  I'm following you so far.

16          MR. FOUNTAIN:  Thank you, Your Honor.  I want to

17  touch now on some of the procedural deficiencies with the Rule

18  2004 subpoenas.  The first is just the clear language of the

19  local rule, which says that production of documents may not be

20  obtained via an order under Federal Rule of Bankruptcy 2004.

21          THE COURT:  And you believe that that modifies

22  Federal Rule of Bankruptcy Procedure 2004 to preclude any

23  document production within the scope of 2004?

24          MR. FOUNTAIN:  I believe that's the plain and correct

25  reading of Rule 2004.

1          THE COURT:  I don't read it that way, quite honestly,

2   I can just tell you.  I think that it means that the Rule 2004

3   order cannot compel the production of documents, that you have

4   to go through a subpoena, as envisioned by Federal Bankruptcy

5   Rule 2004.  I do not believe that District of Nevada precludes

6   any obtaining of documents through any 2004 process.  So if

7   that is the argument, I need a much clearer -- I understand

8   Judge Nakagawa's footnote in the case you cited.  I will talk

9   to him, quite honestly, before I give my opinion.  But I

10  don't -- I think that's an overreach as to the exact language

11  of that local rule.  And quite honestly, I'm concerned about

12  its relationship to the Federal Rule of Bankruptcy Procedure if

13  that is the case.

14          MR. FOUNTAIN:  And, Your Honor, let me attempt just

15  to expand a little bit on the argument, appreciating where

16  you're coming from.  But Judge Barnes may have viewed it

17  differently because when she received proposed orders from the

18  Trustee that included these document requests under Rule 2004,

19  she struck the document requests from the orders that she

20  actually issued.  And the Trustee, nonetheless, proceeded, not

21  with the orders that had been approved by the Court, but for

22  the orders that they had submitted with the subpoenas that did

23  include the document requests.  And so --

24          THE COURT:  And they proceeded with subpoenas, not

25  through the order itself.

```
 1              MR. FOUNTAIN:  And so I will touch on that too.

 2              THE COURT:  At which the form which seeks includes a

 3    statement, "Are you seeking documents?"

 4              MR. FOUNTAIN:  Your Honor --

 5              THE COURT:  If it was totally prohibited by local

 6    rule, why is that language in there?

 7              MR. FOUNTAIN:  Your Honor, I think that, you know,

 8    here we're dealing with an express order by Judge Barnes that

 9    looked at this issue, and --

10              THE COURT:  Haven't other orders been -- or haven't

11    other subpoenas been sent under Rule 2004 and complied with?

12              MR. FOUNTAIN:  My understanding, Your Honor, is that

13    when the Trustee sought renewed subpoenas against certain of

14    the non-parties, she did not go through that process, and so

15    there wasn't the same opportunity.  Those would have been the

16    subpoenas as to Virtu and as to Anson Funds.

17              But I think, Your Honor, there's one other key point

18    to make here, which is that if it is the case that you could

19    proceed via subpoena, right, that is -- that takes us to where

20    we started, which is that the use of Rule 2004 here the Trustee

21    is trying to employ is an attempt to circumvent the procedural

22    safeguards that Rule 45 and Rule 26 would ordinarily apply to

23    non-party discovery.  And that is an area where once we are

24    dealing with Rule 45 subpoenas, their refusal to articulate the

25    relevance is devastating to their ability to pursue this.
```

1          Rule 45 provides that the Court must quash a subpoena

2    that subjects a non-party to an undue burden, and it requires a

3    proportionality analysis.  And that would require us here, Your

4    Honor, to analyze the burden of a year, four years, thousand

5    trading days of trading records and the communications related

6    to them against relevance that has not been articulated to us.

7    Because when we said what is the relevance, we've been told, we

8    won't tell you.

9          And so, Your Honor, if we're in the world of the Rule

10   45 subpoenas, the proportionality analysis demands that they be

11   quashed, and that's even more the case because the information

12   that they're seeking is duplicative for the reasons I said

13   before.  They don't need this information from our clients

14   because they're in the process or have already obtained

15   market-wide data, and so there's nothing additive here.

16         And it leads back to the same question, which is why

17   are they seeking this data from our clients?  And the answer is

18   because they want to pursue litigation against our clients, and

19   that is not a proper use of Rule 2004 given the lack of

20   connection to the debtor's estate, the debtor's property, and

21   also because of the case law that is on all fours and that the

22   Trustee does not even attempt to distinguish in her opposition

23   brief.

24         And it also means that they fail this proportionality

25   analysis because no balancing can be done.  We can't compare

1    the burden that we've demonstrated in our papers to the

2    relevance because there's no articulated relevance here.

3            THE COURT:  While you pause, Mr. Brody has patiently

4    had his virtual hand up.  Do you want to yield the floor to see

5    what co-counsel wishes to raise?

6            MR. FOUNTAIN:  Please, go ahead.

7            MR. BRODY:  Thank you.  Thank you, Your Honor.  Thank

8    you, Mr. Fountain.  Your Honor, Alan Brody, Greenberg Traurig,

9    on behalf of Movant Anson Funds Management.  Your Honor, I will

10   not be duplicative of what Mr. Fountain has to say, and, of

11   course, we support his statements on behalf of the movant.  I

12   merely wanted to address a few items that Your Honor had

13   questioned or mentioned.

14           The first is at the opening, Your Honor said that

15   this was -- and I apologize if I don't have the exact quote, I

16   was trying to write as quickly as I could -- that you view this

17   action similar to a Ponzi scheme, which as bankruptcy

18   attorneys, you know, we see way too often across the country.

19           This is nothing like a Ponzi scheme because in a

20   Ponzi scheme, the Trustee, whether Chapter 11 or Chapter 7

21   Trustee or a creditors' committee or whoever it is proceeding

22   on behalf of the creditors of the estate or the estate itself,

23   is usually seeking fraudulent transfers or avoidance of

24   fraudulent transfers.  Fraudulent transfers, of course, occur

25   between the debtor transferring its asset, usually money, to a

1    third party, and now the Ponzi scheme is about bringing that

2    money back.  We do not view this at all like a Ponzi scheme.

3         THE COURT:  I understand that point very well.

4    That's why I said it was an inept analogy.  It's just a

5    construct.

6         MR. BRODY:  I appreciate that, Your Honor.  As

7    Mr. Fountain pointed out, Bankruptcy Rule 2004 is quite broad,

8    but it's not unlimited.  And the wording of the -- I'd like to

9    say statute, but the rule deals with debtor's act, debtor's

10   conduct, debtor's property.  So the question, debtor's

11   financial condition, is, is this property of the debtor that

12   we're talking about here?  Stock in the company is not the

13   debtor's property.

14        And Your Honor pointed out and asked the question,

15   well, it's the debtor's equity.  Isn't the debtor's equity the

16   debtor's property?  And if this was a solvent entity, the

17   debtor would have an interest in that equity.  But it is not a

18   solvent company, hence the Chapter 7 itself, and therefore, the

19   debtor has no interest in that equity.  This is not stock that

20   the debtor owns.  It's third party.

21        Your Honor, no different than my ownership in Amazon

22   stock.  I trade Amazon stock.  I own Amazon stock.  I don't

23   trade it with Amazon.  I trade it in the open market.  Amazon,

24   but for the fact that it may be solvent, has no interest in

25   that stock that I'm trading.  So it's not an asset of the

1    debtor.

2            Also, Your Honor then raised, well, isn't this an

3    asset of the estate because the debtor may have some cause of

4    action, may be able to sue on it?  Your Honor, any cause of

5    action with respect to alleged market manipulation of stock

6    traded by third parties is not a cause of action of the estate.

7            THE COURT:  Am I deciding that here?

8            MR. BRODY:  No, Your Honor, but you would be deciding

9    whether the document demands that are sought are proper under

10   2004 and whether those document demands must be limited to

11   debtor's assets.  And they wouldn't be debtor's assets, Your

12   Honor.

13           THE COURT:  Isn't that deciding that issue?  I mean,

14   I appreciate the --

15           MR. BRODY:  Well, I (indiscernible) --

16           THE COURT:  -- argument.

17           MR. BRODY:  Well, I think you're right, Your Honor.

18   You are.

19           THE COURT:  You're saying -- you're basically saying

20   the Court needs to establish who has what rights and what's

21   derivative and what's an asset of the estate.  And because it

22   cannot be an asset of the estate, this 2004 is improper, which

23   would then fall under the harassment aspect of the analysis.

24           MR. BRODY:  That -- Your Honor, it would fall under

25   harassment because it's not debtor's property, and so --

1          THE COURT:  But if I'm not deciding it, how does that

2     play into this analysis at this time?

3          MR. BRODY:  Your Honor can decide that this is not

4     property of the debtor or, Your Honor, that the Trustee has the

5     burden to show that it's property of the debtor.  This is stock

6     in the debtor's company that the debtor does not own, so it

7     would be the Trustee's burden to show as part of the good faith

8     that the Trustee needs in order to obtain the Rule 2004.

9          And as Mr. Fountain had pointed out, we've asked the

10    Trustee's counsel several times exactly how this is property of

11    the debtor.  And all we've received back was the wordage in the

12    Rule 2004 that it has to do with the debtor's property, which

13    is a circular answer, has to do with the debtor's financial

14    condition, circular answer, or that the information is

15    attorney-client privilege, and therefore, they're telling us

16    that we're not entitled to know.  There is no cause of action

17    that would belong to them.

18          In this Court, not necessarily this Court, the

19    district court in AgriBioTech, in the District of Nevada, you

20    know, looked at what is property of the estate, what is a cause

21    of action that belongs to estate.  When does a bankruptcy

22    Trustee have standing, and that is only when, only when the

23    action belongs to the debtor's estate.

24          So we're looking at the assets, and right now, Your

25    Honor, if we were to look at the actual document requests

1  themselves, for example, Request 1 takes documents related to

2  shares of Meta and MMTLP, not key Meta --

3          THE COURT:  Could you -- is that Virtu or Anson, or

4  is it Citadel?

5          MR. BRODY:  I'm sorry, Your Honor?

6          THE COURT:  Which Request 1 are you looking at?

7          MR. BRODY:  Oh, I apologize.  I believe I was looking

8  in the Trustee's opposition.  They list the requests, and I

9  believe that's requests for -- of Citadel, Your Honor, as the

10 example.

11         THE COURT:  Okay.

12         MR. BRODY:  I've actually taken it right out of their

13 objection.

14         THE COURT:  I can get there.

15         MR. BRODY:  I apologize.  I don't have the exact cite

16 of the page from their objection.

17         THE COURT:  Page 10.

18         MR. BRODY:  Page --

19         THE COURT:  Yeah, I'm there.

20         MR. BRODY:  Okay.  But if we were to look at Request

21 1, all messages relating to the routing of orders of any type

22 for shares of Meta and/or MMTLP, Meta and MMTLP are the stock

23 that we're talking about.  Request 2 goes to the shares of

24 Meta.  Request 3 goes to the shares of Meta, and it's just

25 continuously in this.  So it's not Meta's own asset or MMTLP

 1   assets.  It's the shares of their stock, which really is what

 2   Mr. Fountain and the movants are looking at.

 3          If their -- their requests are not with respect to a

 4   property of the debtor or the debtor's estate.  With respect to

 5   the local rules, Your Honor, you know, Your Honor, this is

 6   very, very special to Nevada.  I clerked for the Chief

 7   Bankruptcy Judge in the Eastern District of New York, as well

 8   as practicing in New Jersey and the Southern District of New

 9   York.  We deal with 2004s quite differently.  We don't have

10   such a local rule, but the local rule is clear, Local Rule

11   2004(c), that the production of documents may not be obtained

12   by an order of Federal Rule of Bankruptcy Procedure 2004.

13          I understand Your Honor's point, but this was

14   something that Judge Barnes apparently recognized when the

15   provision for the production of documents was struck.  I'm

16   going to allow the local rules truly to speak for themselves,

17   but the points that I wanted to raise at this juncture,

18   because, again, I promised Your Honor I wouldn't be duplicative

19   with Mr. Fountain, is that the debtor's -- trading in the

20   debtor's equity, particularly since it's an insolvent entity,

21   has no effect on the debtor, is not the debtor's property, and

22   we've asked them several times how this connects, how this

23   relates to the debtor's property.  And the only answer we've

24   received other than it is the debtor's property, period, with

25   no further explanation, is that it's attorney-client privilege,

1  Your Honor.  Thank you, Your Honor.

2          THE COURT:  So let's go back to Local Rule 2004(c).

3  Production of documents may not be obtained via an order under

4  Federal Rule of Bankruptcy Procedure 2004.  Production of

5  documents may, however, be obtained via subpoena, as provided

6  by Federal Rule of Civil Procedure 45(a)(1)(C), as adopted by

7  Federal Bankruptcy Rule 9016.  What does that second sentence

8  mean?

9          MR. BRODY:  Rule 9016, as well as Federal Rule of

10  Civil Procedure 45, I believe, deal with the subpoenas and the

11  way that subpoenas can be served themselves, but yet, it still

12  falls short of saying production of documents may not be

13  obtained by an order under Rule 2004.

14          THE COURT:  But you can still get the documentation

15  under 45 and 9016.  It's just not going to be under technically

16  2004(c) then.

17          MR. BRODY:  Your Honor is correct, and, Mr. Fountain,

18  I'm going to go back to -- cede to Mr. Fountain.

19          Sorry, Peter.

20          MR. FOUNTAIN:  No, thank you.

21          MR. BRODY:  There is a great distinction between

22  discovery under Rule 2004 and discovery under Rule 45.

23          MR. FOUNTAIN:  And I'll (indiscernible), if I may.

24          THE COURT:  And I understand that argument.  Let's

25  see.  Mr. Brody, did you have anything else before we shift

1    back over to Mr. Fountain?

2            MR. BRODY:  No, and I appreciate you letting me

3    interject in this matter.  Thank you, Your Honor.

4            THE COURT:  All right.

5            MR. FOUNTAIN:  The only thing I'll add on that point,

6    Your Honor, is that if production may be obtained by a subpoena

7    under Rule 45, then the non-parties would be provided the

8    procedural protections of that rule, which, again, goes to the

9    proportionality analysis that we are discussing.  And so we

10   will hear from counsel for the Trustee, that rule for that Rule

11   2004 is broad, and that they get everything under the sun under

12   Rule 2004.  That will be their articulation.  But this local

13   rule says that if they are seeking documents, the analysis and

14   the proper subpoena would be under Rule 45.  And so that

15   breadth doesn't help them there.  It is the Rule 45 analysis

16   that this Court would need to conduct the proportionality

17   analysis, the burden against the unarticulated relevance.

18           THE COURT:  Can you explain to me the relationship

19   then between local rule and 2004(c) compelling attendance and

20   production of documents or electronically stored information?

21   What is -- why is that in there if you don't have to produce

22   documents in 2004?

23           MR. FOUNTAIN:  I'm sorry, Your Honor, I don't --

24   where is the reference to electronically stored information?

25           THE COURT:  To the Federal Rule of Bankruptcy

1    Procedure 2004(c).

2              MR. FOUNTAIN:  Your Honor, I would think that Rule

3    2004 of the local rules would be more specific and would govern

4    here.

5              THE COURT:  Well, that's the relationship between a

6    local rule and the federal rule, right?  I mean, the federal

7    rule gives that right.  How can the local rule take it away

8    completely?

9              MR. FOUNTAIN:  Well, Your Honor, there are sort of

10   two things I would say there.  The first is that the local rule

11   wouldn't take it away completely because it would permit the

12   process to proceed through Rule 45.  And so the Rule 45

13   subpoena --

14             THE COURT:  Then you just altered -- according to you

15   and Mr. Brody's analysis and argument, you know, very well

16   articulated, then you're shifting the burdens and the standards

17   in the applicable analysis, correct?

18             MR. FOUNTAIN:  You're right, Your Honor.  That is

19   correct.  And I think the other item to think about here is

20   that, you know, Judge Barnes conducted this analysis and issued

21   orders that comply with Local Rule 2004(c) and said that the

22   document production requests are stricken from the Rule 2004

23   subpoenas.  And so there's just -- there is no valid order from

24   the Court authorizing the Rule 2004 subpoenas with document

25   requests that have been served.  It's just -- it's not in the

 1  record.  It doesn't exist.  They are not valid on their face.

 2          And so, Your Honor, you know, we have our view of the

 3  interplay between Rule 2004 and Rule 45, but here that issue

 4  has been decided by Judge Barnes, and the Trustees proceeded as

 5  they did notwithstanding that order.

 6          THE COURT:  Fair enough.  Are we moving on to other

 7  areas outside of -- does that resolve or conclude the

 8  procedural aspect of what you wanted to address?

 9          MR. FOUNTAIN:  It does, Your Honor.  I may reserve if

10  options or if procedural issues are brought up by the Trustee,

11  but that is what I wanted to raise for now.

12          THE COURT:  I imagine they will be.  Do you want to

13  get into the substantive now?  Again, it is 11:20.  We have

14  until 1:30.  So I want to make sure that I reserve sufficient

15  time for the Trustee.  But why don't we get into your

16  substantive arguments?

17          MR. FOUNTAIN:  Your Honor, I'm happy to have the

18  Trustee proceed and to respond to that, if that's the

19  preference.  I don't want to.  I want to be respectful at the

20  time.

21          THE COURT:  All right.  No, I appreciate that.

22          Mr. Brust, was it you that was responding to the

23  procedural?

24          MR. BRUST:  Yeah, Your Honor.

25          THE COURT:  Go ahead.

1          MR. BRUST:  Okay.  I think that the Trustee is, from

2     what I've heard from the Court, fairly closely aligned with the

3     Court on this.  The Trustee does not believe that the Local

4     Rule 2004 was intended to remove any litigant bankruptcy

5     Trustees in the state of Nevada from what 2004 provides.  2004

6     is broad.

7          THE COURT:  How does that reconcile with what Judge

8     Barnes has ordered and the modification of the proposed orders?

9          MR. BRUST:  The only thing that I can think there is

10     that Judge Barnes recognizes the local rule and did not say

11     that we are not allowed to ask for anything.  Just took that

12     out of her 2004 order, knowing that we had the ability to do it

13     under Rule 45, which my understanding is, is the typical way

14     that 2004 requests are sent out in the state of Nevada.

15     There's the 2004 request, and then there's also the Rule 45

16     subpoena that goes along with it.

17          There's nothing in that -- in Judge Barnes's order,

18     even though she removed the request for documents out of the

19     proposed order.  There's nothing in there saying, and by the

20     way, you are not allowed to ask for documents under the venue

21     and the vehicle that we are providing you through Rule 45.  You

22     can guess why does Nevada have the Rule 45 rule?  It seems like

23     maybe the only thing I can think of, Your Honor, that makes

24     sense to me, is that the Court understands that when a Rule

25     2004 examination is done and before a Rule 2004 examination can

1   be asked for, or -- the Trustee may want to get some documents

2   first.  So the local rule provides that you can go out and get

3   documents first under Rule 45 and then be better prepared to

4   make your 2004 examination.

5          Now, I don't know -- I'm just guessing, trying to

6   find a logical reason why Nevada would depart from a rule that

7   is working everywhere else in the country.  And they have done

8   that.  But I cannot believe that the reason Nevada did that

9   would be to deprive Trustees in the state of Nevada the ability

10  to get documents under the 2004 procedure.

11         THE COURT:  Can you clear up just a historical, you

12  know, hole that I have in trying to put this.  My understanding

13  is that the motions for the 2004 and the orders were entered on

14  an ex parte basis, that there was no actual hearing or

15  interplay between the Court.  Otherwise, Judge Barnes does not

16  explain the reasoning in any place that I should look at for

17  modifying the proposed order.

18         MR. BRUST:  The only thing that I remember, Your

19  Honor, there was no interplay.  You're correct.  The only thing

20  I remember is an order saying, your motion is granted, provide

21  a proposed order.  And we provided the proposed order.

22         THE COURT:  Did she modify that order or -- because

23  the order answered is different from the proposed.  Okay, so it

24  was her modification.

25         MR. BRUST:  Exactly.  The proposed order mimicked the

1   Rule 45 subpoena and included the document requests.  And she

2   just took those off.  And she never said, you're not allowed to

3   do this.  And so we proceeded exactly as the statute says and

4   the local rule says and issued it under Rule 45 in conjunction

5   with the order that we had proposed.

6         THE COURT:  And as to obtaining the documents that

7   you referenced from what you refer to as "the Schwab entities,"

8   how was that done?  Was that under 2004?  Was it a straight

9   Rule 45 subpoena?  How was that done?

10         MR. BRUST:  It was done under the same way that we

11   have obtained them from the parties that are before the Court

12   today.  We got about seven or eight similar 2004 orders and

13   then turned around and sent those seven or eight out in almost

14   identical, except for, you know, some of the requests and the

15   names and that kind of thing, to all of the parties.  And now

16   we have three who are objecting, and they responded.  They did

17   not identify, we're responding to the Rule 45 portion of what

18   you've sent us or the Rule 2004 portion.  They just responded.

19         THE COURT:  To be clear, Judge Barnes modified all of

20   those orders, though?

21         MR. BRUST:  I believe so.

22         THE COURT:  Okay.  Thank you.

23         MR. BRUST:  Yeah.  One thing that's noteworthy, I

24   believe, is that the cases that were cited by the non-parties,

25   including the one that's been talked about and directly

1   discussed, the J&R Trucking, but even the other cases where

2   there is a finding that the 2004 was overreaching, none of

3   those cases involved a Trustee.  Those cases involve creditors,

4   pro se or pro per litigants, and maybe even the debtor in one

5   or two of them.

6          And the reason I think that's significant, Your

7   Honor, as Your Honor knows, a Trustee does not come into a case

8   like a normal litigant.  Trustee comes in what's been described

9   to me, and I think it's a good description, as an after-the-

10  fact fiduciary.  The Trustee comes in not like someone who has

11  lived the case, but coming into it and trying to decide what is

12  the scope of this estate.  And part of deciding what the scope

13  of the estate is, is does this estate have any claims,

14  litigation claims?  Has there been theft?  Has there been

15  whatever?  But that's why it's so broad.  And that's why I

16  think Rule 2004 exists.  And if it's ever curtailed, it looks

17  like, from the cases cited by the non-parties, it's curtailed

18  against not the Trustee, but other people who probably should

19  already have this knowledge.

20         In this case, the Trustee came in and is trying to

21  figure out what is in this estate.  And part of that is trying

22  to figure out what litigation claims the estate may have.  Now,

23  Mr. Christian, I think that gets into the substantive part of

24  the analysis as to how the information that we're seeking could

25  help educate the Trustee as to what claims they have.  But this

 1  notion that there's a crossover to we're looking for litigation
 2  and who we can litigate against, that is not a bright line.
 3  We've cited the Millennial case -- or the Millennium case and
 4  several other cases where the Courts have said part of the rule
 5  2004 is to allow a Trustee to investigate what litigation
 6  claims they might have.  And that that's what's happening here.
 7       Now, I think that they are overreaching.  And
 8  Mr. Christian can talk about this on the invocation of
 9  attorney-client privilege or attorney work product.  Sure, some
10  of their questions got into issues that would go into attorney
11  work product.  What are your claims?  What are you thinking
12  about suing our clients for, or something like that.  And we
13  frankly, I don't even think that decision has been made yet.
14  This is still an investigatory process and that's all that's
15  happening here.  So this bright line that somehow if somebody
16  is thinking about litigation 2004 is off the table, that's just
17  not true.
18       THE COURT:  Well, I think let's back that up into
19  what I think Mr. Fountain described as the articulated
20  connection with the request.  And your opposing counsel has
21  made much of the fact that this is not technically property of
22  the estate that you are investigating as the trading between
23  non-debtor entities in an equity interest of the debtor, which
24  you know, they state, in light of the Chapter 7, is likely
25  insolvent.  So it does wrap in ultimately as to the standing

1    issue and causes of action.  But what is the articulated

2    connection here?  Is it sufficient to just say we're looking

3    for litigation assets?

4            MR. CHRISTIAN:  Judge, I'd be happy to address that

5    myself.  Could I do that, please?

6            THE COURT:  I assume Mr. Brust is willing to concede

7    as --

8            MR. BRUST:  What Mr. Christian is going to say is

9    over my head, Your Honor.  But I won't even try to fake it.

10           MR. CHRISTIAN:  Just to give this Court some simple

11   examples of the standing issue, Judge, Mr. Fountain is opposing

12   counsel in a case called Northwest Biotherapeutics.  In that

13   case, much like the potential case that we're investigating on

14   behalf of the estate, the issuer sold shares, and the issuer

15   believes, in Northwest Bio, that ultimately they sold those at

16   a depressed price directly attributable to the market

17   manipulation illegal acts that Citadel and others in that case

18   committed.  That case had a very good motion to dismiss filed

19   by Mr. Fountain's firm.  That motion was denied.  We are in

20   discovery in that case.

21           I'll cite you two other cases, one of which

22   Mr. Fountain is also a opposing counsel on, the Mullen

23   Automotive case.  These are all out of the Southern District of

24   New York, Judge Spraker, similar set of facts.  That motion to

25   dismiss has been denied, and we're in discovery.

1            Another case that is actually the ringleader of these

2    cases is a case called In re: Harrington.  That case is not

3    only passed the motion to dismiss, discovery is complete,

4    Daubert motions have been filed, and we're headed to trial.

5            THE COURT:  And are those -- the motions to dismiss,

6    did they raise the standing issue?

7            MR. CHRISTIAN:  I don't recall whether they raised

8    the standing issue, Judge, but needless to say, I'd have to

9    look at those.  I have so many complaints, frankly, in my head,

10   I'd have to look at them just to be honest with the Court.  But

11   I can't imagine that the opposing counsel didn't bring that

12   issue up.  So let me -- if I could --

13           THE COURT:  They are Chapter 7s involving debtors'

14   causes of action for market manipulation?

15           MR. CHRISTIAN:  No, Your Honor, the Harrington is a

16   large shareholder case where a large shareholder was selling

17   the shares at a manipulated price.  The Northwest

18   Biotherapeutics is a solvent issuer where they sold shares in

19   the same way into a manipulated market, they're contending.

20   Similarly, Mullen Automotive, too.  There is no case presently

21   that we -- that I've worked on in connection with this

22   litigation space, let's call it the 10(b)(5) market

23   manipulation space.

24           And I've done -- myself and my colleagues, including

25   Mr. Burnett on the phone and Steve Towntis (phonetic), who's

1  also special counsel in this case, at least to my knowledge,

2  stemmed out of a bankruptcy proceeding, if that's your

3  question.  But nonetheless, the standing issue is the same.

4  What we're contending is that it's possible. -- again, this is

5  an investigative stage.  And Mr. Fountain's correct, I was on

6  some of those meet and confers.  And Mr. Brody's correct, we

7  did not want to give them our work product, or our proprietary

8  methodology.  They wanted to know, you know, what claims we had

9  against their client, what's the basis of them, et cetera.  We

10  had several dialogues, but their answer was, well, we're

11  producing nothing.

12         So I understand, you know, that's their position.

13  They're entitled to whatever position they want to make.  What

14  we believe.  Your Honor, based on the team that we put together

15  -- and just briefly, it's not only three of the top securities

16  litigation firms on this -- in this market manipulation in the

17  United States, but also some of the best consulting experts.

18  This Court, I'm sure, recognizes Judge Spraker, that Twombly

19  and Iqbal require very detailed, a heightened level of

20  articulation of your claim based on the Private Litigation

21  Securities Reform act, the PSLRA.  And that's a very serious

22  act where you better have your facts together.

23         That, frankly, takes a lot of analytics.  And in that

24  vein, I agree with my colleague, Mr. Brust.  We are

25  investigating this.  Do we have suspicions that the company's

1   been manipulated?  Yes, the company has articulated that.  But

2   that means nothing in the context of bringing a 10(b)(5) market

3   manipulation claim against a defendant pursuant to the Private

4   Securities Litigation Reform Act.  It must be detailed.

5           For the record, Your Honor, the records we are

6   requesting are the similar records that these defendants -- and

7   I should -- I'm sorry, not the Anson Funds.  The Anson Funds,

8   just for, you know, division here, are a investment advisor.

9   They have a certain set of rules.  Virtue and Citadel are

10  market makers.  And if they're trading on their own behalf,

11  brokers.  They are required by 8 a.m. the next day, pursuant to

12  17 C.F.R. 242.613, referred to as the consolidated audit trail.

13  And I believe Mr. Hartman was kind enough to put that in the

14  record so the Court would have reference to it, but let me just

15  summarize what it says.

16          Essentially, all aspects of the trading records which

17  are specifically defined on Pages 7 -- I'm sorry, 8, 9 and 10,

18  if you print out the article for the Consolidated Auto Trail,

19  they're required to give that information to the regulatory

20  authorities.  And in doing so, that's the same information

21  we're requesting.  Give us what you have to report every day by

22  8 a.m. the following day, which is the nature of the trade.

23  Was it short?  Was it long.  Was it proprietary?  Did you do

24  the trade on your own behalf?  Were you doing it on behalf of a

25  customer?  Where was it routed through?

1          And as you could imagine, Judge Spraker, the

2    complexity of these market manipulation cases in connection

3    with how this stock trades is very complex.  And in essence,

4    what we're looking for is those trading records that they

5    already have to produce in electronic form, I might add, Judge;

6    and secondly, the communications associated with it.  And to

7    put this in context, these cases, again, 20 or 21 of them and

8    the past four that are pending in New York with one or more

9    components of the same team that Ms. Lovato has hired, the

10   Trustee has hired in this case, are about really three groups

11   of bad acts.

12         One is in this market, Judge Spraker, you sell shares

13   electronically, but many times the delivery of those shares

14   does not occur.  In many instances, those shares are marked

15   long, but really they're mark -- they're really short sales.  A

16   short sale, if the Court's not familiar, is when you want to --

17   you're going to bet the company's not doing -- going to do

18   well.  You sell it at 100.  The action -- the bad acts of the

19   defendants ultimately cause the price to go down and they cover

20   at a lesser price and make the spread, that's referred to in a

21   vernacular, of a naked short sale.

22         Unfortunately for issuers in the United States of

23   America, if you're a bona fide market maker, you don't have to

24   borrow anything.  The key is bona fide.  What we're

25   experiencing in these cases, frankly, we do not know if that

1  exists today with these parties on the phone.  We suspect it,

2  but we don't know it.  We suspect they're abusing that.  And

3  why would we suspect that?  Because we believe the sell side of

4  their business daily versus the buy side is grossly

5  disproportionate.

6           If you're a market maker, Judge, in this market, you

7  are supposed to create activity.  You're supposed to create

8  sales and buys.  And in theory, at the end of the day, in

9  theory, you're supposed to end up with the broker even, 50/50.

10  Okay?  Your purpose is to generate activity.  That's not what

11  we're seeing in the marketplace.  We're seeing that the market

12  maker exception is being abused.  That's number one.  Number

13  two, we're seeing spoofing in the market.  The cases I cited,

14  you, Northwest Biotherapeutics, Mullen Automotive, and also

15  Harrington, are spoofing cases.

16           Spoofing is something that we're accusing market

17  makers of doing and others in these cases.  And a spoofing,

18  essentially, Judge, is again the injection of false information

19  into the marketplace.  Because under 10(b)(5), it must be in

20  connection with the sale or purchase of securities, and it must

21  be basically something that ultimately causes the price to

22  decline in these cases.

23           So what's happened here in Meta's case is we're

24  contending, we believe, that the shares that Meta Materials

25  sold ultimately was negatively impacted.  They sold at a price

1    greater -- much less than the price they could have sold it at.

2    So instead of selling it at $50 a share, they had to sell it at

3    $20 a share, directly and causationally attributable to whoever

4    the defendants are in this potential cause of action.  That

5    delta is their damage model.  That damage model belongs to the

6    estate.  It belongs to the issuer.  It is a cause of action of

7    the issuer.  Why?  Because it's the issuer that sold the

8    shares.  They are the seller in this case, which is one of the

9    predicates that you must prove.

10            So back to spoofing.  So spoofing is also injection

11   of false information in that all these sell orders are posted.

12   So the perpetrator sells at the highest price of 100.  They

13   post all these sell orders, which really are fake sell orders,

14   Judge, and it goes down to 90.  They then execute, maybe

15   through another party, maybe it's routed a different way, so

16   you have to track all this to figure it out, and then

17   ultimately those sell orders are pulled down.  They're fake.

18   They were never intended to be legitimate.  They're there to

19   show the market there's so much selling going on, there must be

20   something wrong.  This is my simple version.  And hence that's

21   called "spoofing."  You can look at the SEC's website and see

22   it is the topic of -- currently of much concern.  That's number

23   -- the second group of bad acts.

24            The third group of bad acts is lending shares that,

25   for the most part, you don't own.  That's not necessarily what

1    we're looking at in this case, but those are the three groups

2    of bad acts.  Ultimately, all those bad acts are dissemination

3    of false information in the marketplace and ultimately can act

4    as a predicate act to fuel a 10(b)(5) case.

5           I also want to touch on Mr. Fountain's comment

6    regarding, oh, we can get these records from somewhere else.

7    That's really not accurate because ultimately we're asking for

8    their communications.  Here's what those communications look

9    like, Judge.  For every seller, there's a buyer.  If the

10   buyer's broker doesn't get his shares, he's going to be

11   communicating to the seller that sold them those shares, hey,

12   where are my shares?  I owe them to my client.  I gave you the

13   money.  That's referred to in this litigation space as a fail

14   to deliver.

15          In this case, we believe whoever the defendants are

16   sold shares that they did not deliver, either through naked

17   short selling or some other means.  We believe there are large

18   fails to deliver in the marketplace.  And are they attributable

19   to these defendants?  We don't know.  We suspect some are.  How

20   many?  We don't know.  But ultimately those fail to delivers,

21   you used a Ponzi scheme.  This case and this group of cases is

22   really about a counterfeiting scheme.  Only the issuer has the

23   right to issue real shares that are traded in the marketplace.

24   When these shares are issued electronically by perpetrators,

25   they are in essence acting like an issuer.  Well, guess what?

46

1    They're not.

2           You know, and ultimately what that causes, Judge, it

3    causes a disproportionate share of sale orders versus buy

4    orders.  The simplest version of the case we're pursuing is all

5    these acts are to artificially create artificial supply in the

6    marketplace to drive the price down and, in essence, rig the

7    market.  Rig the market.  And what we've experienced is the

8    broker dealers participating this, the market makers

9    participating this, make more money ultimately killing the

10   company by injection of these fake shares, these fake sell

11   orders into the marketplace that ultimately drives the price

12   down because demand simply cannot keep up.

13          So at the end of the day, also on the magnitude of

14   the information, and I talked to my colleagues about this

15   before this call, if it is true, even though they submit this

16   information every day to the regulatory authorities that we're

17   seeking, we would be happy to take the 1,300 days of

18   information, roughly four years we're asking, and reduce it to

19   161 days of information.  Why?  Because in our analytics, we

20   believe some of the most actionable time periods are within

21   this 161 days.  We think that that is a big compromise on our

22   part, that we're going to save the Court time.  We're going to

23   advance it now and not wait till later.  But this information

24   is critical to this estate, Judge.

25          It is critical because we're not going to get

1    communications on these issues from anybody else other than

2    these parties on the phone.  Number two, while Nasdaq may have

3    some of the same information, first Nasdaq is fighting us on

4    this, as the Court may already know.  And also, it's not the

5    same information, for example, that's on the books of these

6    parties.  These parties are obligated to show what shares have

7    they not delivered, what shares have they purchased that they

8    haven't bought the other party in, have they done spoofing in

9    connection with their trading activity on a daily basis, and

10   this type of thing.

11           And it's not just that Judge, just to give you the

12   Court some example, and there's many enforcement actions

13   against Virtue and many enforcements actions against Citadel

14   that you can your law clerks and the Court can go to, you know,

15   SEC's website, Defender's website.  But just to cite two:

16   December 23rd, 2004, Citadel, according to the enforcement

17   action, the fine they paid, failed to report to CAT.  That's

18   Consolidated Audit Trail, which is, in essence, an affiliate of

19   FINRA, Judge, a financial regulatory organization.  They failed

20   to report billions, not millions, of shares to CAT.  And

21   they're not the only unique one that did that

22           On October 9th of 2024 and different --

23           MR. BRODY:  Your Honor, I'm going to object to all of

24   this evidence that Mr. Christian is putting in with respect to

25   Citadel and Anson unrelated to this case unless he wants to put

1  this in by declaration and be a witness.  This is the first

2  we're hearing about this coming from him.  There's no bearing

3  to this case.

4        MR. CHRISTIAN:  This isn't evidence.  These are

5  facts.  This is a governmental document that is self-

6  authenticating.  I'm not even proffering it as evidence.  I'm

7  communicating to the Court to put this in context.

8        MR. BRODY:  Your Honor, he's proffering evidence that

9  has nothing to do with this motion.

10        THE COURT:  All right.

11        MR. CHRISTIAN:  If you provide me --

12        THE COURT:  First of all, it's not evidence because I

13  haven't opened evidence.  All right.  Closest that I can see is

14  that he is asking quite honestly for judicial notice of other

15  matters of record that may be taken of judicial notice.  I

16  don't know what that's going to play out.  I am considering the

17  matter at hand.  If you want to expand it, we can talk about

18  whether we want to expand it to allow a declaration to give me

19  that information.  You're right, it's not in the record.  It is

20  more for context, if anything, at this point.  Unless you want

21  to supplement and then you can argue then so --

22        MR. BRODY:  Your Honor, my point is that he is not --

23  this is the first that's coming up so we've never had an

24  opportunity to even look at the veracity of what Mr. Christian

25  is saying.  And again, it's nothing to do with the matter at

1    hand.

2          Mr. Fountain also -- I believe the whole point, Your

3    Honor, and I apologize, but I believe the point of bifurcating

4    the procedural and the substantive part of this was that

5    Mr. Brust was responding to Mr. Fountain and my issues

6    regarding the procedural, and then it was going to turn back

7    over to Mr. Fountain with respect to the substance.  But

8    Mr. Christian seemed to have gone down that route already.

9          THE COURT:  Again, to be fair, you know, look, that

10   was the part and problem with bifurcating this at all.  I asked

11   for the articulated connection of which much was made by both

12   you and Mr. Fountain.  Now he has given you the articulated

13   connection.  I understand this may or may not be what you heard

14   when you asked for the causes of action.  You will have a

15   chance to respond to that, but he's laying out the causes of

16   action that he believes may be pursued and why this is needed.

17         So as to the quandary of raising a objection to

18   evidence during argument that -- those two don't match up.  All

19   I can tell you is I am hearing argument.  If you want to ask

20   for supplement to address that at the risk of placing even more

21   emphasis on it, we can talk about that.  You know, I am taking

22   all this information in.  We'll see where it leads.  So I

23   understand your point.  And if you're concerned about that, we

24   can't talk about whether we want to require, you know, the full

25   and fulsome citation to those matters, and you'll be able to

 1  respond.

 2          That will eventually raise a question of all parties

 3  telling me the priority of this decision because you are

 4  shoveling a lot into my processor at the moment, and I will

 5  need time to go back on both procedural and as now we tilt over

 6  to the substantive to figure that out.  So you may want to go

 7  that route, you may not.  But there is no objection to be made

 8  to evidence because I am not taking evidence.  Question is,

 9  having raised that, is that being brought in through judicial

10  notice.  We'll leave that for later discussion or resolution.

11          But to the extent I have to or need to make a ruling

12  on objection, it's overruled because it is not evidence.

13  Evidence is not -- evidence before the Court has been

14  presented.  This is nothing more than case citation effectively

15  so --

16          MR. CHRISTIAN:  May I proceed, Your Honor?

17          THE COURT:  You may, but we do need to hew it to the

18  procedural because we did bifurcate this.  Mr. Brust did yield

19  time.  I appreciate it.  Again, I am taking on the articulated

20  connection.  Maybe that's a segue if Mr. Brust wants to

21  conclude the procedural to get us into the substantive.

22          MR. BRUST:  Your Honor, I think that on the

23  procedural side that was the end of the procedural was the

24  segue into the substantive because that's really where this

25  goes.

1          THE COURT:  Well, and that leads us to another

2   because I focused on the articulated.  But when we were there,

3   when the objection was made, really we were focused upon the

4   argument that this is unnecessary and again gets to the

5   harassment aspect or limitation of Rule 2004 because the estate

6   has already obtained all of the information needed.

7          Mr. Christensen -- Mr. Christian, I'm sorry, was

8   explaining that no, the this gets to the actual entities and

9   their activities within that market as to the nature of the

10  trades, you know, and the fail to deliver and all of that.  So

11  it is substantive, but again it illustrates that's tied to the

12  procedural.  But I just want on the record that I don't think

13  we strayed unnecessarily into that discussion.  I'm looking at

14  my notes to see if there were any other aspects of the

15  procedure that I wanted to address.

16          I do want to, before -- if that is it, Mr. Brust, I

17  do want to close with reply on the procedural before we

18  actually get into the substantive.  I think those are big items

19  that I wanted to address was the articulated connection and the

20  obtained from and also the trigger into when, quite honestly,

21  the interest -- the matter on the procedural that I am most

22  interested in, which also gets into substantives, when, if at

23  all, does a use of 2004 change from the more generic

24  information gathering, the wide net, into litigation

25  preparation and when, if ever, that becomes improper under

1    2004.  If you care to address that issue, Mr. Brust, before we

2    go to reply, I would be interested in that.

3         MR. BRUST:  Yeah.  Your Honor, I guess I would just

4    -- I would posit that it becomes -- maybe it starts to cross

5    the line, although I don't think that line has ever been

6    articulated in the cases.  But maybe it become -- it crosses

7    the line when a decision is made by the Trustee to start

8    pursuing a particular defendant for particular claims for

9    relief.

10        THE COURT:  Isn't that -- I can -- I anticipate that

11   Mr. Fountain and Mr. Brody are going to say that is only known

12   by the target of the 2004 through the actions of the estate.

13   Right?

14        MR. BRUST:  That is.  Yeah, but that's true.  The

15   only person who's going to know when that line is crossed is

16   the Trustee, essentially.  But this is the very first thing

17   that's being done.  Seeking these documents is the very

18   beginning of the examination.  Having suspicions is not the

19   same as litigation activity, especially in light of the

20   heightened standards for pleadings that are required by these

21   claims.  So this is the very beginning of the spectrum.

22        And the case law, the Millennial Holdings that says

23   2004 motion seeks regarding prospective claims that a Trustee

24   may bring in the future is allowed by 2004.

25        THE COURT:  Again, in analogy, if you're after a

1    preference, sure.  You go and you get the financial

2    transaction.  To the extent, though, that, you know, play it

3    out for me.  Do you get to bring in the recipient of that

4    alleged preference and start asking about ordinary course and

5    other matters?

6              MR. BRUST:  Well, I think that's going to depend on

7    the context, and I think that that is -- potentially yes,

8    because it's not even necessarily true that the information

9    from -- that's being sought by these subpoenas only relate to

10   the recipients of these subpoenas.  These subpoenas could show

11   that there are other parties that need to be sought.  And --

12             THE COURT:  Would that go into the routing

13   information and the failure to deliver that Mr. Christian was

14   discussing?  But put a much more finer point, is that

15   information directed to the -- you know, Citadel and Virtu, or

16   could it, in your mind, expose other potential parties that may

17   then be wrapped in within this investigation?

18             MR. BRUST:  Absolutely.  Absolutely it could lead to

19   other parties.

20             THE COURT:  And why is that?

21             MR. BRUST:  Because -- and I'm going to have to let

22   Mr. Christian speak to it, but I can speak to it generally,

23   Your Honor.  The information that comes in identifies the

24   parties and who's doing what.  And it's that information that

25   shows where Mr. Christian, in these types of lawsuits, goes for

1    targets.  And I'll let him talk to it a little bit, because a

2    lot of the substantive part of this is part of the procedural

3    part of it.  So I hate to blur the line there, but sometimes

4    there isn't a line there in this analysis.

5         THE COURT:  If think -- you know, so I think I made

6    that pretty clear that I want more information on that.

7    Mr. Christian, we'll come back to you on the substantive side

8    because I think we're just about to transition.

9         MR. CHRISTIAN:  All right, Judge.  Thank you.

10         THE COURT:  All right.  Mr. Brust, anything else then

11   on the procedural aspect?

12         MR. BRUST:  No, Your Honor.

13         THE COURT:  All right.  Mr. Fountain?

14         MR. FOUNTAIN:  Your Honor, would it make sense for us

15   to respond now on the issues?

16         THE COURT:  On the procedural issues, yes.

17         MR. FOUNTAIN:  Yes, of course.  So, you know, I'll

18   start with the procedural, Your Honor.  I -- essentially,

19   there's been an admission by counsel for the Trustee that Judge

20   Barnes's order was disregarded and that they served Rule 45

21   subpoenas to attempt to solve what they saw as the issue with

22   either the Court's order or the local rule.  They obtained

23   documents through Rule 45 subpoenas.  And because there is this

24   admission that the Rule 2004 subpoena document requests were

25   not validly issued by the Court, the analysis that this Court

1  would need to do is within the lens of Rule 45, giving the

2  non-parties here the procedural protections, the requirement

3  that those subpoenas must be quashed if there's an undue burden

4  and an analysis of relevance.

5        And while we've heard today, for the very first time,

6  a lot of arguments about purported relevance, none of those

7  were previously articulated by counsel for the Trustee.  None

8  of those were briefed before the Court.  And the non-parties

9  would, of course, be -- you know, should have an opportunity to

10  respond to that, whether it's through additional briefing or

11  whatever manner, you know, the Court, you know, may direct.

12        I'd like to spend some time on the allegations that

13  Mr. Christian said, which I think support the arguments that

14  the non-parties advanced here in several ways.  If there was

15  any doubt before Mr. Christian's speech that the non-parties

16  had been identified as litigation targets by the Trustee, that

17  doubt has evaporated.  He has talked about the case that

18  they're pursuing against the non-parties.  He talks about an

19  obligation that the non-parties purportedly have to show

20  whether they've manipulated the market, what fails to deliver

21  their --

22        THE COURT:  No.  No.  No, stop.  I mean, I appreciate

23  that.  I appreciate the argument.  I get your part.  But

24  there's a subtle but very important difference here of

25  underlying information and targeting.  All right?  And that's

```
 1   really what you're asking me, is to draw that line.  All right.
 2   So just because this information may implicate you, yes, that's
 3   the purpose of discovering litigation assets.  All right?  The
 4   question is whether it is proceeding toward -- I mean, as if a
 5   litigation.  And to Mr. Brust's point, you do have an after-
 6   the-fact fiduciary who needs to get knowledge before filing
 7   lawsuits or even assessing whether to proceed with a lawsuit.
 8   How does that person get that in that situation but for 2004,
 9   which is why it is a fishing expedition?
10           MR. FOUNTAIN:  Your Honor, I want to respond to that
11   point.  And also this idea that this is the property of the
12   estate, you know, the property of the --
13           THE COURT:  The cause of action would be the property
14   of the estate.  Now, I've raised that and I've heard your
15   argument that they do not have standing.  I don't know.  That
16   is not the primary focus of this.  So unless the parties are
17   going to make it the primary focus, which to your point, has
18   not really been raised, the question of standing is out there,
19   but it is not developed that I have any ability or willingness
20   to opine at this point in juncture as to who owns what cause of
21   action.
22           MR. FOUNTAIN:  And, Your Honor, I think it's very
23   important to note that Mr. Christian talked to you about these
24   cases that he says supports their theory of standing, and they
25   support the opposite facts.  The Northwest Biotherapeutics case
```

1    that he talked about, he said there was a motion to dismiss

2    opinion.  That is correct.  And the Court, in the motion to

3    dismiss opinion, said that the plaintiff only had a cause of

4    action for the trades that it was actually engaged in, its own

5    sales of stock that were not only its sales, but temporally

6    tied to the purported spoofing.

7            And so not only do they have to be, A, the trades

8    that were done, you know, by analogy by the debtor, but they

9    also had to be narrow in time to the alleged market

10   manipulation, and that refutes and rejects the subpoena and the

11   information that they're seeking in several ways.  They're

12   trying to cast this broad net --

13           THE COURT:  But you understand, Mr. Fountain, this is

14   clearly a horse-and-cart, cart-and-horse situation.  The

15   problem is the distance between the horse and the cart are

16   miles.  When you start giving that information, as Mr. Brody,

17   you know, raised in his objection, this is not briefed.  I

18   don't know all these things.  I have not -- you know, it has

19   not been discussed.

20           Now, we can get to the additional briefing, but to

21   tell me about the specifics of Northwest and the other matters,

22   it's not moving the needle on oral argument, because I have no

23   way to ascertain, sitting here today, what that means.

24           MR. FOUNTAIN:  I understand that and appreciate that,

25   Your Honor.  We, of course, would be happy to brief, you know,

1    any issues.  I'm hearing Mr. Christian's characterization of

2    these cases, which I think is incomplete and not quite right.

3    And so I wanted to provide that context.  The Court, happy to

4    do so on the papers, but I think one of the key things here,

5    Your Honor, is that in every single one of these cases, it is a

6    distinction as to here.  Right?

7          They cite the In re Millennium case.  All of these

8    involved a direct relationship between the harm and the debtor.

9    In the Millennium case that they cite, there was a contract

10   that the -- you know, they were seeking Rule 2004 discovery

11   from a party to an agreement with the debtor.  And here there's

12   nothing like that.  There's no relationship between our clients

13   and the debtor.  It proves the point that there has to be,

14   under Rule 2004, that connection to the debtor's estate.  That

15   is entirely lacking here.

16         And I think that's one of the critical takeaways from

17   the argument that we've heard from Mr. Brust and Mr. Christian.

18   You know, I can speak to Your Honor to this idea that, you

19   know, how do we know when they've crossed into having

20   identified litigation targets.  And we heard Mr. Brust say

21   they're at the very beginning of the investigation.  But we

22   heard something very different from Mr. Christian.

23         In fact, we heard for the very first time today

24   they've identified apparently 161 days on which they think

25   there was alleged market manipulation or what they want to

 1   focus on.  They have secured $11 million in litigation funding.
 2   That is not something you do without viable claims against
 3   identified defendants.  They've selectively identified our
 4   clients to subpoena out of what they admit is more than 3,000
 5   possible entities that traded the stock.  All of these -- this
 6   is the clearest evidence that they've gone far past the line.
 7   And, you know, I think again, Your Honor, there's not a dispute
 8   between the parties that once you cross the line, Rule 2004 is
 9   no longer available to you.  That's something that they don't
10   dispute in their briefing.  And so the only question --
11          THE COURT:  Again, you do -- all right.  So there's
12   the pending proceeding rule.  That's obviously the line.  You
13   are pushing it back to when it coalesces.  And, you know,
14   they've tried to distinguish J&R Trucking.  You know, you have
15   the -- I think it's Transmar, as I said.  Transmar, as I
16   understand, is not even a Westlaw case.  It was, you know, you
17   cite the transcript.  So when you say it's well established --
18          MR. FOUNTAIN:  And Your Honor, I think what I would
19   say to that is there is authority supporting our worldview and
20   no authority supporting the position that the Trustee's counsel
21   is articulating.  You know, the In re: Transmar case.  You're
22   correct, it is a transcript, but it is a transcript of an oral
23   decision that the Court gave and was transcribed.  So it --
24          THE COURT:  You need to provide that to me.  I mean,
25   I did not see that as an -- you need to supplement, please.

 1          MR. FOUNTAIN:  Of course.  And I believe that was

 2  Exhibit 16 to our motion, but we'll make sure that the Court

 3  gets a copy.

 4          THE COURT:  Okay.  If it is, that helps.  When I was

 5  reviewing it again, you know, I just saw the citation to the

 6  ECF number to the New York, you know, case, so

 7          MR. FOUNTAIN:  Of course, Your Honor, we'll make sure

 8  that that reaches your chambers.  There's the J&R Trucking

 9  case, as mentioned.  There's the Defoor case.  And all of these

10  cases stand for the proposition that once you cross the line,

11  that is too far.  And here, you know, there is an incredible

12  set of facts.  And I think comparing these cases to the

13  authority -- comparing the facts here, comparing what is in our

14  briefing with the $11 million of litigation funding, there was

15  a reference today to the consultants that they have analyzing

16  these trades.  There's a tremendous amount that they already

17  have that would allow them to satisfy the pleading requirements

18  and bring these claims against us.

19          Mr. Christian has said he's suing Citadel Securities

20  all over the place for these claims.  And it brings us back to

21  the key point of all of this, which is that this is an attempt

22  to use Rule 2004 to obtain, from non-parties, discovery that

23  they would otherwise not be entitled without the procedural

24  protections that would be provided by Rule 45.  And that's

25  another thing that goes to the procedural issue as well, Your

61

1  Honor.  We're entitled to these Rule 45 protections, but

2  they're trying to get unfair pre-litigation discovery against

3  us in contradiction of the rules and the case law.

4        Your Honor, there's a couple of other items that were

5  raised that I'm happy to address if that's okay with the Court.

6        THE COURT:  Yeah, let's go ahead and run through the

7  rest of procedural and we'll take a five-minute break so people

8  can stretch their legs.

9        MR. FOUNTAIN:  Thank you, Your Honor.  So one of the

10  things we heard from counsel for the Trustee is this idea that

11  there is a special duty afforded to the Trustee.  The opposite

12  is true, Your Honor.  Section 704 provides that the -- it

13  actually cabins what the Trustee's investigation is supposed to

14  look like.  I believe it's 704(1)(a)(4) provides the Trustee's

15  duty is to investigate the financial affairs of the debtor.

16  And in that way, it works hand in hand with the limitations we

17  spoke about in the context of Rule 2004.  Both of them

18  expressly limit the investigation that can be adopted to the

19  affairs, the conduct, the liabilities of the debtor.  And

20  they're far afield from that.

21        Rule 2004 also speaks to a party in interest.  It

22  doesn't distinguish between the powers or the opportunities

23  that the Trustee might have.  It -- Rule 2004 treats any

24  individual, any party in interest the same, which refutes their

25  idea that there is a some special authority that we're talking

1   about.

2          You know, one other item I just want to flag for the

3   Court, which is that, you know, what I heard from Mr. Christian

4   is an admission that they are seeking communications and there

5   was some dispute about this.  You know, they had said at one

6   point it's -- maybe it's just trading records.  Oh, well, yes,

7   maybe we ask for communications.  It goes to the massive burden

8   associated with this.

9          I think he said there was something like 1,300

10  trading days; we heard for the first time, 161.  They're

11  seeking every communication related to every single one of

12  these trades under all of these various causes of action that

13  Mr. Christian is talking about indicates and I think proves

14  that the non-parties need the protections of the procedural

15  rules, Federal Rules of Civil Procedure here.  They're on a,

16  you know, a wild goose chase for a cause of action that they

17  think they've identified, and it's simply not proper under the

18  rules.

19          THE COURT:  All right.  Thank you.

20          MR. FOUNTAIN:  Yeah.  The last thing, Your Honor, and

21  forgive me, but you know, we obviously reject the

22  characterization of our client's actions.  And you know, we'd

23  appreciate the opportunity to respond to that in more detail if

24  the Court would want to hear it.

25          THE COURT:  I think that's the segue into the

1  substance.  So why don't -- we've been going for now over an

2  hour and a half.  Let's take a five-minute break so people can

3  stretch and do whatever they'd like for a few minutes.  And

4  then we'll come back and we'll move on to the subset of

5  arguments regarding the Rule 2004 and Rule 45 subpoenas.  Thank

6  you.

7       (Recess taken at 12:08 p.m.)

8       (Proceedings resumed at 12:16 p.m.)

9           THE CLERK:  You're on.

10          MR. FOUNTAIN:  Yes, on behalf of the --

11          THE CLERK:  We're on record.

12          THE COURT:  All right.  Madam Clerk, I'm sorry.  Did

13  you just say we're back on record?

14          THE CLERK:  Yes.  We're back on record.

15          THE COURT:  All right.  Thank you.  This is Judge

16  Spraker again.  We are back on record in the Meta Materials'

17  oral argument regarding the motion to quash.  We'll now move to

18  the, I guess, remainder of the substantive arguments as to the

19  motion to quash, noting that it is now 12:17.  We have

20  additional hearings at 1:30.  So what I would like to do is

21  kind of roughly divide the time between the parties.

22          And so, Mr. Fountain, if you could just keep that --

23  or I see Mr. Brody -- if you would just keep that in mind for

24  your presentation.  I'll try to signal if we're getting past

25  roughly the halfway mark.  All right.

1          MR. FOUNTAIN:  Thank you, Your Honor.  That works for

2   us.  I believe it'll be over to counsel for the Trustees.  I

3   would just make one remark if I may, which is that we've

4   identified the LEXIS cite for the Transmar case, and we're

5   happy to provide that to the Court.  And it's 2018 Bankr. LEXIS

6   2473.

7          THE COURT:  2473.

8          MR. FOUNTAIN:  And I won't respond further here, Your

9   Honor, to, you know, the comments that Mr. Christian made about

10  other cases and their effect on this, but we do think they

11  raise some threshold issues of what causes of action actually

12  belong to the debtor, and that's an issue we would appreciate

13  the opportunity to brief.

14         THE COURT:  All right.  So are we moving to Mr. Brody

15  for more substance?

16         MR. BRODY:  Your Honor, I have no substance.  I just,

17  on behalf of Anson, want to echo what Mr. Fountain said, that

18  whether or not the deputy Trustee has the ability to use Rule

19  2004, certainly only -- can only impact the debtor's estate,

20  and what we've heard from the Trustee is that she believes that

21  there's a cause of action here against whoever, but that

22  there's a cause of action.  And Your Honor even mentioned when

23  the -- at the beginning, when did that cause of action belong

24  to the estate?  That is a threshold, threshold requirement

25  under Rule 2004.  And since our questions to the Trustee as to,

1    you know, what they were look -- what -- why they believed it

2    was property of the estate or a financial condition went

3    unanswered for all these months, and now we're hearing from

4    Mr. Christian, I would echo what Your Honor even mentioned,

5    which is we need to brief this.

6          If that's -- you know, there's a question of whether

7    the Trustee even has standing to commence any action.  We would

8    think that any of those actions belong to the investors, and

9    I -- I'm not going to go any further than -- deeper than that

10   because Your Honor even recognized that that does not -- the

11   brief -- that is not before -- has not been -- we thought we

12   put that before Your Honor in the -- in our motion by stating

13   that this was not property of the estate.  Again, threshold

14   question.  We would ask that Your Honor set up a briefing

15   schedule for all parties and -- because I don't know how we go

16   forward without that question being answered.

17         THE COURT:  Understood.  Well, thank you.  Appreciate

18   that, and we will certainly pick that up.

19         I don't know, Mr. Christian, if you want to address

20   that at the beginning or at the end of your comments.

21         MR. CHRISTIAN:  It's up to you, Judge Spraker.  I'm

22   happy to address that particular issue now or wait.  Which

23   would you prefer, Your Honor?

24         THE COURT:  Well, the question really is just do we

25   open it back up for some more supplemental briefing on the

1  three pending matters that you have raised to put it more

2  properly before the Court as to, you know, identification of

3  those matters, the decisions, what was raised by whom in what

4  regard, and the outcome.  To the extent that it is a standing

5  issue, again, going back to my Ponzi scheme, there are always

6  questions of standing.  There's a number of cases out there

7  that address those, you know, the in pari delicto matters and

8  all of that.  And again, this is a rough analogy just to a

9  significant, sophisticated litigations.  I think one of the

10  counsel used as schemes that bring these materials out, and

11  whether it is property of the estate, whether it's property of

12  the investors, when it shifts -- I get that.

13          All of that is out there, but we're here,

14  technically, from the Trustee's vantage point, on a Rule 2004

15  endeavor, which has expanded to the subpoenas, which have been

16  challenged, and whether there's really, truly now under 45.  I

17  get all of that, but at the core of it from the Trustee is

18  we're at the lowest end of the entry pool wading in.  So we

19  haven't gotten to these, you know, on a motion to dismiss the

20  case actually filed as to standing.  I expect beefy, long,

21  detailed, heavy citations in the briefing as to the standing.

22  Their role in a 2004/Rule 45 subpoena, I have to think about.

23  You did raise the matters.  So it kind of opens the door.  I

24  guess pointedly, do -- does the Trustee want to pursue a

25  supplemental briefing on those topics?

 1          MR. CHRISTIAN:  I would say not, Your Honor, and

 2   simply because I think it's more appropriate for a 12(b)

 3   motion, a motion to dismiss.  We're not talking about whether

 4   we're even going to sue these parties.  So why are we talking

 5   about standing?  But just for the record, for clarity purposes,

 6   there's enormous case law on 10b-5 litigation in connection

 7   with market manipulation.  That's -- that rule under the

 8   Securities Exchange Act talks about misrepresentation and

 9   fraud, and it talks about manipulation.

10          These cases are more about manipulation.  All of that

11   has to be done in connection with the sale or purchase of

12   securities.  The only party who we represent who was selling

13   securities is the issuer, the issuer, and that's the case with

14   all the other cases I cited.  I would like to add another case

15   that is also in a bankruptcy context that I failed to mention.

16   It is In re Sorrento, S-O-R-R-E-N-T-O.  We can provide you the

17   orders in the context of a 2004 examination -- so this is not

18   on the standing issue; it's on the 2004 issue -- issued by and

19   signed by Judge Jones here in Houston, Texas, before he was --

20   left the bench in the Southern District here in Houston, and I

21   participated in that case in part.  And we can provide you the

22   orders of Judge Jones requiring brokers under 2004 to produce

23   documents, et cetera, et cetera.

24          So that may aid the Court on that issue, but on

25   standing, I think unless my co-counsel disagrees with me,

1  Mr. Brust or Mr. Hartman, that we think that's more appropriate

2  on a motion to dismiss, Judge, not on an investigation.  How

3  can you -- how can the Court even deal with standing when we

4  don't even know who the parties are?  So I get their point.  If

5  you don't have standing, then you shouldn't be entitled to a

6  2004.  I don't think that's the case.  How can you know what

7  you're entitled to until you do an investigation and obtain the

8  documents necessary to see if you even have claims?  That's the

9  problem.

10       MR. BRODY:  Your Honor, it's a question of whether

11  it's property of the debtor, and Mr. Christian just -- really

12  just proved my point because Sorrento Therapeutics, which was

13  the case that Mr. Christian just spoke about, that was before

14  Judge Jones.  In Sorrento, the debtor sought information

15  regarding the debtor's assets.  In that one, the debtor's 52

16  percent equity interest in Scilex Holding Company, a whole

17  other company, was the issue.  It was about trading in an asset

18  owned by the debtor, not the debtor's stock, but stock that the

19  debtor actually owned, and that does -- that's not here.

20       You also have, for example, another case that the

21  Trustee relies on when they talk about investigations,

22  securities, you know, and litigation, the Profilet v. Cambridge

23  Financial Corp. heavily relied on by the Trustee.  In that

24  case, the issue was about the debtor's stock issuance, the

25  actual stock issuance, and the reckless and willful

69

1    misrepresentations at the time of the stock issuance.  Your

2    Honor, Mr. Christian likes to say about -- that the debtor is

3    the issuer.  That stock is out the door.  The horse is out the

4    barn I think is the old expression.  They were talking about

5    the trading that has occurred way past that issuance here.

6              So those cases don't apply.  Whether or not this is

7    property of the debtor may or may not be a -- it is -- and

8    since -- is the threshold issue because the debtor -- the

9    Trustee is telling us that they're looking at potential causes

10   of action, to be property of the debtor, in order to have

11   standing, it has to be property of the debtor.  That's

12   AgriBioTech in the District of Nevada.

13             THE COURT:  And just to (indiscernible) --

14             MR. BRUST:  Your Honor, Your Honor --

15             THE COURT:  -- Mr. Brody is --

16             MR. BRUST:  Oh.  Go ahead.

17             THE COURT:  Hold on.  (Indiscernible)--

18             MR. BRUST:  Sorry, Mr. Brody.

19             THE COURT:  Yeah.  Let -- let's let one side --

20             MR. BRUST:  Sure.

21             THE COURT:  -- speak.

22             MR. FOUNTAIN:  Yeah.  Thank you, Your Honor.

23             And thank you, Mr. Brust.

24             Just to briefly add on to what Mr. Brody said, you

25   know, the decisions that Mr. Christian was referring to, this

 1  Northwest Biotherapeutics case, the Mullen Auto case, the

 2  Harrington case, they do involve these issues, and the facts of

 3  those cases are very different from what was described here in

 4  court.  And so, you know, we should have an opportunity to

 5  explain why the application of those cases, you know, relate to

 6  this fundamental threshold issue of whether any cause of action

 7  is in fact property of the estate of the debtor.

 8            THE COURT:  All right.  Now Mr. Brust.

 9            MR. BRUST:  I just turned myself off.  Yeah, Your

10  Honor.  I concur with Mr. Christian.  This is -- this has the

11  cart way before the horse.  Standing is not an issue --

12            THE COURT:  (Indiscernible) you raised it by bringing

13  it up with three cases.

14            MR. BRUST:  Well, but the issue here is we are still

15  trying to discover who potential targets could be.  That

16  discovery is -- you -- we can't now stop in time and say, are

17  one of these three nonparties who are being subpoenaed

18  appropriate targets?  And then even if you go further and say,

19  well, we don't care about the parties who are being targeted

20  here, we're talking about the information you're seeking could

21  never be used to assert a claim on behalf of the Trustee.  That

22  is not the case.  That's self-evident by Mr. Christian's

23  practice where he does sue parties who are involved in market

24  manipulation on behalf of companies.  There are cases like --

25            THE COURT:  After the initial stock has been issued

71

1    from -- which is what I believe, you know, your opponents are

2    arguing so that the debtor is not the issuing entity at that

3    time as it's being traded by non-debtor entities in a market

4    manipulation.  What is that case?

5         MR. BRUST:  So the market -- I'll let Mr. Christian

6    talk to it, but the 30,000 view is that market manipulation

7    affects the price of the stock that would then be issued by the

8    company.  And then when the company goes to sell its stock, the

9    market manipulation has depressed its stock price.

10        And sorry, Mr. Christian.  Go ahead.  You can --

11        MR. CHRISTIAN:  (Indiscernible) --

12        THE COURT:  I know that's your bailiwick.

13        MR. CHRISTIAN:  -- (indiscernible) think that it's

14   that simple, Judge, but I think in addition to that, that's

15   just one group of claims.  There are other claims in cases that

16   aren't just 10b-5 claims.  So at the end of the day, it -- it's

17   back to Mr. Brust's point.  What are the claims?  Because in

18   order to determine whether we have standing, you've got to

19   figure out what your claims are.  Well, we suspect what they

20   are, but what they end up may be -- that may happen is a

21   different matter.  So we can't be relegated to not getting the

22   discovery to figure out what are the claims, and we have to

23   prove standing first.  How can we prove standing until we know

24   what the claims are?  I mean, that's --

25        THE COURT:  I understand that.  You -- the -- let's

1  kind of -- again, all of this is narrowing down.  You're

2  arguing to a bankruptcy judge about sophisticated market

3  manipulation, securities issuance, and depressing prices that

4  you are telling me will lead to a cause of action that it hurt

5  the debtor as Meta Materials as opposed to the individual

6  investors involved in those trades or not involved in those

7  trades.  So, you know, what Mr. Fountain and Mr. Brody have

8  articulated is the connection.  You know, I understand fraud

9  claims.  I understand the Ponzi scheme, all of that, but the --

10 you are arguing more esoteric, specific causes of action on

11 behalf of the debtor.  You know, I don't want to get into

12 attorney-client.  I don't want to get into work product, but

13 generically, I need to know what those causes of actions might

14 be, a wish list of causes of actions that a debtor has for

15 market manipulation of its stocks where the securities have

16 already been issued by the debtor.

17             MR. CHRISTIAN:  Yeah.  I'd think we'd be happy to

18 brief that, which Mr. Fountain has already alluded to, but just

19 in its simplest form, you can't even bring a claim under 10b-5

20 for manipulation unless you are a seller or a purchaser of

21 securities.  That seller was the issuer, and again, I'm going

22 to be clear.  I'm not saying that's the only claims we can

23 bring, Judge Spraker, but just on that specific claim.  The --

24             THE COURT:  The original issuer.

25             MR. CHRISTIAN:  The original issuer is the only party

1  who can bring that claim because they're the only seller, Judge

2  Spraker.  There is no other seller, and what we're alleging

3  potentially as a claim -- not the only claims -- is that the

4  manipulative acts of certain defendants out there in the

5  marketplace are the causational link that caused the issuer to

6  sell its stock at $0.05 versus a hundred dollars.  And

7  therefore, in fact, it probably causationally -- this may be a

8  stretch -- it caused the whole company to go into bankruptcy

9  because as the Court knows, the currency of an issuer is its

10  stock.  If you impair their currency, they are going to be out

11  of business.  And so we would have to prove in a court of law

12  and a jury charged that ultimately, the causational link

13  between the depression in that price at the time that that

14  seller, the issuer issued those shares was directly an

15  attribute to this defendant this much, this defendant this

16  much, and this defendant this much.  That is the long and short

17  of how that 10b-5 market manipulation claim works.  So it's

18  only attributed to the seller, and there is only one seller,

19  Judge, in this -- in the concept we're pursuing is the issuer,

20  who is our client in this case.

21            MR. FOUNTAIN:  All right.  Your Honor, if I --

22            THE COURT:  Mr. Fountain, I -- from your reactions

23  during that -- during Mr. Christian's discussion, I could tell

24  you have a strong disagreement to that.  I think that is

25  convincing me that I would like some briefing on that.  Look, I

1  am well aware that this is not a 12(b) motion.  We are not

2  there.  Whether I -- first question I have to analyze is

3  whether this is a 2004 or solely a 40 -- Rule 45 situation.

4  Right?

5         After that, I have to analyze -- you know, the

6  movants have articulated that this will never inure to the

7  debtor's benefit, and they have raised a standing issue --

8  raised.  It wasn't really developed anywhere in where we are

9  now or where I expect I guess we'll get if I allow the

10  supplemental briefing.  But I -- having traveled this road this

11  far, I think it's important to get that clarity to see where

12  that road ends for this motion.  Whether I use it or not,

13  that's on me, and quite honestly, I couldn't give you an answer

14  even if I wanted to at this point in time.  And I want to have

15  the benefit of that to be able to articulate -- because, again,

16  as I've kind of alluded to, I am really leaning towards the

17  harassment aspect of the concerns of 2004 and Rule 45, which

18  branches off the undue hardship, as Mr. Fountain has argued.

19         If there is -- if it is abundantly clear beyond

20  purview at this point that there can never be an asset for the

21  estate given the structure of where the debtor was during this

22  timeframes -- these timeframes, that's one thing.  But as

23  Mr. Brust indicated, if there's a possibility, even if it may

24  never come to be a fruition, if there's a possibility, then I

25  think this is an appropriate exercise.  So I need that more

1    clarity.  I need the parties to go into it explaining it from

2    that vantage point of what the debtor could possibly have, you

3    know, under whatever may be discovered if it went their way in

4    light of what is being asked.

5           So yeah.  I don't think keep throwing more cases at

6    me.  The parties obviously have a better control and

7    understanding because you're involved with them throughout the

8    country.  It's really fruitful here, but I do think giving some

9    additional time for that to tie it back into could it ever be

10   something that results in a permissible exercise of the

11   Trustee's discretion at this point.  So I think I will take up

12   the offer for the supplemental briefing.

13          MR. CHRISTIAN:  I think that's a good thing, Judge.

14   We'd appreciate that.

15          THE COURT:  All right.  In light of that,

16   Mr. Fountain -- you know, quite honestly, Mr. Brody,

17   Mr. Christian, Mr. Brust, do we continue, or do we wait to get

18   that supplemental briefing and come back for a more targeted

19   discussion on the substance?

20          MR. CHRISTIAN:  I think the briefing, Your Honor,

21   first because I think that's going to give the accord to be

22   able to make a more educated and comprehensive decision as

23   opposed to slicing this pie up.  I think that answering those

24   questions is going to really aid the Court and, frankly,

25   everybody on the call to get the right decision.

```
 1              THE COURT:  Okay.

 2              MR. FOUNTAIN:  Your Honor --

 3              MR. BRODY:  Your Honor, I actually agree with

 4   Mr. Christian.  I -- because it's -- because this a threshold

 5   issue, I don't even think you get to the substance if they

 6   can't pass the muster under Rule 2004 of being a debtor's

 7   asset.

 8              MR. FOUNTAIN:  Your Honor, I -- on behalf of Citadel

 9   Securities, you know, we agree as well, and we're happy to

10   confer with Counsel for the Trustee as to a briefing schedule.

11   I think one additional item that might be helpful to have is

12   guidance from the Court as to -- you know, you've heard a lot

13   from us today about how we've asked, you know, why do you need

14   this information, what are you looking for, and if, you know,

15   that's work product.  You know, if it -- I think it would be

16   more productive in the context of, you know, what are these

17   issues, who do these claims belong to, could there ever

18   permissibly be a cause of action if the Trustee is -- will

19   share with us, you know, why it is they're looking for these

20   documents, what causes of action they think they're pursuing.

21   I've heard some of that today from Mr. Christian.  I think it

22   would be helpful for us to have that for the supplemental

23   briefing.

24              MR. CHRISTIAN:  And from our perspective, Judge,

25   that's too much of an ask.  How can I determine what the cause
```

1  of action are when I don't have the underlying documents to

2  support the causes of action?  So I mean (indiscernible) --

3         THE COURT:  Yeah.  And that's why I think really --

4  there's a fine line here, but it's all the -- this entire

5  argument really is in the fine line and drawing -- you know,

6  drawing that line as between what is the Trustee's generalized

7  exercise of Rule 2004 versus, you know, litigation preparation.

8  So I really would like to keep it in the generic, you know,

9  informed by the context of where the debtor was and then is now

10  in bankruptcy.  All right?  And, you know, taking your point,

11  Mr. Fountain, in that this is not the issuer.  There's a

12  fundamental disagreement of whether the debtor is the issuer

13  for the cause of action.  You know, that needs to get played

14  out a little bit in this discussion because that -- that's just

15  too fundamental to the causes of actions as I see it.

16         Now, you know, the specifics -- you know, I think

17  you've gotten quite a bit from Mr. Christian's discussion about

18  the routing.  We'll ultimately work back to the targets of the

19  discovery's involvement and potential exposure.  I mean, that's

20  abundantly clear from this.  So I think that's the predicate.

21  If those transactions might lead to a cause of action held by

22  the estate, that's all I need at this point.  So subject to

23  your undue hardship that this is going to create all of that,

24  which we can get into a little more detail at the next session,

25  but, you know, at that point, to the extent that there is any

78

```
 1  viable cause of action out there for the estate as the estate,
 2  then I think, you know, some preliminary use of pre-discovery,
 3  you know, availability, whether it is 2004 or 45, as Rule 45 is
 4  likely going to be warranted.
 5          MR. HARTMAN:  (Indiscernible) what does your calendar
 6  look like for December?
 7          THE COURT:  I think it's generally open, Mr. Hartman.
 8  It's just that at some point I shut down for the year.  So I
 9  think I'll go -- I think the last matter I have -- yeah.  We
10  are certainly open through the 19th and, you know, maybe
11  through the 22nd.  And then back on January 6th, I believe.
12          MR. DAHU:  Your Honor, not to drive the schedule off,
13  I personally have a trial beginning of December and then a
14  preliminary injunction hearing on December 18th, but I'm happy
15  to confer with Counsel for the Trustees about dates and come
16  back to the Court with a joint proposal if that would be
17  workable for the Court or however you'd like to proceed.
18          THE COURT:  Certainly.  Yeah.  The -- so I don't
19  really see anything dominating the calendar yet, Mr. Hartman.
20  So that's -- and January is fairly -- I have a couple things,
21  but nothing that suggests unavailability.
22          MR. HARTMAN:  I think we'll be able to reach an
23  agreement with co-counsel and Mr. Fountain.
24          THE COURT:  Yeah.  All right.  And I look forward to
25  that.
```

```
 1                MR. HARTMAN:  (Indiscernible) --

 2                THE COURT:  Do you -- do we want to leave it in your

 3    hands, or do we want to set a quick scheduling or status

 4    conference just to keep some thumb on the scale here?

 5                MR. HARTMAN:  It -- it's up to the Court, Your Honor.

 6    To keep control of your calendar, we can meet -- subject to

 7    Mr. Fountain's trial schedule, we can meet, you know, most any

 8    timeframe you set.

 9                THE COURT:  Yeah.  I -- I'd let the parties figure it

10    out, how and when and what order, if you want blind or if you

11    want staged.  So while I -- let's see.  What do we have?  The

12    30th.

13                MR. BRODY:  Your Honor, if I could make a suggestion.

14                THE COURT:  Sure.  Go ahead, Mr. Brody.

15                MR. BRODY:  I am confident that the parties can reach

16    an agreement on a briefing schedule and then work with your

17    chambers on a hearing date, but if for some reason the parties

18    believe that somebody's dragging their feet, which I don't

19    believe anybody will, I think we could always come back to Your

20    Honor to force a --

21                THE COURT:  Yeah.

22                MR. BRODY:  -- a status conference or whatever Your

23    Honor needs -- or wants.

24                THE COURT:  And it's not -- I'm not even concerned

25    about dragging the feet.  Just sometimes, it's helpful to have
```

 1  a date, and sometimes, it's just better to get back in front of

 2  the Court.  But to your point, you can always -- if both

 3  parties ask, I can set a status and scheduling, you know,

 4  within a day or so.  So just let me know if that would be

 5  helpful if you can't figure it out between yourselves.  So --

 6              MR. BRODY:  (Indiscernible) --

 7              THE COURT:  -- we'll leave it to the parties.

 8              MR. BRODY:  Thank you.

 9              MR. FOUNTAIN:  Thank you, Your Honor.

10              THE COURT:  All right.  Well, thank you for a very

11  interesting morning here.  I am getting a note from my law

12  clerk.  Mr. Hartman, Mr. Brust, you're aware that currently

13  there are no hearing on Fridays.

14              MR. HARTMAN:  That is correct.

15              THE COURT:  So who knows how long that will happen,

16  you know.  Some of the parties that appear for me, I do

17  generally set hearings on Fridays fairly frequently, but --

18  again, I don't see anything dominating the Court's calendar in

19  the upcoming weeks that should be a problem.  So we should be

20  able to find you something very easily.

21              MR. HARTMAN:  Thank you.

22              MR. CHRISTIAN:  All right.  Thank you, Your Honor.

23              MR. HARTMAN:  (Indiscernible) --

24              MR. BRUST:  Thank you.

25              MR. BRODY:  Thank you, Your Honor.

1          THE COURT:  Thank you very much.  Unless there's

2    anything else, that will conclude the hearing for today, and

3    we'll be adjourned until the 1:30 calendar.

4          MR. FOUNTAIN:  Thank you.

5          MR. CHRISTIAN:  Thank you, Your Honor.

6          THE COURT:  Off record.

7          THE CLERK:  Thank you.  Off record.

8       (Proceedings concluded at 12:44 p.m.)

9                         *  *  *  *  *

10

11

12

13

14                   **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: November 3, 2025

25   ACCESS TRANSCRIPTS, LLC